```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5        Plaintiff,                  )  No. 20-CR-3445-LAB
                                      )
 6            v.                      )  August 4, 2021
                                      )
 7   MANUEL VASQUEZ-PEREZ,            )  4:19 p.m.
                                      )
 8        Defendant.                  )  San Diego, California
     _____ )
 9

10      TRANSCRIPT OF JURY TRIAL DAY 1 -- LAURIE TORRES TESTIMONY
                  BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  VIVIAN SAPTHAVEE, ESQ.
14                                MICHAEL DESHONG, ESQ.
                             880 Front Street
15                           San Diego, California  92101

16   For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
                             By:  LAUREN J. CLARK, ESQ.
17                                BRITTANY SHERRON, ESQ.
                             225 Broadway
18                           San Diego, California  92101

19   Court Interpreter:      DANIEL NOVOA

20   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
21                           333 West Broadway, Suite 420
                             San Diego, California, 92101
22                           cynthia_ott@casd.uscourts.gov

23

24

25   Reported by Stenotype, Transcribed by Computer
```

1                          I N D E X

2    EXAMINATIONS                                        PAGE

3    LAURIE TORRES.......................................
     DIRECT EXAMINATION BY MS. SAPTHAVEE.................   3
4    CROSS EXAMINATION BY MS. CLARK.....................  14
     REDIRECT EXAMINATION BY MS. SAPTHAVEE..............  26

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SAN DIEGO, CALIFORNIA, AUGUST 4, 2021, 4:19 P.M.
 2                              * * * *
 3              MS. SAPTHAVEE:  The United States calls Laurie Torres.
 4               LAURIE TORRES, GOVERNMENT'S WITNESS, SWORN
 5              THE COURT:  Have a seat.  Speak into the mike.  State
 6      your full name and spell it, please.
 7              THE WITNESS:  Yes.
 8              It's Laurie Torres, L-A-U-R-I-E, T-O-R-R-E-S.
 9                           DIRECT EXAMINATION
10      BY MS. SAPTHAVEE:
11      Q.  Ms. Torres, what do you do for a living?
12      A.  I am the senior latent print examiner for the city of Chula
13      Vista police department crime laboratory.
14      Q.  And how long have you been a print examiner?
15      A.  I have been in this field for over 30 years.
16      Q.  Over the course of those years, I take it you've received
17      special training in fingerprint analysis and comparison?
18      A.  Yes.
19      Q.  And how many total hours of training do you think you've
20      received in fingerprint analysis and comparison?
21      A.  Oh boy, it's probably under 2000 hours, you know, somewhere
22      between 1500, 2000 hours.
23      Q.  And can you estimate the number of fingerprints that you've
24      examined in your career?
25      A.  That would be -- because I don't keep track of these
```

1    things, that would be in the hundreds of thousands, could be in

2    the low millions.

3    Q.   Now you've testified as an expert in fingerprint

4    examination before, correct?

5    A.   Correct.

6    Q.   About how many times have you done that?

7    A.   About, probably 140, 150 times.

8    Q.   And as a fingerprint examiner have you seen fingerprints

9    used to identify someone in a criminal case?

10   A.   Yes.

11   Q.   Now, can you tell us briefly what is it about fingerprints

12   that make them useful for identifying someone?

13   A.   Well, fingerprints is a definitive way of identifying

14   somebody.

15       Everybody's fingerprints are different.  Even identical

16   twins have different fingerprints.  They do have -- carry the

17   same DNA, but their fingerprints are different.

18       So no two people have the same fingerprints and they're

19   permanent.  They develop in the womb and what makes everybody's

20   fingerprints so unique is while they're developing in the womb,

21   they form, the lines on your fingers, the raised portions are

22   affected by the mother's environment and what she eats, if she

23   bumps her stomach into something.

24       And you can't duplicate that so -- and that -- that is

25   basically how your fingerprints form all these unique shapes is

```
1   due to the environment at the time they are forming.

2       And they're permanent so what you were born with unless you

3   scar them up or try to obliterate them remain from before

4   you're born until after you die.

5   Q.  Thank you for that.  Now let's talk about how you compare

6   fingerprints, what method do you use when you compare

7   fingerprints?

8   A.  I use -- it's an acronym that is called ACE, and it stands

9   for analysis, comparison and evaluation.

10  Q.  All right.  So what does the analysis portion of ACE

11  entail?

