1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,            )
                                          )
5          Plaintiff,                     ) No. 20-CR-3445-LAB
                                          )
6            v.                           ) August 5, 2021
                                          )
7    MANUEL VASQUEZ-PEREZ,                ) 9:17 p.m.
                                          )
8          Defendant.                     ) San Diego, California
     _____   )
9

10              TRANSCRIPT OF CLOSING ARGUMENTS - EXCERPT
                 BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                              By:  MICHAEL DESHONG, ESQ.
14                                 VIVIAN SAPTHAVEE, ESQ.
                              880 Front Street
15                            San Diego, California  92101

16   For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
                              By:  LAUREN J. CLARK, ESQ.
17                                 BRITTANY SHERRON, ESQ.
                              225 Broadway
18                            San Diego, California  92101

19   Court Interpreter:       DAN DECOURSEY; EDITH MONROY

20   Court Reporter:          CYNTHIA R. OTT, RDR, CRR
                              District Court Clerk's Office
21                            333 West Broadway, Suite 420
                              San Diego, California, 92101
22                            cynthia_ott@casd.uscourts.gov

23

24

25   Reported by Stenotype, Transcribed by Computer

1                           I N D E X

2   EXAMINATIONS                                          PAGE

3   CLOSING ARGUMENT BY COUNSEL FOR THE GOVERNMENT
    MS. SAPTHAVEE.......................................   3
4   CLOSING ARGUMENT BY COUNSEL FOR THE DEFENDANT
    MS. SHERRON........................................    9
5   REBUTTAL CLOSING ARGUMENT BY COUNSEL FOR THE
    GOVERNMENT -- MR. DESHONG..........................  17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           SAN DIEGO, CALIFORNIA, AUGUST 5, 2021, 9:17 A.M.

2                                * * * *

3           (Beginning of Excerpt.)

4           CLOSING ARGUMENT BY COUNSEL FOR THE GOVERNMENT

5           MS. SAPTHAVEE:  When Mr. Vasquez chose to sneak into

6    the country and travel five miles through mountainous terrain,

7    he knew he wasn't supposed to be out there.  After all, he had

8    just been deported eight days before that, and that wasn't the

9    first time he was deported either.

10          But he decided to come back into the country, where he

11   had no legal right to be.  And that's why, when agents were

12   closing in on him, he ducked into a bush and he hid.

13          Let's take a look at the video.  Now, that grainy

14   figure you see coming down that hill on the side, that's the

15   defendant.  And right there, he hides.

16          Now, when agents finally found him out there after a

17   long search, he admitted right away that he was a Mexican

18   citizen with no documentation allowing him to be there, and

19   that he knew he was here illegally.

20          And of course he admitted that, because he had already

21   admitted as much just eight years ago in July 2012.  And that

22   time, he did it under oath.  That's why we're here today.

23          Now, yesterday, you heard a lot of testimony.  And you

24   saw all kinds of evidence.  And this morning, we're going to

25   walk through how all of that evidence proves beyond a

1    reasonable doubt that the defendant is guilty as charged.

2          Now, you heard Judge Burns talk about the elements or

3    the ingredients that make up the offense.  Here's a list that

4    summarizes those ingredients.  First, that the defendant has

5    been removed or deported before.  Second, that he voluntarily

6    came back into the United States.  Third, he knew he was in the

7    United States and wanted to stay.  Fourth, he was found without

8    permission to come back.  Fifth, he was an alien, or in other

9    words, not a U.S. citizen when he entered the United States.

10   And finally, he was free from official restraint.  Now, I know

11   that looks complicated, but we'll walk through all the

12   evidence.  And I'll show you how the evidence proves each and

13   every one of those items.

14         And we'll even group some of those together to

15   streamline the process a little bit.  So first, the evidence

16   shows that the defendant is a removed alien, and he didn't have

17   permission to come back.  The immigration documents prove it.