12  A.  The analysis portion is when you're first observing the

13  fingerprints and looking to see if there's enough information

14  there, enough ridge characteristics for you to compare and

15  hopefully identify or exclude somebody, so that's the analysis,

16  it's just looking over the fingerprint in front of you seeing

17  if it's got enough information.

18  Q.  How about the comparison part or the C in the ACE analysis?

19  A.  Yes, so comparison is when you're looking at the minute

20  detail, those ridge characteristics, the patterns that they

21  form in your fingerprints, you're comparing those unique

22  characteristics to the other fingerprints that you're hoping to

23  identify it to.

24      So you're comparing looking for the same types of unique

25  characteristics and do they reproduce in the other fingerprint
```

1  that you're comparing it to.

2  Q.   And finally, what about evaluation or the E part?

3  A.   The evaluation is when I form my opinion.  So I take the

4  information that I have in front of me.  After I've looked at

5  the details, then I make -- my opinion is either an

6  identification or did I exclude the person from making that

7  print and then sometimes it can be inconclusive, if there is

8  not enough clarity or not enough information for me to say yes

9  or no.

10  Q.   Now is ACE the process you described to us a common method

11  used by fingerprint examiners?

12  A.   Yes.

13  Q.   All right.  Let's turn to the work -- your work on this

14  case.  What were you asked to do here?

15  A.   I was asked to view deportation documents that were in an

16  A-file at the U.S. Attorneys office.

17  Q.   Please direct your attention to Exhibit 19 or what's been

18  admitted as Exhibit 19.  And specifically let's look at the

19  second page.

20  A.   Okay.

21  Q.   Do you recognize this document?

22  A.   Yes, I do.

23  Q.   And is this the fingerprint card taken on October 20th,

24  2020?

25  A.   That's correct.

1    Q.   Now can you describe what those handwritten notations are

2    on the right side of the page where that blank is?

3    A.   That would be -- my documentation, the K1, is an exhibit

4    number that I use for my reporting purposes, then my initials

5    and the date that I viewed that document.

6    Q.   So you label it as K1 so you can reference it later?

7    A.   In the report, yes.

8    Q.   Now please direct your attention to what's been admitted as

9    Exhibit 16A and we're going to look at page two.

10   A.   Okay.

11   Q.   Do you recognize this document?

12   A.   Yes, I do.

13   Q.   Is this the April 10th, 1997 warrant of deportation?

14   A.   Yes, it is.  It doesn't show my documentation on there but

15   it is here on this copy, yes.

16        MS. SAPTHAVEE:  Oh, it looks like it's not being shown

17   to the jury.  There we go, okay.

18   BY MS. SAPTHAVEE:

19   Q.   Now, does this document have a fingerprint you analyzed?

20   A.   Yes.

21   Q.   Which one?

22   A.   Which fingerprint?

23   Q.   Yes.  I apologize.  Which fingerprint does it have?

24   A.   That would be the right index finger.

25   Q.   Okay.  And I know we don't see it here but do you happen to

1    recall what you labeled this one as?

2    A.   Yes, that was labeled as K5.

3    Q.   Okay.  Now did you compare the fingerprint in this exhibit

4    against the corresponding fingerprint in that card that we just

5    looked at?

6    A.   I did.

7    Q.   And what did you find?

8    A.   That the two fingerprints were made by the same individual,

9    Mr. Vasquez-Perez.

10   Q.   Turning to what's been marked as Exhibit 21 if we could.

11   A.   Yes.

12   Q.   And do you recognize this?

13   A.   It's still on the same.

14   Q.   Oh, you know what, you might have to look at the binder in

15   front of you.

16   A.   Yes, I've got the binder.

17        THE COURT:  Tish, apparently they're trying to switch

18   it up and it's not coming across.

19        MS. SAPTHAVEE:  She's going to authenticate it I think

20   and we'll use it as a demonstrative.

21   Q.   So what is it that you're looking at?