18   This document shows that on October 12th, 2020, he was deported

19   just eight days before he showed up again this time.  And as

20   Judge Burns says, the fact that he was deported doesn't in

21   itself prove that he's an alien, but it sure indicates that he

22   was, because he wouldn't have been deported otherwise.

23         Now, Officer Pena testified that he watched the

24   defendant with his own eyes walk across a bridge from

25   Brownsville, Texas back into Mexico.  Ms. Torres' testimony

1   showed that that fingerprint belongs to the defendant.

2           Now, we're going to ask you to make a special finding

3   as well, that the defendant was deported sometime after

4   November 1st, 2016.  And that last document proves that,

5   because October 2020 comes after November 2016.

6           But that wasn't the only time he was deported.  This

7   document shows that way back in 1997, an immigration judge

8   ordered the defendant deported after a hearing in Arizona.

9   This is the top half of a document that shows that he was, in

10  fact, deported on April 10th, 1997.  And as you can see from

11  the bottom left part of that document, someone watched him

12  leave.

13          This is the bottom half of that document.  You can see

14  the defendant's photograph as a younger man over 20 years ago.

15  And again, that fingerprint, according to the expert testimony,

16  belongs to the defendant.  So those documents prove that the

17  defendant is a deported alien without permission to be here, at

18  least at that time.

19          And you don't have to rely just on the documents.  You

20  can look at the defendant's own admissions.  You heard

21  yesterday that the parties had stipulated, which means that

22  they agree that the defendant, under the penalty of perjury,

23  admitted in July 2012 that he was a Mexican citizen, that he'd

24  been deported or removed before, and that as of May 2012, he

25  had no permission to be here.

1           On top of that, after the defendant was arrested, he

2    admitted to Agent Sells that he was a Mexican citizen, that he

3    had no documentation to be here, and that he knew he was in the

4    U.S. illegally.

5           And finally, you heard from Agent Alexandre that just

6    yesterday, he searched databases looking for any indication

7    that this defendant had permission to be here.  He didn't find

8    any.  He looked in the A-file, and he didn't find any.  He

9    looked in the CLAIMS database.  And he looked in the CIS

10   database.  There was no consent allowing the defendant to be in

11   the country.

12          Now, the documents, the admissions, and the databases

13   show, and they prove that the defendant was a deported alien

14   without permission to come into the country.

15          So next, we'll look at the evidence that proves he

16   chose to come back into the country, and he wanted to stay.

17   Let's start with his actions.  He chose to come out to a remote

18   area in the middle of nowhere, nine miles from a port of entry.

19   No one forced him to do that.

20          He decided that he should travel through an area that

21   would make it hard to find him.  And he was right.  He got five

22   miles into the country before Border Patrol agents even knew

23   that he was there.  And when they started to close in on him,

24   he fled and he hid.

25          Now, that speaks volumes.  Why would you hide unless

1    you didn't want to be found?  He didn't turn himself in.  He

2    didn't wave his arms at the Border Patrol agents, or the Border

3    Patrol vehicles, or the helicopter flying low overhead.

4          Instead, he climbed into a bush, he lied on his back,

5    and didn't move or make a sound, because he knew he wasn't

6    supposed to be there, and he didn't want to be found.  Then

7    right away after he was arrested, he admitted that he knew he

8    was in the United States, and he knew he was here illegally.

9          And really, he was just admitting what his actions had

10   already proved.  Now, we've walked through the evidence that

11   shows that he was a deported alien -- that he was a deported

12   alien without consent to be in the country, and that he came

13   back voluntarily, and he wanted to stay.

14         So we come to the last element, freedom from official

15   restraint.  Now, to prove the defendant was free from official

16   restraint, the government needs to prove that he was not under

17   constant government observation, from the moment that he

18   stepped across the border up until the moment he was arrested.