22   A.   It is a document that I prepared that has the two images on

23   it side by side to show the two prints that I compared.

24   Q.   And does Exhibit 21 contain true and accurate copies of the

25   fingerprints that you reviewed?

1   A.   Yes.

2   Q.   Now did you create Exhibit 21 to assist with your

3   testimony?

4   A.   Yes, I did.

5   Q.   At this time we move to publish Exhibit 21 for the jury

6   just as a demonstrative.

7            THE COURT:   Any objection to that?

8            MS. CLARK:   No, Your Honor.

9            THE COURT:   All right.   Ladies and gentlemen, 21 may

10   be shown to you.   This is an illustration of the fingerprints

11   compared by Ms. Torres and she's going to offer an explanation

12   of her opinion.   Go ahead.

13   BY MS. SAPTHAVEE:

14   Q.   So what's pictured on the left side of Exhibit 21?

15   A.   The left side would be the known fingerprint recording on

16   the fingerprint card dated October of 2020.   I used that as the

17   standard to compare the prints from the documents.

18   Q.   And what's pictured on the right side of Exhibit 21?

19   A.   That would be one of the fingerprints from a deportation

20   document.

21   Q.   And can you explain for the jury some distinct points of

22   comparison you found in each of these fingerprints.

23   A.   Yes.   So the first thing that I look at and they're not to

24   scale obviously, the one on the left is bigger than the one on

25   the right, but what I look for first is the overall fingerprint

1   patterns, the clarity, do I have enough there to compare with

2   each other.

3       This is what we call a loop pattern which kind of if you

4   look at what we call the core, and I don't -- does

5   this -- those make little dots, okay.

6       This right here is the core area of the fingerprint and

7   makes kind of a paper clip formation and this is what we call a

8   loop and so the print on the right, K5, is also the same, you

9   can see has the same pattern type.

10      So then I go further and I will look at the individual

11  ridge characteristics that make everybody's fingerprints

12  different to see if I can find them duplicating in the -- in

13  each of the prints.

14      So I start with, of course, the one on the left which is my

15  standard and I will pull out ridge characteristics that I see,

16  so this one here that I'm marking, you have a single ridge

17  that's flowing and then comes to this area right here where it

18  now divides or forks into two ridges.  And that is what we call

19  a bifurcation.

20      If you come down you can also see it bifurcates again.  So

21  we look for these types of characteristics.  Here I have a

22  bifurcation.  Here's another bifurcation.  And I continue on,

23  bifurcation, bifurcation.  And I continue on to see if they are

24  corresponding with the standard and when I find that I've found

25  a sufficient amount that I feel comfortable is when I will call

1    the identification.

2        But these red marks are -- these little red dots are

3    marking the ridge characteristics that I used in order to come

4    up with my conclusion.

5    Q.   Now, were the fingerprints you examined clear enough for

6    you to form a conclusion with a reasonable degree of certainty?

7    A.   Yes.

8    Q.   And could you tell us what your conclusion was?

9    A.   That they were both made by the same individual, it's the

10   right index finger of Mr. Vasquez-Perez.

11   Q.   Now could you direct your attention to Exhibit 18A, please.

12   And that should be appearing soon.

13       Now do you recognize this document?

14   A.   This is 18.  Yes.

15   Q.   And, I'm sorry, 18A is a color version of 18.

16   A.   Yes.

17   Q.   Now is this the October 20th, 2020 warrant of deportation?

18   A.   Yes.

19   Q.   Now let's take a look at page two if we could.  Now does

20   this document have a fingerprint you analyzed?

21   A.   Yes, it does.

22   Q.   And how do you know?

23   A.   It doesn't show in the screen, but my copy has my

24   documentation, my exhibit number K2, my initials and the date

25   that I viewed the document.