19         Well, we know he wasn't under constant government

20   surveillance because he made it five miles into the country

21   before Border Patrol even knew he was there.  And you can see

22   why by looking at this terrain.  All those mountains and ridges

23   blocked Agent Huber's view of most of the border, south of

24   where the defendant was found.

25         Agent Huber didn't even know where, when, or how the

1   defendant crossed the border that day.  And that other scope

2   that was in the area could see even less.

3           Now, if other agents had spotted the defendant in

4   those five miles before he showed up on the scope, they would

5   have called it out on the radio.  But you heard testimony that

6   Agent Huber didn't hear any radio chatter to that effect,

7   except for that group that was found right next to where the

8   defendant was found.

9           The bottom line is this.  The defendant evaded

10  surveillance when he was crossing the border, and for five

11  miles after that.  And each of those facts alone is enough to

12  prove that he was free from official restraint.

13          Remember, even after the defendant popped up on Agent

14  Huber's scope, he only saw him on and off after that.  I mean,

15  you saw the video.  It would have been hard enough to track the

16  defendant before he went and hid in a bush, let alone after.

17          Now, you'll have the opportunity to review those

18  surveillance clips when you go back to deliberate.  And you'll

19  see that even though the picture is really grainy, the fact

20  that he wasn't under constant surveillance will be very clear.

21          So let's go back to that list we started with.  All

22  the evidence we talked about, it all fits together to prove

23  each and every one of those elements beyond a reasonable doubt.

24          And in the end, when you go back to deliberate, just

25  use your reason and your common sense.  Look at the defendant's

1  admissions in the field and under oath.  Look at the

2  immigration documents with the defendant's name, his

3  fingerprints, and his pictures on them.

4       Last but not least, look at the defendant's actions.

5  He went miles out to a remote mountainous area.  He dodged

6  surveillance.  And then he climbed into a bush, lied on his

7  back, and didn't make a sound while at least five agents and a

8  helicopter looked for him.

9       Despite his efforts, and despite the fact that agents

10  lost sight of him on and off, eventually they found him in a

11  place where he wasn't supposed to be.

12       Members of the jury, you'll find when you look at the

13  evidence, that there's only one verdict that's supported by

14  that evidence in this case, that the defendant is guilty as

15  charged.

16       Thank you.

17       CLOSING ARGUMENT BY COUNSEL FOR THE DEFENDANT

18       MS. SHERRON:  When I was a kid, my dad would say,

19  Brittany, almost only counts in horseshoes and hand grenades.

20  Admittedly, I had no idea what horseshoes or hand grenades had

21  to do with anything, but I understood my dad to say that almost

22  just didn't cut it.

23       Ladies and gentlemen, we've heard the government's

24  evidence, and almost just doesn't cut it.  They may be able to

25  prove some elements to you, but they have to prove all of the

1  elements beyond a reasonable doubt.

2          There are two things that they must prove, but they

3  have failed to prove to you.  The first is that Mr. Vasquez was

4  removed before -- was removed from this country before.  And

5  the second is that -- is the manner in which he entered the

6  United States.  They have to prove to you that he came in

7  voluntarily, and that he was found in the United States.  But

8  we haven't heard any evidence about how he entered, where he

9  entered, or what happened.

10          So let's talk about those in turn.  First, let's talk

11  about how he was removed, or if he was removed.  The government

12  brought to you Agent Pena, who took that stand and told you

13  that he didn't remember anything.  That he, in fact, has done

14  thousands and thousands of deportations and he had no memory of

15  this Mr. Vasquez.

16          He told you that he grabs a stack of papers, calls

17  people's names, and has them get on to a bus that they

18  contract.  They drive to the border, and he watches people walk

19  to the midpoint.

20          Then he goes back to his station, and he signs all of

21  that paperwork without any memory of who actually just crossed

22  the border.  They brought him here all the way from Texas, so

23  that he could tell you that he doesn't remember.