```
 1   Q.  Did you compare the fingerprint in this exhibit against the
 2   corresponding one in the fingerprint card we discussed earlier?
 3   A.  Yes.
 4   Q.  Turning to what's been marked as Exhibit 22, that should
 5   appear --
 6   A.  Yes.
 7   Q.  -- or be in, I'm sorry, the binder in front of you, I
 8   apologize.
 9       Do you recognize this document?
10   A.  Yes.
11   Q.  And what is it?
12   A.  It's, again, it's a document that I created with the two
13   fingerprints that I compared putting them side by side and
14   marking the corresponding ridge characteristics.
15   Q.  Does Exhibit 22 contain a true and accurate -- or contain
16   true and accurate copies of the fingerprints that you reviewed?
17   A.  Yes.
18   Q.  Did you create Exhibit 22 to assist with your testimony?
19   A.  Yes.
20   Q.  At this time the government moves to publish Exhibit 22 for
21   the jury as a demonstrative.
22           MS. CLARK:  No objection, Your Honor.
23           THE COURT:  All right.  Again, this is another
24   corresponding set of photos, it will help Ms. Torres explain
25   her opinion.
```

 1   BY MS. SAPTHAVEE:

 2   Q.   What's pictured on the left side of Exhibit 22?

 3   A.   Left side is the right index finger that I used from the

 4   standard fingerprint card from October of 2020.

 5   Q.   And what's pictured on the right side?

 6   A.   That is a fingerprint that was -- that I viewed on a

 7   document in the A-file.

 8   Q.   Now you explained in the other comparison that you found

 9   some distinct points of comparison, did you find the same or

10   similar ones in this comparison as well?

11   A.   Yes.

12   Q.   And were the fingerprints you examined here clear enough

13   for you to form an opinion with a reasonable degree of

14   certainty?

15   A.   Yes.

16   Q.   And what was that opinion?

17   A.   That the two fingerprints were made by the same individual,

18   Mr. Vasquez-Perez, right index finger.

19   Q.   Now I want to talk to you briefly in conclusion about your

20   analysis of Mr. Vasquez-Perez's A-file documents.  Were you

21   asked to compare the fingerprint card that we talked about

22   earlier at Exhibit 19 to five other fingerprints previously

23   taken from Mr. Vasquez-Perez?

24   A.   Yes.

25   Q.   And were all those fingerprints from the Department of

1   Homeland Security documents in the A-file?

2   A.   Yes.

3   Q.   How many of those five fingerprints were of sufficient

4   quality for you to make a determination?

5   A.   All, they all were.

6   Q.   And for those five prints in the A-file that were of good

7   enough quality, how many of them did you conclude belonged to

8   the defendant?

9   A.   I concluded that all of them belonged to the defendant.

10   Q.   And, finally, with what degree of confidence did you reach

11   your conclusions?

12   A.   Absolute confidence.

13         MS. SAPTHAVEE:  No further questions, Your Honor.

14         THE COURT:  All right.  Cross examination.

15         MS. CLARK:  Yes, Your Honor.

16                    CROSS EXAMINATION

17   BY MS. CLARK:

18   Q.   Hi, Ms. Torres.  How are you?

19   A.   Hi, good.  Thank you.

20   Q.   I want to talk just -- follow up on some of the answers

21   that you gave about the science of fingerprint comparisons.

22   A.   Okay.

23   Q.   You start from the premise that everyone has different

24   characteristics or points on their fingers?

25   A.   Everybody's fingerprints are -- will share ridge

1    characteristics, but it's the random distribution.

2        So you will have bifurcations, what we call ending ridges,

3    dots possibly in your fingerprints, but it's the random

4    distribution of those within your fingerprints that make

5    everybody's unique.

6    Q.   And so you start with that premise that everyone has their

7    own characteristics and points in their own fingerprints?

8    A.   It's the -- yes, it's the distribution of those ridge

9    characteristics that make everybody's fingerprints unique.

10   Q.   Or different?

11   A.   Or different, yes.

12   Q.   And as you previewed, there are names for those

13   characteristics?

14   A.   Yes.

15   Q.   Such as ridge?

16   A.   Right.

17   Q.   Or bifurcation?

18   A.   Yes.

19   Q.   Those are scientific terms that normal folks might not

20   know?

21   A.   True.

22   Q.   And how many points or characteristics does the average

23   fingerprint have?

24   A.   The average fingerprint has approximately 125 ridge

25   characteristics.