24          Let's talk about the elephant in the room.

25  Ms. Colgan, if you could pull up Government's Exhibit 18A and

1   scroll to the second page.

2          Who is that man?  He looks nothing like this

3   Mr. Vasquez.  The government just stood here and told you that

4   this document is from eight days before he came back into the

5   United States.  The man on the screen is clearly 100 pounds

6   more than this petite, slim man sitting next to my co-counsel.

7          Thank you, Ms. Colgan.  They then brought to you --

8   they then have to prove to you that Mr. Vasquez was

9   undocumented at the time that he entered the United States.

10          Now, that means that the manner and the time and place

11   that he entered are facts that you, as the jury, need to find

12   beyond a reasonable doubt.

13          Now, you heard from Agent Huber, who told you that he

14   was operating a scope.  It was very hard to see.  Ms. Sapthavee

15   just stood in front of you and told you that the video was

16   grainy.  I believe she said very grainy.  It was difficult for

17   him to see.  It was difficult for him to tell who those four

18   people were, what they were wearing.  He couldn't tell what

19   color hair they had, if they were male or female, he couldn't

20   tell anything about them.

21          And then he was watching this video looking for anyone

22   else who might be out there.  And he saw another ant-like

23   object on the screen.  And he sent some agents to go find out

24   who that might be.  In fact, he couldn't tell them exactly

25   where to go.  There were five agents running around in these

1    hills in the rough terrain, looking for an ant on a screen.

2         And they did eventually find someone.  They found a

3    man that Agent Sells told you himself, the agent who found him,

4    told you himself was wearing all black.

5         And I want you to remember that, and we're going to

6    come back to that in a second.  But Agent Sells also told you

7    that the person that he found made some admissions there on the

8    hillside.  That that person he found told you that he wasn't a

9    citizen, that he had no -- no right to be there, that he had

10   been removed before.  And the government is asking you to rely

11   on those admissions.

12        But Agent Sells told you that those admissions were

13   made in Spanish.  And he told you that he had studied Spanish

14   for six months.  Now, I know that at least a couple of you know

15   more than one language.  And I bet that it took you longer than

16   six months to become fluent in that language, and to be able to

17   have a full conversation with someone in that other language.

18        So let's talk about the clothing.  Agent Sells told

19   you that the man he arrested was wearing all black.  Then the

20   government brought you Agent Alexandre, who was the processing

21   agent, and put his name on all of the paperwork.

22        Agent Alexandre told you that the man that he

23   remembered processing, he, in fact, watched a video, so that he

24   was accurate.  And he told you that that man was wearing a

25   white shirt and light tan shorts.

1          That is the opposite of black.  Perhaps if he had

2    said, oh, the -- if Agent Sells had said, oh, the man running

3    was wearing light gray clothing, we could forgive that.  But he

4    said black, and Agent Alexandre looked at a video where the man

5    was wearing mostly white.

6          Now, I'm no artist, but those are opposite colors.

7    The problem here is that we don't know who that man was who was

8    found on the hill.

9          Agent Sells told you that he was not the one who

10   transported him to the station.  He was not the one who

11   processed the man that he found on the hill.  He has no idea

12   what happened to that man.  He may have been returned to

13   Mexico.  All we know is that this Mr. Vasquez, for some reason,

14   was at the Brownfield Station that day.

15         So let's talk about the fingerprint evidence.  The

16   government is trying to connect this Mr. Vasquez with the file

17   of a Mr. Vasquez that they found.  They brought you Laurie

18   Torres -- well, first, they brought you Agent Alexandre, who

19   said that he has no idea who took those fingerprints, where

20   they came from, if they were from this man, if they were done

21   properly.  He wasn't there.  He put his name on paperwork, but

22   he has no idea who took those fingerprints.

23         Then they brought you Ms. Torres, who took the stand

24   and explained that she used the ACE method.  The ACE method is

25   different from the ACE-V method in one very important respect,

1    the V stands for verification.  And she never verified her

2    work.  She never gave it to another person who could check to

3    see if she had come to the same conclusion.