```
 1   Q.   What is your source for that number?

 2   A.   Oh my gosh, you're taking me way back.

 3   Q.   I didn't mean this to be an exam, I'm sorry.

 4   A.   If I remember right, it's by Scott, and the title escapes

 5   me at the moment.  But I know it's also another -- it's also in

 6   other publications.

 7        I believe it's also in Qualitative-Quantitative by

 8   Ashbaugh, but I mean this is something I learned, you know, way

 9   back in school.

10   Q.   I understand.  Again, I didn't mean to trip you up with

11   that.

12   A.   Okay.

13   Q.   When you're looking at the 125 or so points of possible

14   comparison, you put one fingerprint under the microscope?

15   A.   I look at them on a computer actually.

16   Q.   Oh, okay.

17   A.   Yes.

18   Q.   So I guess the microscope would have been predigitized

19   fingerprints?

20   A.   Yes, I do have a microscope at my desk at work, not at

21   home, but we, yeah, we've upgraded to computers.

22   Q.   So you put both prints on the computer?

23   A.   Yes.

24   Q.   And you just look at them?

25   A.   Yes.
```

```
 1   Q.   You don't have the computer run the analysis?
 2   A.   No.
 3   Q.   This is your eye looking at them?
 4   A.   Yes.
 5   Q.   And you're trained?
 6   A.   Yes.
 7   Q.   You have certifications?
 8   A.   Yes.
 9   Q.   You've gone to school for this?
10   A.   Yes.
11   Q.   But it is the human eye?
12   A.   It is.
13   Q.   If you saw one difference between the first and the second
14   fingerprints, then that would mean that you disqualified a
15   match?
16   A.   It would depend.  It would depend on what that difference
17   is.  If I've got a difference that's clear in one print and
18   I've got a clear print to compare it to and it's not there and
19   I can't explain why, then that's more than likely going to
20   negate my identification, yes.
21   Q.   And that's called an exclusion?
22   A.   Yes, an exclusion is when -- is just as important as an
23   identification.
24        If you're excluding somebody, you need to be just as sure
25   as if you are identifying them that it's not that person.
```

1    Q.  And so if there were one real difference then that would

2    exclude?

3    A.  Very possibly.

4    Q.  But there are differences that you determined aren't

5    significant enough to exclude?

6    A.  Right.  You can get artifacts, certain distortions from

7    pressure and too much ink, I mean -- or too much sweat.

8         You know, there's certain things that can cause unclarity

9    or issues in one fingerprint that's not prevalent in the other,

10   but there's reasons and we know -- we can explain usually why

11   it looks different, but yet it's still an identification.

12   Q.  So if you saw a difference that wasn't a clear difference,

13   you wouldn't necessarily exclude someone?

14   A.  No, I wouldn't, unless I had enough clear clarity in both

15   prints to see that they're obviously two different prints.

16   Q.  And, again, that's your determination?

17   A.  Yes.

18   Q.  From your eyes looking at it?

19   A.  Yes.

20   Q.  And there's, again, no computer that makes the

21   determination about the clarity of the distinction?

22   A.  No.  And to be clear, the tools that you're thinking of

23   that plot the points and do searches for you are -- is just a

24   tool.

25        It's still up to us, the examiner, with our own training

```
 1   and experience and our eyes to make that final determination,

 2   the computers just help us.

 3   Q.  You're the --

 4   A.  Yes.

 5   Q.  The word?

 6   A.  The final, yeah.

 7   Q.  So when we're talking about what you did in this case, you

 8   took a fingerprint card that contains the name Mario

 9   Vasquez-Perez -- I'm sorry, Manuel Vasquez-Perez, is that

10   right?

11   A.  Yes.

12   Q.  You didn't take those prints?

13   A.  No.

14   Q.  The prosecutor gave you the card?

15   A.  They were in the A-file, yes.

16   Q.  And then the prosecutor showed you the other documents to

17   compare them to?

18   A.  Yes.

19   Q.  And were they all original fingerprints?

20   A.  They were not -- I don't believe they were original -- I

21   can't say that for sure.  Some of them can be copies, some of

22   them can be originals.

23   Q.  So you're not sure if they were all original, all

24   photocopies or some combination?