4         Ms. Clark, my co-counsel, asked her how many markers

5    are there that could possibly be found in similarity between

6    fingerprints.  And she said 125.  Well, on the demonstrative

7    that the government showed you, Ms. Torres found eight.  And

8    she also told you that it would take a single difference to

9    exclude someone.  That we all have similar ridges, and

10   bifurcations, and loops, and whorls, and that our fingerprints

11   are mostly made up of the same characteristics.  It's just

12   where they lie that's different.

13        And she found eight similarities, when all you needed

14   to exclude is one.  She also told you that she was hired by the

15   prosecutor, and that when she was looking at the fingerprint

16   cards, she saw the same name on all of the documents that were

17   given to her.

18        This wasn't a blind test.  She wasn't given

19   fingerprints and asked to see if perhaps some of them were

20   similar.  No, she was asked to confirm that they were the same.

21   That might seem like a small difference, but it means that she

22   was starting from the premise that they would match.  And it

23   means she already had in her mind that these were from the same

24   person.  She wasn't starting from the premise that perhaps they

25   were not, and that she would need to be very particular to see

1   if there were any differences.

2        Another important thing is that she told you that

3   she'd gone to multiple trainings on the ACE-V method, that she,

4   in fact, has taught people how to do these comparisons for

5   trials such as these.  She teaches people.  And she told you

6   that the recommended practice for 10 print finger cards, which

7   is what she was using in this case, is ACE-V.  That the

8   recommended practice is to verify.

9        In a federal criminal case, shouldn't we be using the

10  practice that's recommended?  As I explained to you at the

11  beginning, there is one document that could definitively say

12  Mr. Vasquez was from a different place.

13       Not only did the government fail to prove to you

14  beyond a reasonable doubt that this Mr. Vasquez is the same

15  Mr. Vasquez from the A-file, but they also failed to prove to

16  you beyond a reasonable doubt that this Mr. Vasquez is from

17  somewhere else.

18       They didn't bring you a birth certificate.  We have to

19  bring our birth certificates to prove that we are who we say we

20  are, but the government is asking you to find that this man is

21  who they say he is with no definitive proof.

22       Lastly, Ms. Sapthavee talked to you about the special

23  finding at the bottom of the verdict form, that they're going

24  to ask you to find that this Mr. Vasquez was removed after

25  November 1st, 2016.

1          And they're relying on that document with a picture of

2    a man that I don't know to get -- to ask you to find -- to make

3    that finding.  So that's an easy one.  You can just put, no.

4    He was not removed, because we don't know who this man is.

5          At the beginning of this case, we talked about the

6    ladder of proof, and the fact that the government had to fill

7    in all of the bricks for you to make that ladder stable, so

8    that you could get to the top.

9          Now, I don't know if any of you have been sky diving,

10   and I am certainly far too chicken to do that.  But if you were

11   to go sky diving, you would want to be virtually certain that

12   your parachute was going to open.

13         You wouldn't want to think, it's probably going to

14   open, or maybe it's going to open.  You would want to know,

15   before you jump out of a plane, that that parachute is going to

16   help you land on the ground.

17         So while you're all deliberating, I want you to think

18   if you have any reasons not to jump.  If you think this

19   Mr. Vasquez was not the man wearing all black, that's a reason

20   not to jump.  If you think that this Mr. Vasquez is not the man

21   on that warrant of deportation, because they look nothing like

22   each other, that's a reason not to jump.

23         Now, you all are sitting here, and Judge Burns has

24   said this multiple times, you all are sitting here because you

25   went through the process of being chosen, because you were all

1  reasonable people.  So if you have doubts, talk to each other.

2  Think about what's reasonable.  Think about what somebody else

3  might say.  Because you will come to a reasonable conclusion.