25   A.  I couldn't -- no, couldn't tell you.
```

```
 1    Q.   But all the documents had the name Vasquez-Perez on them?
 2    A.   Yes.
 3    Q.   And you know Mr. Vasquez-Perez is charged with a crime?
 4    A.   I would assume.
 5    Q.   Well, the prosecutors hired you?
 6    A.   Yes.  Yes.  I would assume so, yes.
 7    Q.   And they believed the documents belonged to
 8    Mr. Vasquez-Perez?
 9    A.   Okay.
10    Q.   I want to talk about some of the organizations and I know
11    you're a member of at least one of them, I want to talk first
12    about the International Association For Identification?
13    A.   Yes.
14    Q.   IAI?
15    A.   Yes.
16    Q.   You're certified with IAI?
17    A.   Yes, I am.
18    Q.   And that's a professional certification for people who work
19    in forensic identification?
20    A.   Yes.
21    Q.   Forensic identification includes fingerprints?
22    A.   It does.
23    Q.   And, again, you are IAI certified?
24    A.   I am.
25    Q.   And one of the certifications that they offer is 10 print
```

1   fingerprint certifications?

2   A.   Yes, they do.

3   Q.   And you've taken that course?

4   A.   I'm not certified as a -- that's geared more for records,

5   people that look at known prints, you know, as their daily job

6   and that's geared towards them, because I work -- at Chula

7   Vista, I work with crime scene prints, latent prints and so I'm

8   certified as a latent print examiner.

9   Q.   But the prints here weren't latent prints?

10  A.   No, these were not.

11  Q.   These were 10 prints?

12  A.   They're called known prints.

13  Q.   So you have not taken the 10 print certification class?

14  A.   No, no.  10 prints are -- usually because they're

15  intentionally recorded they usually have much more information

16  on them than you would have as a crime scene chance print.

17  Q.   And, again, the prints on this case were on a 10 print

18  card?

19  A.   Yes.

20  Q.   And the IAI does offer certification and recertification

21  every five years?

22  A.   Yes.

23  Q.   And you have kept up with that certification?

24  A.   Yes.

25  Q.   You've taken the continuing education classes?

1   A.   Yes.

2   Q.   And you are up to date on your certifications?

3   A.   Yes, I am.

4   Q.   And you've heard of the Scientific Working Group on

5   Friction Ridge Analysis Study and Technology?

6   A.   Are you talking about SWGFAST?

7   Q.   The acronym is SWGFAST which is much easier to say.

8   A.   Yes.

9   Q.   SWGFAST sets standards for fingerprint identification?

10  A.   They did, yes.  They don't exist any longer but they did.

11  Q.   Right.  And SWGFAST published guidance calling for the

12  ACE-V method in 10 print operations or identifications?

13  A.   ACE-V is actually geared towards latent print examiners,

14  and it's -- it's up to the individual agencies if they want to

15  use the verification phase with 10 print documents.

16  Q.   Okay.  But you're aware that SWGFAST did recommend the

17  ACE-V method for 10 print cards?

18  A.   I think that's kind of a gray area.  It -- it is -- well,

19  it is a recommendation, yes, it is not something that is

20  expected as a latent print examiner made an identification,

21  those are pretty much the standard that you do verify those

22  prints, but not 10 prints necessarily.

23  Q.   So just to make sure I got this right, it is recommended

24  but it is not -- it's not a requirement?

25  A.   Yes, thank you.

```
1    Q.  All right.  So I want to talk about the methodology that

2    you did use in this case.

3         Your direct testimony and also your report talks about the

4    ACE method?

5    A.  Yes.

6    Q.  And that was analyze, compare, evaluate?

7    A.  Yes.

8    Q.  All right.  And you are aware of the ACE-V method?

9    A.  Absolutely.

10   Q.  And your resume has indicated you have attended several

11   trainings on the ACE-V method?

12   A.  Oh, yes.

13   Q.  For example in 2012 you attended a course on Advanced ACE-V

14   Application For Fingerprint Examiners?

15   A.  Yes.

16   Q.  In 2013, a course on Statistics, Ridgeology, and ACE-V?

17   A.  Yes.

18   Q.  Ridgeology is kind of a difficult word to say, sorry about

19   that.

20        In 2015 you attended a course on the scientific

21   analyst -- Analysis of ACE-V From the Laboratory to the Witness

22   Stand?

23   A.  Yes.

24   Q.  Again, in 2019, just a couple years ago you attended a

25   course on Incorporating Technology Into the ACE-V Process?
```

```
1    A.   Yes.

2    Q.   And ACE-V is an acronym?

3    A.   Yes.

4    Q.   We've talked about the ACE?

5    A.   Yes.

6    Q.   The V stands for verification?

7    A.   Yes.

8    Q.   And the last step, therefore, would be to have your

9    determination or your opinion verified by another technician?

10   A.   Yes, that's what it would be.

11   Q.   Another fingerprint expert would check your work?

12   A.   Yes.

13   Q.   To make sure they agree with your analysis?

14   A.   Yes.

15   Q.   Your findings?

16   A.   Yes.

17   Q.   And your opinions?

18   A.   Yes.

19   Q.   And ACE-V was developed to make fingerprint science more

20   objective?

21   A.   Yes.

22   Q.   You talked about your job and I know you're at Chula Vista

23   and you've been there about 16 years?

24   A.   This is my 16th year, yes.

25   Q.   Okay.  You're the senior latent print examiner?
```

```
1   A.   Yes.