4        And if at the end of the evidence, if you have reasons

5  not to jump, if you have a doubt or a question that hasn't been

6  answered, then this case has not been fully proven to you.  And

7  almost doesn't cut it.  Not in a federal criminal case.

8        So then you have the power to return the verdict,

9  which in this case is just, return a verdict of not guilty.

10  And put on that special finding, no, he was not the man who was

11  taken across after November 1st, 2016.

12        Thank you.

13    REBUTTAL CLOSING ARGUMENT BY COUNSEL FOR THE GOVERNMENT

14        MR. DESHONG:  Ladies and gentlemen, I think the

15  defense is mistaken about a few things that I'd like to go over

16  with you.  It sounds like their theory is that this is a case

17  of mistaken identity.  And that's ridiculous.  And there's a

18  couple of reasons you can know it's ridiculous.

19        One, I didn't hear the defense reference at all that

20  they stipulated.  You heard Judge Burns, that stipulation means

21  it's conclusively proven to you that this defendant in 2012, in

22  an official proceeding, admitted under oath that he is not a

23  citizen of the United States, he's a citizen of Mexico.  That

24  he has previously been deported.  And that at that time, he

25  didn't have permission to come back.

1          And before I get into the significance of that a

2     little more, I want to talk about those removal documents.

3     Those are documents over a 24-year history at this point.  And,

4     yes, they're not perfect.  Some of them are old.  But all of

5     them are linked to him by his name, Manuel Vasquez-Perez or the

6     alias he's used, Mario Vasquez-Perez.  His A number, his

7     photograph, and his fingerprint.

8          And I want to show you one of those documents.  Can we

9     put up Exhibit 18A?  And this is why that stipulation is so

10    important.

11         I need a call out of the top half of that.  So you'll

12    remember, Exhibit 18A is after he'd already been deported once

13    and he came back.  You may have remembered some testimony that

14    this document was prepared in May of 2012.  It is not a

15    coincidence that just a little bit after that, he is in an

16    official proceeding talking about his immigration status in May

17    of 2012.

18         They stipulated that that was him in that proceeding

19    talking about his status on this date, the A-file document with

20    his name, with his A number, with his photograph, and his

21    fingerprint.

22         Now they want to say it has nothing to do with him?

23    That's ridiculous.  And beyond that, look at the date of the

24    prior removal order here.  Actually, I think it's -- can we go

25    to 17, please?

1          This further serves to connect him to the document.

2     You may have remembered, he appeared before an immigration

3     judge on April 10th of 1997.  Look at the notice he got when he

4     came in May of 2012.  It is reinstating a removal order from

5     April 10th of 1997.

6          Can we go to 13 now?  And, again, all these documents,

7     his name, his A number, they fit together.  And can we do a

8     call out of the top half?  Again, his immigration judge order,

9     all the way back from 1997, Manuel Vasquez-Perez, with that A

10    number is being ordered deported to Mexico, and didn't even

11    seek relief contesting it.  And they want to say this is

12    mistaken identity?  That's ridiculous.

13         And, yes, there's some issues, Agent Alexandre didn't

14    take the fingerprints on that 10 print card.  But you heard him

15    say, there's a process.  It's automatic.  Prints are scanned,

16    photos taken at the end.  And then he sat down with the person

17    and looked at the photograph, looked at the person in front of

18    him, reviewed his information to confirm it was correct, and

19    had him initial for the property that was being held.  And he

20    put the initials MV, Manuel Vasquez.  That's a lot of

21    coincidences they're expecting you to find.

22         Remember, you heard the instructions, a reasonable

23    doubt is a doubt based on reason and common sense.  It is not a

24    doubt based on pure speculation.  And reason and common sense

25    applied to this evidence firmly establishes it is the defendant

1   who is being addressed in all these documents.  And you have

2   his statements under oath proven conclusively to confirm that.