2   Q.   And there one aspect of your job is to analyze, compare,

3   evaluate and verify latent print evidence?

4   A.   Yes.

5   Q.   And before this you worked for the San Diego Police

6   Department?

7   A.   I did.

8   Q.   You were there for 11 years?

9   A.   Yes.

10  Q.   One of your responsibilities was to evaluate and

11  participate in mock trial for other 10 print examiners?

12  A.   Yes.

13  Q.   And the 10 print was what was used in this case?

14  A.   Yes.

15  Q.   You had helped prepare other people to testify?

16  A.   I did, yes.

17  Q.   And you also analyzed, compared, evaluated and verified

18  latent print evidence?

19  A.   I did.

20  Q.   In this case the government did not ask you to compare

21  fingerprints to any documents from the Mexican government?

22  A.   Of that I don't know that I would -- I don't believe so,

23  no.

24  Q.   You didn't, for example, have a birth certificate?

25  A.   Oh, no.
```

```
1    Q.   And no other technician verified your results in this case?

2    A.   No.

3              MS. CLARK:   I don't have any other questions.

4              MS. SAPTHAVEE:   May I just ask one question, Your

5    Honor?

6              THE COURT:   Sure.

7                        REDIRECT EXAMINATION

8    BY MS. SAPTHAVEE:

9    Q.   Are there things about comparing latent prints that are

10   more difficult than comparing known prints?

11   A.   Yes.

12   Q.   Could you explain briefly?

13   A.   Well, latent prints are what we recover from crime scenes

14   or evidence.   Latent means hidden, so usually the fingerprints

15   that we find are not readily visible, we have to use powders or

16   chemicals to render them visible so we can collect them and

17   then analyze and compare them.

18        But they are also called chance prints because, you know,

19   people touch things randomly, you don't sit there and so I'm

20   going to touch this table, I'm going to roll my prints across

21   it or I'm going to make it a nice clear print, no.   You might

22   press your fingers down and slide them across or, you know, you

23   don't think about how you touch or pick up things.

24        And so they're chance impressions.   And you don't always

25   find latent prints on evidence, it's about 20 percent of the
```

1   time.  And they're usually fragmented or distorted because of

2   pressure, too much perspiration or they have very dry skin, so

3   they don't reproduce well on an object, because your latents

4   are being left behind by your perspiration that comes out of

5   your fingers.

6       So usually what you get are, like I said, fragmented

7   partials, pieces, and you don't have a ground truth.  You don't

8   know who touched that item.  You don't -- you know, it's only

9   through investigation or through search engines that we are

10  able to find somebody to compare those fragmented prints to.

11      Because you don't have demographics to that -- to that

12  latent print that you found, you don't know if it's a partial

13  palm, you don't know where on the finger, it could be down here

14  in the lower joints, so you need to have a clear set of knowns

15  to compare that to and those are the type of prints that you

16  want verified.

17      You want somebody to -- that is competent, that is, you

18  know, a qualified latent print examiner to say, yes, that tip

19  or that side of a finger or that piece right here on the side

20  of your palm is identify -- yes, I agree it's identified to

21  this person or I agree that you were able to exclude this.

22  It's not him.

23      Those chance impressions are the ones you want to have

24  verified.  It's not -- it's not required with known prints

25  because those are being recorded in a contained environment,

1    controlled, having somebody that has -- not expertise but, you

2    know, somebody that knows how to record fingerprints on to

3    documents.

4        Because you have so much information usually with these

5    type of known prints they don't -- they don't require

6    verifications on those because you have so much information and

7    you have demographics that go along with it.  You have a name

8    and dates and that kind of information.

9              MS. SAPTHAVEE:  Thank you, Ms. Torres.

10             No further questions from the government.

11      (The excerpt concluded at 4:51 p.m., August 4, 2021.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3      I, CYNTHIA R. OTT, Official Court Reporter, United States

 4  District Court, Southern District of California, do hereby

 5  certify that pursuant to 28 U.S.C. §753 the foregoing is a

 6  true, complete and correct partial transcript of the

 7  stenographically reported proceedings had in connection with

 8  the above-entitled matter and that the transcript page format

 9  is in conformance with the regulations of the Judicial

10  Conference of the United States.

11

12      DATED at San Diego, California, August 6, 2021.

13

14                           _____/s/ CYNTHIA R. OTT_____
                             CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25
```