3          Now, I think the defense is also a little confused

4   about the significance of how he entered the United States.  We

5   don't have to prove exactly when or where he entered.  We have

6   to prove two things, that he came voluntarily, nobody put a gun

7   to his head and marched him in against his will.  No evidence

8   of that at all.  You saw the scope.  He was alone.  Who was

9   forcing him to do anything?  No one.

10          And then we have to prove that he knew he was in the

11   United States.  And, again, use your reason and common sense.

12   Look at his actions, look at where he chose to enter, and think

13   about what he knows about his history.

14          He knows he's someone who's been deported.  He knows

15   he's not allowed to be here.  And so how would someone who

16   knows they're not supposed to be here act?  They would go out

17   to the middle of nowhere, where they don't expect anyone to see

18   them.  And then if they run into anybody, they'd hide.

19          That's all you need to know.  That he voluntarily came

20   in.  He knew where he was.  And he wasn't under constant

21   government surveillance from the moment he crossed till the

22   moment of his arrest.  Just some point he evaded detection,

23   that's it.  If you find those three things, those elements have

24   been proven.

25          You know, and going back to the beginning, you know, I

 1   just want to make clear one thing.  You know, both sides in

 2   this case are entitled to a fair trial.  And that's why you

 3   took an oath at the beginning that you would make your decision

 4   based on the evidence, and the law as Judge Burns gives it to

 5   you.

 6           That you would not consider the things we talked about

 7   a lot in voir dire, you know, sympathies, prejudices, you know,

 8   someone's position in the community.  That's not an appropriate

 9   basis for this decision.  Our duty and our burden, which never

10   leaves this table, is to prove the elements to you beyond a

11   reasonable doubt with the evidence.

12           It's not to answer every question.  It is not to prove

13   it beyond all doubt.  It is to prove those elements beyond a

14   reasonable doubt.  And as I said, a reasonable doubt is a doubt

15   based on reason and common sense.  It is the same standard

16   that's been applied in this country for 200 years.  Nothing

17   special about it here.

18           And if you look at the evidence that's been presented,

19   at those A-file documents, how they all fit together,

20   immigration judge, April 10th, 1997, notice referencing that

21   prior order with his name, A number, and photo on it.  His

22   stipulated admissions, saying as of that very month, way back

23   in 2012, he was not a citizen of the United States, he'd been

24   removed and didn't have consent.

25           And by the way, he would have had to get consent after

1    his last deportation in eight days.  And the United States

2    Government is a lot of things, but it is not fast moving.

3           And to say he applied and received permission to come

4    back in an eight-day window between October 12th and October

5    20th, no evidence of that.  So look at how all those documents

6    fit together, look at his admissions, the ones that they

7    stipulated to, and the ones in the field.  Are those consistent

8    with all the other evidence?  And of course they are.  He says,

9    I knew I was here illegally.  And someone who knows where

10   they're not supposed to be hides when anyone approaches,

11   because they know they're doing something wrong.  It's

12   consciousness of guilt.

13          And if you follow your oath, and look at that evidence

14   fairly and impartially, I submit to you there's only one

15   conclusion it supports.  And that's the defendant is guilty of

16   being a removed alien found in the United States.

17          Thank you.

18      (The excerpt concluded at 9:53 a.m., August 5, 2021.)

19

20

21

22

23

24

25

COURT REPORTER'S CERTIFICATE


     I, CYNTHIA R. OTT, Official Court Reporter, United States

District Court, Southern District of California, do hereby

certify that pursuant to 28 U.S.C. §753 the foregoing is a

true, complete and correct partial transcript of the

stenographically reported proceedings had in connection with

the above-entitled matter and that the transcript page format

is in conformance with the regulations of the Judicial

Conference of the United States.


     DATED at San Diego, California, November 2, 2021.



                         _____
                         */s/ CYNTHIA R. OTT*
                         CYNTHIA R. OTT, RDR, CRR