```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5        Plaintiff,                  )  No. 20-CR-3445-LAB
                                      )
 6            v.                      )  August 4, 2021
                                      )
 7   MANUEL VASQUEZ-PEREZ,            )  12:29 p.m.
                                      )
 8        Defendant.                  )  San Diego, California
     _____)

 9

10            TRANSCRIPT OF JURY TRIAL DAY 1 - EXCERPT
                 BEFORE THE HONORABLE LARRY ALAN BURNS
11                   UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                              By:  VIVIAN SAPTHAVEE, ESQ.
14                                 MICHAEL DESHONG, ESQ.
                              880 Front Street
15                            San Diego, California  92101

16   For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
                              By:  LAUREN J. CLARK, ESQ.
17                                 BRITTANY SHERRON, ESQ.
                              225 Broadway
18                            San Diego, California  92101

19   Court Interpreter:       DANIEL NOVOA

20   Court Reporter:          CYNTHIA R. OTT, RDR, CRR
                              District Court Clerk's Office
21                            333 West Broadway, Suite 420
                              San Diego, California, 92101
22                            cynthia_ott@casd.uscourts.gov

23

24

25   Reported by Stenotype, Transcribed by Computer
```

1                                  I N D E X

2    EXAMINATIONS                                              PAGE

3    OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT
     MR. DESHONG........................................  24
4    OPENING STATEMENT BY COUNSEL FOR THE DEFENDANT
     MS. SHERRON.......................................  29
5
     ERIC HUBER........................................
6    DIRECT EXAMINATION BY MS. SAPTHAVEE................  31
     CROSS-EXAMINATION BY MS. SHERRON...................  54
7
     AARON JAMES SELLS.................................
8    DIRECT EXAMINATION BY MS. SAPTHAVEE................  60
     CROSS-EXAMINATION BY MS. SHERRON...................  67
9    REDIRECT EXAMINATION BY MS. SAPTHAVEE..............  71
     RECROSS EXAMINATION BY MS. SHERRON.................  72
10
     DANIEL ALEXANDER..................................
11   DIRECT EXAMINATION BY MR. DESHONG..................  72
     CROSS-EXAMINATION BY MS. SHERRON...................  93
12   REDIRECT EXAMINATION BY MR. DESHONG...............  98

13   MANUEL PENA.......................................
     DIRECT EXAMINATION BY MR. DESHONG................. 102
14   CROSS EXAMINATION BY MS. CLARK.................... 108

15   RUBENS ALEXANDRE..................................
     DIRECT EXAMINATION BY MR. DESHONG................. 111
16   CROSS EXAMINATION BY MS. CLARK.................... 118
     REDIRECT EXAMINATION BY MR. DESHONG.............. 125

17

18

19

20

21

22

23

24

25

1                        E X H I B I T S

2                                                              PAGE

3

  Government's Exhibits 1 through 4 were received in
4 evidence......................................... 33
  Government's Exhibits 5 through 10 were received in
5 evidence......................................... 38
  Government's Exhibits 12A through 12H were received
6 in evidence...................................... 48
  Government's Exhibits 15, 16A, 17, 18A, and 19 were
7 received in evidence............................. 78

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              SAN DIEGO, CALIFORNIA, AUGUST 4, 2021, 12:29 P.M.

2                                  *  *  *  *

3              (Jury voir dire not transcribed.)

4              (Jury sworn.)

5              THE COURT:  Folks, I'm aware now that it's 12:30.

6         We got a little bit of a late start, as I said,

7   because of a hitch this morning.  But I just want to make a few

8   comments to you about our schedule, and then I'll put off

9   everything and allow you to go to lunch.  I know you've been

10  sitting for a while, and probably want to get something to

11  drink or eat.

12        Our schedule is this.  We start typically at 9:00, and

13  we go until noon in the morning with a 15-minute break.  I give

14  you an hour at lunchtime, so typically, that's from 12:00 to

15  1:00.

16        Today, it'll be 12:30 to 1:30.  Whatever time we end,

17  I'll give you an hour from there.  And then we go from 1:00 or

18  whatever time we commence in the afternoon until 5:00, again

19  with a 15-minute break.

20        I want to ask all of you to join us in trying to make

21  efficient use of everyone's time.  One of the frequent

22  complaints I hear as a judge over many years is from people who

23  serve as jurors, who say, oh, the lawyers and the judge were

24  completely indifferent to, you know, our schedule and our

25  priorities, and the fact that we have other things to do.  And
```

1   we found ourselves sitting on the bench outside long periods of

2   time.  That's not going to happen here.  As I said, we've taken

3   precautions and prepared to make efficient use of your time.

4          The lawyers know that they have to raise issues with

5   me during our breaks or before Court starts or after Court

6   ends, so when you're here, you'll be working.

7          We're not in a rush, but I'm mindful that everyone has

8   priorities.  Some are raising children, some have business

9   concerns, but this is important stuff, as you heard me mention

10  to those who were not selected.

11         We -- you keep the guarantee of the right to a jury

12  trial alive by appearing here, so we respect that.  And I'm

13  trying my level best to reconcile that with the priorities you

14  have in every day life.

15         So with those things said, when you come back, we'll

16  begin the trial, but please come a little early.  Tomorrow

17  morning, it looks like we're going to go till tomorrow, leave

18  yourself a little bit of time to get here.

19         Somebody was Navy.  Navy?  Were you in the Navy?

20  Yeah, there's an old Navy expression.  We move at the pace of

21  the slowest ship in the convoy.  So that means if one of you is

22  not here, we can't start.

23         Please, everybody be here on time, and we will conduct

24  an efficient trial in this case, which will be to the benefit

25  of you, as well as the litigants and the lawyers and the Court.

```
1            So it's now -- we'll call it 12:31.  Please be back at

2    1:30, and the trial will begin at that time.  If you need to

3    leave anything here, you may.  One final thing, right -- I'm

4    going to stop calling you my boy Luke, Mr. Devine, right next

5    to Mr. Devine, there's a door.  And counterintuitively, you

6    push it, right?  Push it?

7            JUROR:  It says push.

8            THE COURT:  Yeah, you push it instead of pulling it,

9    so don't wrench your arm trying to pull it open.  Inside there

10   is the jury room, where you'll deliberate in this case, but

11   there's also a Keurig coffee maker, if you want to have coffee

12   or tea.  You can get that there and you can bring it out with

13   you.  There are also two restrooms there.  And during the

14   breaks, you're free to go in there.

15           You don't have to -- you can go back in the hallway,

16   but you're free to use this throughout the trial, not just

17   during deliberations.

18           Those things said, see you back at 1:30.

19      (At 12:32 p.m., the jury was excused, and the following

20   proceedings were held:)

21           THE COURT:  Have a seat, please.

22           All jurors are absent.  Counsel and the defendant is

23   present.  Anything we need to discuss before we take our lunch

24   break?

25           MS. SHERRON:  Nothing from the defense, Your Honor.
```

```
 1          MR. DESHONG:  Your Honor, the only thing we hadn't

 2   flagged for the Court yet is, we did intend to split closing

 3   and rebuttal.  I can promise that rebuttal will be --

 4          THE COURT:  No, no, that's fine.  The only thing, what

 5   I mentioned at sidebar is, one lawyer per witness or per issue.

 6   You know, it just -- it helps me concentrate on what the issue

 7   is, instead of having two lawyers advocate the same issue or

 8   take the same witness.

 9          MR. DESHONG:  Understood, Your Honor.

10          THE COURT:  Split your case any way you want, but one

11   person per thing, okay?  All right.  See you back a little bit

12   before 1:30, please.  We're in recess.

13          (A recess was taken from 12:34 to 1:33 p.m.)

14          THE COURT:  Have a seat, please.  All members of the

15   jury are present.  Counsel and the defendant are present.

16          Ladies and gentlemen, I'm going to give you some

17   preliminary instructions in the case, and then you'll hear

18   opening statements from counsel.

19          The 12 of you are now the jury in this case.  I'm

20   going to take just a few minutes to tell you something about

21   your duties as jurors, and to give you some preliminary

22   instructions.  At the end of the trial, I'll give you more

23   detailed instructions.

24          It's your findings of fact, that is your determination

25   of what happened and how it happened, together with the
```

1    instructions on the law that help you -- they control your

2    deliberations, and help you reach a verdict in this case.

3         Let me begin with the obvious.  Don't take anything I

4    say or do during the course of the trial as any indication of

5    what verdict you should reach.

6         That's a matter that's entirely and exclusively up to

7    the 12 of you.  I make sure that the rules are followed.  That

8    the case is tried according to established procedures, but the

9    determination of credibility and what the outcome should be,

10   inferences to be drawn from the evidence, and ultimately, the

11   conclusion is exclusively your province, not mine.

12        This is a criminal case brought by the United States

13   Government.  The government has charged Mr. Vasquez-Perez with

14   being found in the United States after being previously

15   deported.

16        The charge against the defendant was contained in the

17   indictment that I read to you.  The indictment, I remind you,

18   is simply a description of the charge.  It's the way of framing

19   what the issue is to be decided by the jury.  It's an

20   accusation only, it's not evidence.

21        And I remind you also, the defendant has pled not

22   guilty to the charge.  He's presumed to be innocent unless the

23   government proves his guilt beyond a reasonable doubt.

24        The defendant has the right, as I mentioned during

25   jury selection, to remain silent.  Never has to prove innocence

1    or produce any evidence.

2         Speaking of evidence, I did mention this, again,

3    during jury selection, but there's an instruction on it, which

4    I'll give you now.  The instruction is captioned, what is

5    evidence.  And here's the answer.  The evidence that you're to

6    consider consists of three things.  First, sworn testimony of

7    witnesses.  In all trials, testimony from witnesses is the

8    predominant or primary form of evidence.

9         Second, the exhibits that are received in evidence.

10   These are tangible things.  It may include things like photos

11   or records.  One of the allegations here is the defendant has

12   been previously deported.  And typically, the government tries

13   to prove that with some form of official record.  So anything

14   that's admitted into evidence, you'll have with you in the jury

15   room to consider, and that's a second form of evidence.

16        And finally, any facts to which the lawyers agree or

17   stipulate.  I've mentioned to you a couple of times that we

18   want to make efficient use of your time.  One of the ways we do

19   that is when things are important to the outcome of the case,

20   but are not in controversy, that is both sides agree, I've

21   encouraged them just to reach stipulations.  That avoids us

22   having to call a witness to put information on that is not

23   contested.  So testimony, exhibits, and stipulation are

24   evidence.

25        In contrast, here are things that are not evidence.

1    Statements and arguments of the lawyers, and questions and

2    objections made by the lawyers.  I made this distinction during

3    jury selection, too.  This charge goes back to October of 2020.

4    I don't know where the lawyers were, but I know they weren't

5    down where the action was taking place that led to the

6    accusation that the government has levelled in this case.

7         So keep in mind, if the lawyers inadvertently or

8    passionately characterize something different from the way you

9    heard the evidence, by all means, you rely on your recollection

10   of the evidence in one of those three forms that I mentioned to

11   you.

12        It sometimes happens that a witness will answer a

13   question nonresponsively.  They'll hear the question

14   differently than the way it was put, and the answer won't

15   respond to it.  A lawyer may object, and I may strike it as

16   nonresponsive.  That's just one example.

17        The point here is, if I do strike any testimony,

18   you're not to consider it in reaching a decision.  I don't

19   expect you to blank it out of your mind.  We're human beings.

20   We don't forget things.  It's like dropping a drop of ink in a

21   gallon of milk, and shaking it up.  You know, you can't taste

22   it or see it, but it's always in the back of your mind that

23   there was a drop of ink in there, right?

24        The point here is, don't allow that to influence you

25   at all in reaching the final outcome of the case, even though

1   you may have a recollection of something that's been stricken.

2          And then, finally, anything that's said or done when

3   we're not in session here is not evidence.  It doesn't happen

4   very often.  In fact, I can't remember the last time it

5   happened, but once in a while, after a recess, lawyers may be

6   giving a last-minute instruction to a witness, and you'll hear

7   something said as you pass, and come back into Court.

8          Everything -- the decision here that you make, the

9   verdict that you reach has to be based on evidence that's

10  presented while we're in session.  Everybody has an opportunity

11  to listen to it, and respond to it.  Nothing that's said

12  external to this process should influence your decision.

13         You're likely to hear both direct and circumstantial

14  evidence in this case.  Those are two legal forms of evidence.

15  Circumstantial evidence sometimes gets a bad name if you watch

16  Perry Mason.  Nobody watches that anymore, because they don't

17  even show the reruns, but any of the law programs, somebody

18  will stand up and say, oh, object, that's circumstantial.

19         That, in life, in true life, is not a valid objection.

20  Both circumstantial and direct evidence are competent ways of

21  proving things.  Let me explain the difference between the two

22  forms of evidence to you.

23         As the name implies, direct evidence is evidence from

24  a witness that directly proves a fact.  So if the question is,

25  did a jet fly from North Island over here behind us toward El

1   Cajon this morning at 9:00, somebody who had to prove that

2   would call a witness that said, I looked up, it was 9:00 on the

3   dot, I heard the unmistakable rumble of a jet engine.  And I

4   saw a jet moving west to east.  If you found that to be true.

5   If you found the person was in a position to see and hear and

6   know that, then you could credit it, and it would be direct

7   evidence.

8           But all of us, all of us who have been around as long

9   as we have know that there's another way to prove that.  We

10  know that jets sometimes leave vapor trails, right?  So the

11  other way one could prove that a jet flew from North Island to

12  El Cajon this morning is to call a witness who said, you know,

13  it wasn't 9:00, it was like 9:05 when I looked up.  And I

14  didn't see or hear a jet, but you know what I saw?  I saw one

15  of those vapor trails.  And the end over toward El Cajon, it

16  was intact.  The end over here toward North Island, it was

17  starting to dissipate, to break up.  We know from our common

18  sense, our experience, that that means a jet recently passed

19  over.  So circumstantial evidence is proof of a fact, the jet

20  trail, from which using your common sense and experience, you

21  can infer another fact, that the jet recently flew over.

22          The point here is that both direct and circumstantial

23  evidence are competent ways to prove things.  And it's up to

24  you to decide how much weight to give either form of evidence.

25          We have legal rules, as I mentioned, that apply to the

1   five of us here.  I've gone to law school, where we get a big

2   book like this, and you have to learn all the rules.  And the

3   lawyers ask me to enforce the rules by making objections.

4   There may be objections from time to time during the trial.

5   And my job is to rule on those objections.

6           If I sustain an objection, sustain it, that means I

7   agree with it.  That means I think that the rules prohibit a

8   question from being answered or an exhibit from being received.

9           If I overrule it, well, you know what that means.

10  That means I disagree with it, and the evidence can come in.

11  You should not be influenced by either the making of an

12  objection or the Court's ruling on the objection.  And if I do

13  sustain an objection, don't guess or speculate what the answer

14  might be.

15          It leads sometimes to a misunderstanding, a false

16  impression that we're trying to hide something that's important

17  from the jury.  That's not true.  That's not the reason that

18  these rules exist.  These rules exist to make sure you get the

19  most reliable information on which to base your verdict.

20          I'll give you an example.  All of us have heard the

21  term hearsay before, right?  You don't have to be a lawyer to

22  know what that means.  It's something somebody said out of

23  Court, not subject to examination by both sides.

24          The law has a preference for the speaker of words to

25  come in and be examined about the circumstance, because context

1    is often important to understanding the meaning of words.  The

2    point here is that these rules are designed to make sure you

3    get the most reliable information on which to base a verdict.

4    That is, once you reach a verdict in this case, no one can

5    point to it and say, yeah, look at the information they relied

6    on in reaching that decision, it wasn't reliable at all.

7            So bear that in mind.  As I said, if I do sustain an

8    objection, don't guess or speculate.  Understand that the

9    objection was sustained to ensure that your verdict has

10   integrity, and that it stands the test of reliability.

11           One of your jobs in deciding this case is to decide

12   what to believe, what not to believe.  You can believe

13   everything a witness says, or part of it, or none of it at all.

14           I alluded to this during the jury selection process.

15   Here's a list of factors that you should keep in mind -- try to

16   keep in mind as you hear witnesses testify.  And these will

17   resonate with you, because they're common sense things.

18   They're things, considerations that we take into account in

19   most -- in deciding the most important affairs in our own life.

20           But they apply here in Court, too, as you try to

21   assess believability and determine what happened, and what

22   weight you should give the testimony.  Ask yourself this as to

23   each witness, each bit of evidence that comes in.  As to

24   witnesses, what opportunity, what ability did the witness have

25   to see, or to hear, or know the things that the witness is

1    testifying about.

2            In other words, were they in a good position to make

3    firsthand observations?  I gave you the analogy about the jet

4    flying over.  Was the person in a good place to see that, and

5    hear that, and know what was going on.

6            Ask yourself also, what's the state of the witness's

7    memory?  Is it good, intact, clear, or is it sketchy.  I

8    mentioned that this is a bit of a divided attention task.  We

9    want you to pay attention as witnesses testify, because

10   sometimes demeanor explains that, you know, maybe a witness

11   doesn't fully remember something, or there's some other aspect

12   of demeanor that, using your experience, you look at and say,

13   I'm not so sure about that.  The witness didn't seem sure.  I

14   saw him roll his eyes back, things like that.

15           Ask yourselves, also, does the witness who testified

16   have any particular interest in the outcome, or is there any

17   perceptible bias or prejudice on the part of the witness.

18           Here's another important factor.  Is there other

19   evidence that contradicts what a witness says, or on the other

20   hand, corroborates what the witness says?  You may be convinced

21   after listening to a witness, the witness has told the absolute

22   truth, and ought to be believed.  And then other witnesses will

23   testify, and you'll say, oh, not so fast, you know, maybe --

24   maybe it didn't happen the way that witness told.

25           So you consider the evidence against the background of

1    all other evidence in the case.  You're here, I believe,

2    because the lawyers perceive that you're reasonable people,

3    that you have life experience, that you have good judgment,

4    that you're going to apply those faculties in deciding this

5    case, in reaching a verdict in this case.

6         That's my perception, that you're conscientious

7    people.  The lawyers have great confidence in you that you'll

8    reach a right, just, and proper verdict in this case.

9         So ask yourself as to each bit of evidence, each

10   witness you hear from, how reasonable does that seem to me?

11   You don't have to be a border agent or somebody else to say,

12   yeah, it sounds like that's the way something like this would

13   occur in real life, or wait a minute, this sounds farfetched,

14   it sounds like we're out in left field on this.  So you don't

15   check common sense and judgment and experience at the door, you

16   bring those to bear on the decision to be made in this case.

17        And then other factors.  And I'll leave this to you,

18   there are other factors that bear on believability.  This is

19   just a partial list.  It's not exhaustive.  It's not the only

20   factors.  Remember this, too, that the weight of the evidence

21   as to a particular fact doesn't depend on how many witnesses

22   testify to that.  What this means is, you can be thoroughly

23   convinced that something happened based on the testimony of a

24   single credible witness.  You don't have to have four witnesses

25   or five witnesses.

1          In contrast, you may hear from multiple witnesses on

2    some point.  You can say, they can call two dozen witnesses and

3    I still don't think it happened like that.  So your task here

4    is qualitative.  It's to look at the quality of the evidence

5    and make a decision based on quality evidence, not

6    quantitative, counting up simply the number of witnesses and

7    deciding the case in favor of the side that calls the majority

8    of witnesses.

9          Let me now say a few words about your conduct as

10   jurors.  First, you're not to discuss this case with anyone.

11   It's very likely that the case will run over until tomorrow.

12   I'm still very confident that we'll have the case to you by no

13   later than noon tomorrow, but it's likely that it will go

14   beyond today.

15         And you'll go home and meet with loved ones, or maybe

16   see a friend or something like that, and they ask you what

17   you're doing today.  I'm on federal jury service, which is sort

18   of novel.  There's a lot of superior courts.  The federal court

19   is much smaller, so that's novel.  And they may say, tell me

20   about it, tell me about your experience.

21         What you have to say is, I'm impanelled on a criminal

22   immigration case.  I'll give you a blow by blow account once

23   we've reached a verdict in the case, but I'm not supposed to

24   talk about it until then.

25         And that's for the obvious reason that we don't want

1    somebody that's not here, not hearing things to try to

2    influence you or tell you what their experience is.  We don't

3    want external factors to do this.  Now, this admonition, not to

4    discuss the case, even applies among the 12 of you, even though

5    you've been sworn as jurors now, you're not to discuss the case

6    among yourselves until it's submitted to you for deliberation.

7         I tell jurors all the time, jury service is not like

8    Survivor.  You don't form friendships or coalitions and say,

9    okay, here's the way we're voting when we get in, regardless of

10   what the other people do.  So no discussion among the 12 of you

11   until it's submitted for deliberations.

12        Second, I don't think there's any news on this, but

13   more generally, if, you know, an expose comes up tomorrow about

14   immigration law or border enforcement, it's in the Union

15   Tribune or it's on TV, Tivo it or put the paper aside until

16   this is over.  I'm not forbidding you from looking at TV or

17   reading the newspaper, but use common sense.  If you start into

18   an article and it's exposing, you know, how the border laws are

19   enforced, put that aside.

20        Third, this is very important, and it ties back into

21   an observation I made earlier.  My perception is that the

22   lawyers think that you're a conscientious people, and you

23   likely are.  My experience with conscientious people is this,

24   that when they don't know something, or they need to get up to

25   speed on something, they Google it or they look at Wikipedia,

1    or they get on the internet to kind of figure it out.

2         I'm a fan of all the YouTube videos that tell me how

3    to get things done around the house, so I look at those.

4    Here's the problem with that.  You can't do that in this case.

5    Things that are important to the decision in this case have to

6    come here in Court during the course of the trial.

7         We don't want you to do any kind of research, or

8    Google anything, or look up terms, nothing like that.  In fact,

9    if you do that, I'd have to disqualify you.  And because we

10   don't have an alternate, we'd have to start all over.

11        It would be a great inconvenience to the parties and

12   to the defendant, to the government, to the Court to do that.

13   So, again, I'm not forbidding you from getting on the internet,

14   checking your e-mail, that type of thing.  But don't do any

15   research on this.

16        I'll make you a guarantee here.  Everything you need

17   to decide this case, everything, all the evidence, correct

18   principles of law, all of that will be presented in the course

19   of the trial.

20        You'll have a basis at the end of this case for

21   deciding whether the defendant's guilt has been proved or not.

22   So trust me on that, don't rely on self-help or individualized

23   research.

24        Finally, I want you to keep an open mind throughout

25   this case.  Again, this is something I alluded to during jury

1  selection, and let me be clear about this.  As we process

2  information as human beings, we start to form impressions.

3          You have an impression of me.  You have an impression

4  of the lawyers.  I have an impression of you.  That's human

5  nature.  I couldn't possibly forbid you from engaging in that,

6  because that's the way our DNA is, right?

7          So this instruction does not go to that.  It doesn't

8  say don't form impressions.  What it does say is, exercise the

9  mental discipline not to paint yourself in a corner before

10  deliberations and say, well, I'm voting guilty or I'm voting

11  not guilty.  Even if you have a premonition, even if you have

12  an idea, wait until everything's said and done, including very

13  importantly that fourth leg that I told you about, which is the

14  discussion of things among equally conscientious people.

15  Sometimes perceptions change, sometimes you learn in

16  deliberation some consideration that's very important that

17  hadn't occurred to you.

18          I know that to be true.  I sat on a jury once when I

19  was a trial lawyer, and I tried a lot of cases.  I thought,

20  this is going to be easy for me, right?  This is what I do for

21  a living.  11 nonlawyers and I, we got back in the jury room.

22  And people began talking, and I thought, my goodness, I didn't

23  even think of that.  That's a very good point, and it did

24  influence my thinking.

25          So the same can and probably will happen to some of

1    you.  So exercise the mental discipline not to make up your

2    mind on what the outcome of this case should be until

3    everything's said and done, including, importantly,

4    deliberations.  Only then, only during deliberations should

5    your view as to what the right outcome is begin to crystallize.

6           This young lady has been taking down everything that's

7    been said since we first called Court to order this morning.  I

8    talked about this technological age in which we live, in which

9    we can get instant access to information.  And jurors sometimes

10   think we can push a button on her computer and have a

11   transcript.  No can do.

12          She's taking a record down, but the record has to be

13   reviewed.  Sometimes a word will be wrong, and she'll correct

14   that.  And we -- to have an accurate transcript, it takes

15   review and it takes time.  So all that to say, we can't give

16   you a transcript of witness testimony here.

17          It's not going to be available to you.  You have to

18   listen carefully.  This is expected to be a short case, not a

19   particularly complicated case.  If you're good at

20   compartmentalizing information, sit back and rely on your

21   memory.  And as I said, it's only going to last a day, day and

22   a half, something like that.

23          If you would like, each of you has a note pad under

24   your chair.  And if you want to take notes, you can.  The one

25   caution I'd give you is to remind you, again, it's a divided

1   attention task.  I've seen conscientious jurors so ensconced in

2   their notes that we could march a bleeding elephant through

3   here, and they'd look up and say, where did all the blood come

4   from?  So remember, if you take notes, just little notes to

5   yourself to give you reminder of things that you think are

6   important.

7          Let me tell you what you can expect from this point

8   on.  The next phase of the trial is going to be opening

9   statements.  Both sides have the opportunity to address you

10  now, preliminarily, and tell you what they think the evidence

11  is going to show.  This is kind of an outline -- an outline of

12  what they expect the evidence to be.

13         It's not evidence, but it's their best projection of

14  what they think the evidence will show, what it will be.  Each

15  side has the opportunity, no obligation, but the opportunity to

16  make an opening statement.  The government, if it chooses to,

17  will go first.  And then the defense will have an opportunity.

18         Once opening statements are made or waived, the

19  government goes first with its presentation of evidence.

20  They'll call witnesses, and we'll go through the government's

21  case witness by witness, and piece of evidence by piece of

22  evidence, until the government rests.

23         The defendant will then have the opportunity to call

24  witnesses, present evidence if he wants to.  Again, no

25  obligation to do so, but if he elects to do, so he'll go after

1    the government.  And his lawyers will call witnesses, present

2    evidence.  We'll go through that evidence, piece by piece.

3           Once all the evidence is in, I'm going to give you

4    more thorough instructions on the law.  For example, I

5    mentioned to you that crimes have elements that are defined.

6    And this allegation here, this criminal charge is made up of

7    elements.  And I'll read you that.  You'll have these

8    instructions with you when you deliberate to consult.  And I'll

9    give you the instructions.  I'm required to read them in open

10   court, so you'll both have them read to you and then you'll

11   have them to consult.

12          And then the lawyers will sum up the case to you.

13   This will probably happen tomorrow morning sometime.  That is,

14   they'll stand before you, and they'll say, here's what we think

15   you should find.  Here's what we think the evidence supports.

16   Here are the inferences that we contend are reasonable, the

17   conclusions that we think you should draw.  Give them your

18   respectful attention.

19          Once all of that's done, we'll turn the case over to

20   you for deliberations.  Again, my best projection is sometime

21   between 9:00 and noon tomorrow, when this case comes to you.

22          So, with those things said, Mr. Deshong, does the

23   government wish to make an opening statement at this time?

24          MR. DESHONG:  Yes, Your Honor.

25          THE COURT:  All right.  You may do so.

1          OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT

2          MR. DESHONG:  Now, this case begins in a remote

3    mountainous area near the Otay Mountains.  And it's on October

4    20th of 2020 in this isolated rugged area that a Border Patrol

5    agent by the name of Eric Huber, who you're going to hear from

6    was working something called a scope camera.

7          And so he's scanning this area, looking for people.

8    And on that day, around noon, he sees a little person.  And

9    you're going to see it's not a perfect camera.  This person is

10   about the size of an ant on the screen, moving through the

11   brush, through the hills, and he alerts other agents.

12         And so as they respond to this area where this person

13   is seen moving, you see the person go down the hillside and

14   disappear into a bush.  And he hid pretty well, because

15   multiple agents are looking for him.  They call in a helicopter

16   for assistance.  And they eventually find him, and pull him out

17   of a bush and identify him as the defendant, Juan -- or I'm

18   sorry, excuse me, Manuel Vasquez-Perez.  Thank you.

19         And once they identify him, they get him back to the

20   station, and they run his fingerprints.  And those fingerprints

21   connect him to an immigration history.  And that history shows

22   he is not a citizen of the United States, he's been deported

23   from the United States on more than one occasion, most recently

24   just eight days before his arrest.  And he doesn't have

25   permission to come back.  And that's why you're here, because

1  he's charged with being a removed alien found in the United

2  States.

3           And now, you're going to hear the term "alien" a few

4  times throughout this trial.  Please know it's not my word,

5  it's not Ms. Sapthavee's word, it's not the Court's word.  It

6  is a legal term that just means not a citizen of the United

7  States.  I know some people find the term offensive, and so

8  please don't hold this against us if you hear us using it

9  occasionally.

10          Now, to understand what led up to his arrest, we

11 actually have to go back a little earlier.  So he's arrested

12 around 12:30 p.m. on October 20th.  And a couple hours before

13 then, Agent Huber is on his scope camera.  His shift starts at

14 6:00 a.m., and he's looking at this area.

15          And as I mentioned, it's not a perfect system.

16 There's mountains.  So he can't really see all the way to the

17 border from his scope, because there's a big mountain in the

18 way.  So what he does is he's looking at an area about five

19 miles north of the border, to see people coming from the

20 direction of the border.  And he sees a group of four people at

21 around 8:00 a.m. that morning.

22          So he does his job.  He alerts agents on the ground.

23 Hey, I see a group of four coming.  They respond.  And an agent

24 apprehends -- attempts to apprehend this group, but he only

25 gets three of them.  And the fourth flees.  So agents are

1  searching for him.  Agent Huber is searching for him on his

2  scope, but he gets away.  Despite their efforts, they don't

3  pick him up again.  So as you can imagine, Agent Huber is

4  focused on this area that day, because he knows someone got

5  away from a group earlier.

6       And so when we fast forward a couple hours, till

7  around noon, about a mile west of where the group was found, he

8  picks up someone.  And that's what we were just talking about.

9  He picks up a person who's trapped.  And this time, an agent

10 named Aaron Sells, who you're going to hear from, finds this

11 guy hiding in a bush.

12      And when he finds him, he asks him, what country are

13 you a citizen of?  And he says Mexico.  Do you have any

14 documents that would let you enter or remain in the United

15 States?  No.  And then he admits, I know I'm in the country

16 illegally.

17      And you're going to see records that support this.

18 You're going to hear about something called an A-file, which

19 stands for alien registration file.  But, again, it's not my

20 word.  And you're going to hear from a Border Patrol agent,

21 who's essentially a custodian of an A-file.  And an A-file is

22 basically a file that includes a person's immigration history.

23 And it's tracked to them by something called an A number, which

24 is, like, a nine-digit identifier.  It's kind of like a Social

25 Security number for immigration purposes.

1           And Agent Alexander is going to tell you, he looked

2    through the A-file associated with Manuel Vasquez-Perez.  And

3    what he found was an order by an immigration judge from '97

4    showing that there was a hearing.  And at the end of that

5    hearing, he was ordered deported to Mexico.  And that that was

6    carried out that same day.

7           And when these orders are carried out, it's

8    documented.  There's a form where a witness signs that they

9    witnessed it.  The name is put on it, the A number is put on

10   it, a photograph of the person is put on it, and their

11   fingerprint is put on it.

12          And he's going to testify how, again, October 12th,

13   2020, that order was reinstated.  The defendant was removed

14   again, just eight days before his arrest.  And once again, his

15   photograph is on it, his fingerprint is on it, his name, and

16   his A number.

17          And you're also going to hear from that most recent

18   one, the person who witnessed him walk to Mexico, and then

19   signed to document it.  And you're going to hear from a

20   fingerprint expert who's going to testify that the fingerprints

21   on those forms are the same fingerprints on the card bearing

22   the name Manuel Vasquez-Perez, taken on the day of his arrest

23   at the Border Patrol station.

24          And you're also going to hear from Agent Alexander,

25   how he looked into, well, did he get permission to come back?

1  He looked through that A-file, he tried to find whether there

2  were any applications, any permission granted.  He saw nothing.

3       He looked through databases to see if any forms had

4  been submitted, any fees paid for applications.  He saw

5  nothing.  He looked through the systems that track people's

6  immigration status, and saw that the defendant was listed as

7  deportable.  He did not get permission to come back.

8       And if all that wasn't enough, you're going to hear

9  about defendant's own admissions, not just in this case, but in

10  2012, during an official proceeding, under oath, he admitted he

11  is a citizen of Mexico, and not a citizen of the United States,

12  in other words, an alien.  That he had previously been

13  deported, and as of 2012, did not have permission to come back.

14  And he made virtually the same admissions when he was arrested

15  in this case.

16       And so at the end of this case, we're asking you to

17  listen to Judge Burns' instructions, follow them carefully, and

18  look at that evidence.  Look at those records and testimony

19  about his prior deportation.

20       Look at the testimony in the absence of any indication

21  that he got permission to come back.  Look at his choice of

22  where he tried to sneak into the United States in a remote

23  area.  Look at his actions when agents approached of hiding in

24  a bush.

25       Most importantly, look at his admissions.  And at the

1   end of this case, when you look at all that, we're going to ask

2   you to render the only verdict that we believe is consistent

3   with that evidence, that he is guilty of being a removed alien

4   found in the United States.

5          Thank you.

6          THE COURT:  Thank you, Mr. Deshong.  Ms. Sherron, do

7   you wish to make an opening statement?

8          MS. SHERRON:  Yes, Your Honor.

9          THE COURT:  All right.  You may do so.

10         OPENING STATEMENT BY COUNSEL FOR THE DEFENDANT

11         MS. SHERRON:  The government has explained to you

12  their case, and went through some of the elements and the

13  evidence that they hope to show you today.  But what they

14  didn't tell you is that at the end of this case, they're going

15  to ask you to fill in holes that they cannot.

16         The government's job in this case is difficult.  And

17  it's up to you, the members of the jury, to hold them to that

18  task.

19         Mr. Deshong just went through many of the elements and

20  evidence that he and his co-counsel will have to prove to you.

21  He explained that in order to find Mr. Vasquez guilty of this

22  crime, he will have to prove that he was a noncitizen at the

23  time that he entered the United States.

24         But what he didn't tell you is that he will not be

25  able to bring you the one document that would definitively

1    prove that Mr. Vasquez was a noncitizen at the time that he

2    entered, his birth certificate.

3         Now, we all know that we use birth certificates to

4    verify or to prove that we are who we say we are.  We had to

5    submit our birth certificate at the DMV when we got our first

6    driver's license.  We had to send in our original birth

7    certificate with our application to get a passport.

8         Because the government wants to verify that we are who

9    we say we are.  But in this case, the government is asking you

10   to believe that Mr. Vasquez is who they say he is with no

11   documents.

12        You see, we have in this country what I like to call

13   the ladder of proof.  The higher you get up the ladder, the

14   more proof you need.  And that proof is like a brick wall

15   holding up the ladder.  And when you're missing evidence, when

16   bricks in the wall are missing, the ladder is unstable, and you

17   can't reach the top.

18        Ladies and gentlemen, in this case, the government's

19   job is to help you reach the top, but they will not be able to

20   bring you the one piece of information that will let you get

21   you to the top.

22        Members of the jury, you have the most important job

23   in this courtroom, more important than mine, than the

24   government, you have the job of holding everyone accountable,

25   of holding the government accountable for their job.

1           All I ask is that you listen to all of the witnesses

2    and the evidence in this case, that you be thoughtful, be

3    skeptical.  And then at the end of the case, if you're left

4    with questions that are unanswered, if you're left with doubts

5    that you can't resolve, then you have the awesome

6    responsibility of telling the government that they have not

7    done their job by returning a verdict of not guilty.

8           Thank you.

9           THE COURT:  All right.  Mr. Deshong, call your first

10   witness.

11          MS. SAPTHAVEE:  Thank you, Your Honor, the government

12   calls Border Patrol Agent Eric Huber to the stand.

13             ERIC HUBER, GOVERNMENT'S WITNESS, SWORN

14          THE COURT:  Take a seat, remove your mask.  Keep your

15   voice up.  Speak directly into the mic.  State and spell your

16   full name.

17          THE WITNESS:  My name is Eric David Huber, E-R-I-C,

18   D-A-V-I-D, H-U-B-E-R.

19                       DIRECT EXAMINATION

20   BY MS. SAPTHAVEE:

21   Q.  Good afternoon, Agent Huber.

22   A.  Good afternoon.

23   Q.  State your current occupation for us, please?

24   A.  I'm a Border Patrol agent.

25   Q.  And what are your responsibilities as a Border Patrol

```
 1   agent?
 2   A.   Currently, I'm an ATV agent.  I ride all-terrain vehicles
 3   and we patrol the border on ATVs.
 4   Q.   And which station do you do that at?
 5   A.   I'm a Brownfield Border Patrol agent.
 6   Q.   And how long have you been a Border Patrol agent?
 7   A.   A little bit over 21 years.
 8   Q.   Now, have you operated high-powered scope cameras as part
 9   of your duties?
10   A.   Yes.
11   Q.   What are they called?
12   A.   There are different types, but in this instance, it was an
13   MSC scope that I was operating.
14   Q.   And is -- does MSC stand for mobile surveillance
15   capability?
16   A.   Yes.
17   Q.   Now, how much experience have you had operating the MSC
18   scope?
19   A.   I've operated it for several years.  Pretty much for the
20   last four years, approximately, I've been operating it.
21   Q.   And what do you use the scope camera for?
22   A.   The scope is utilized -- during the day shift, it's
23   utilized to look for people crossing the border.
24   Q.   And could you describe generally how the scope camera
25   works?
```

1    A.   Yes, it has two cameras on it.   There's an infrared camera

2    and a regular daytime camera, like a videocamera.   And it has a

3    radar on it also.

4    Q.   And can you control what you see with that camera?

5    A.   Yes.

6    Q.   Now, please take a look at the binder in front of you, at

7    the documents marked as Exhibits 1 through 4.   And let me know

8    when you're done, please.

9    A.   Okay.

10   Q.   Do you recognize those documents?

11   A.   Yes, I do.

12   Q.   Are they still screen shots from the MSC video from October

13   20th, 2020?

14   A.   Yes, they are.

15   Q.   And do these exhibits fairly and accurately depict the

16   still images from scope video you watched on that day?

17   A.   Yes.

18         MS. SAPTHAVEE:   At this time, Your Honor, the

19   government moves to admit Exhibits 1 through 4 into evidence.

20         THE COURT:   Any objection to those?

21         MS. SHERRON:   No, Your Honor.

22         THE COURT:   Exhibits 1 through 4 are admitted.

23   (Government's Exhibits 1 through 4 were received in evidence.)

24         MS. SAPTHAVEE:   Thank you, Your Honor.

25   BY MS. SAPTHAVEE:

```
 1    Q.  Now, Agent Huber, you just said earlier that there were two
 2    modes, daytime and infrared.  Could you please take a look at
 3    Exhibit 1.
 4          MS. SAPTHAVEE:  And could we publish that for the
 5    jury?
 6    BY MS. SAPTHAVEE:
 7    Q.  Is this a still shot from the scope camera?
 8    A.  Yes, it is.
 9    Q.  Now, what mode is this image in?
10    A.  This is the daytime camera.
11    Q.  Let's take a look at Exhibit 2.  Now, what mode does this
12    show?
13    A.  This is the infrared camera.
14    Q.  And why might you use the infrared camera during the
15    daytime?
16    A.  The infrared camera enables us to see in areas that aren't
17    as visible to the daytime camera, because of the bushes or any
18    of the trees or any of the other things.  The infrared camera
19    enables you to see heat from a person that maybe would be maybe
20    camouflaged or not as visible in a daytime camera.
21    Q.  Now, can this camera pan from left to right?
22    A.  Yes.
23    Q.  And can it zoom in and out?
24    A.  Yes.
25    Q.  What zoomed view are we looking at here in Exhibit 2?
```

1    A.   This is approximately the middle zoom view.

2    Q.   And in the upper left corner, is that the date and time the

3    video is being taken?

4    A.   Yes.

5    Q.   And could you circle that for the jury, please?

6         Now, how many different zoom levels do you typically use

7    during the daytime?

8    A.   During the daytime, on an infrared mode, this is generally

9    the most zoomed in that I'll zoom the camera in.  There's two

10   other zoom modes that are a little bit more of a wide angle

11   view, but this particular one is the one that I use most

12   frequently.

13   Q.   And so is this what we're looking at here, the most zoomed

14   in view you would use during the daytime?

15   A.   Generally, yes.

16   Q.   And could you just circle for the jury where you can tell

17   how far the image is zoomed?  Thank you.

18        Now, let's take a look at Exhibit 3.  What view are we

19   looking at here?

20   A.   This is the daytime camera, and it's zoomed out one more

21   zoom mode from what we were looking at in the previous exhibit.

22   Q.   Would you say it's sort of the middle of the three zoom

23   levels you use during the daytime?

24   A.   Yes.

25   Q.   And let 's turn to Exhibit 4.

1      Now, is this the most zoomed out view?

2   A.   Yes, the camera cannot zoom any further.

3   Q.   And are all these views available in both daytime and

4   infrared mode?

5   A.   Yes.

6   Q.   Now, let's back up and talk about how many of these scope

7   cameras are used.  How many of these scope cameras does your

8   station use during the daytime?

9   A.   We have two at my station.

10  Q.   And are there other scopes available for use during the

11  nighttime?

12  A.   Yes.

13  Q.   Now, who operates these scope cameras?

14  A.   At present, we have National Guard members operating the

15  cameras, but it could also be Border Patrol agents.  If the

16  National Guard members are not available to run the cameras,

17  there would be a Border Patrol agent running them.

18  Q.   Have you operated both of these two cameras before?

19  A.   Yes.

20  Q.   And roughly how many hours would you say you've spent using

21  this type of scope camera?

22  A.   I would say comfortably that I've operated this camera for

23  thousands of hours.

24  Q.   Let's turn to what happened on October 20th, 2020.

25       Were you manning one of the scopes that day?

1    A.   Yes.

2    Q.   And what area were you watching at the time?

3    A.   From this location, I was monitoring areas that were near

4    Otay Mountain, portions of Tecate Mountain, and other areas in

5    between.

6    Q.   Please take a look at the binder in front of you, at the

7    documents marked as Exhibits 5 through 10, and let me know when

8    you're done, please.

9    A.   I'm sorry could you repeat, 5 through which?

10   Q.   5 through 10, please.

11   A.   Okay, I'm complete.

12   Q.   Do you recognize those documents?

13   A.   Yes, I do.

14   Q.   And are those aerial views and photos of the area near the

15   apprehension site at issue here?

16   A.   The first several were topographical maps or aerial views.

17   The last two were actually photographs from -- from the ground.

18   Q.   And are some of those documents marked to show the two

19   scope locations, as well as areas where you observed

20   individuals who were arrested on that day?

21   A.   Yes.

22   Q.   And do these exhibits fairly and accurately depict the

23   area, including and surrounding where you were conducting

24   surveillance on the morning of October 20th, 2020, and a little

25   bit after noon?

```
 1    A.  Yes, they do.

 2              MS. SAPTHAVEE:  At this time, Your Honor, the

 3    government moves to admit Exhibits 5 through 10 into evidence.

 4              THE COURT:  Is there any objection to Exhibits 5

 5    through 10?

 6              MS. SHERRON:  No, Your Honor.

 7              THE COURT:  All right.  Those photos are admitted, 5

 8    through 10.

 9    (Government's Exhibits 5 through 10 were received in evidence.)

10    BY MS. SAPTHAVEE:

11    Q.  Let's look first at Exhibit 5, please.  Now, is this an

12    aerial view of Otay Mesa and the port of entry?

13    A.  Yes, the Otay Mesa port of entry is in the lower left-hand

14    corner of this -- of this picture.

15    Q.  Now, could you please draw a line on your screen to show us

16    where the border is?  And now, is the area north of the border

17    the United States?

18    A.  Yes.

19    Q.  And what's the area south?

20    A.  South of the line is Mexico.

21    Q.  Now, what does that yellow pin show in the upper right

22    corner?

23    A.  The yellow pin in the upper left-hand corner --

24    Q.  Do you mean the upper right, Agent Huber?

25    A.  I was -- I'm sorry, excuse me.  The pin in the upper
```

1   right-hand corner, I believe, is the location where an

2   individual was arrested on the 20th of October.

3   Q.   And could you circle where the nearest port of entry is,

4   please?

5   A.   Yes.

6   Q.   Now, about how far is that port of entry from that yellow

7   pin?

8   A.   Approximately nine miles in a straight line.

9   Q.   And what is the terrain like in the area by that yellow

10  pin?

11  A.   In some cases, it's very steep, but it's -- it's

12  mountainous terrain.  There's -- Otay Mountain is roughly in

13  the middle of the picture, and it's a 3300-foot tall mountain.

14  Q.   Now, is there much commercial activity nearby?

15  A.   No.

16  Q.   What did you notice the morning of October 20th, 2020?

17  A.   On October 20th, roughly an hour to two hours into my

18  shift, I observed four people walking through an area that's

19  known to Border Patrol agents as the Shrine Draw.

20  Q.   And what time would that have been, approximately?

21  A.   Approximately 7:45 a.m.

22  Q.   Let's take a look at Exhibit 6 now.  Now, is this an aerial

23  view a bit east of what we were just looking at?

24  A.   Yes.

25  Q.   And what 's that yellow balloon marking?

```
 1    A.   The yellow balloon that's in the center of the top portion

 2    of the margin of the picture is the scope location, where I

 3    was -- where I was working that day.

 4    Q.   What about the gray balloon on the right side of the image?

 5    A.   The gray balloon on the right side of the image is another

 6    scope location, similar to the one that I was operating in, but

 7    a separate location.

 8    Q.   Now, is that yellow pin still marking the area where the

 9    defendant was apprehended that day?

10    A.   Yes.

11    Q.   Let's talk very briefly about that other scope, that gray

12    balloon.  How does that view from that scope compare with what

13    you could see from where that yellow balloon is on your scope?

14    A.   This scope is not as high in elevation as the other scope

15    that I was operating that day, somewhat more limited in view.

16    Maybe 270 degrees arc of view from the scope towards the south.

17         The scope that I was operating that day is a little bit

18    higher in elevation, and it's pretty much a 360 degree view

19    from the hill top.

20    Q.   Now, could you show the jury, on Exhibit 6, roughly where

21    Shrine Draw is, where you saw that group that morning?

22    A.   I believe the area that I've circled there is approximately

23    the area where the -- where the group was observed that

24    morning.

25    Q.   And once you spotted the group, what did you do next?
```

```
 1   A.   I requested assistance on the radio from other Border

 2   Patrol agents that were working that area, to investigate the

 3   four people that were walking through there.

 4   Q.   And did agents respond to the area?

 5   A.   Yes.

 6   Q.   And what did you tell them?

 7   A.   That I had observed the four people walking through an area

 8   with relatively few trails that is used frequently by people

 9   coming across the border illegally.

10   Q.   Now, how did the agents know where to go?

11   A.   I directed them to the location via the radio.  I asked

12   them to go to particular coordinates, latitude and longitude

13   coordinates that I directed them to go and investigate.

14   Q.   And did they make an arrest that day?

15   A.   Yes.

16   Q.   How many individuals did they arrest?

17   A.   They arrested three of the four people.

18   Q.   Now, from your scope, did you observe the arrest happening?

19   A.   No.  I was not able to see the actual arrest happen.

20   Q.   Why not?

21   A.   Because of the terrain features, the ridges and hills that

22   were there obscured me actually seeing the three people being

23   arrested.

24   Q.   So if you couldn't see it on the scope, how did you know

25   what happened?
```

1   A.   I heard on the radio that the agent had arrested three

2   people, and that one person had run away.

3   Q.   And were you able to track that fourth person on your

4   scope?

5   A.   Not immediately, but throughout the course of the day, I

6   did observe one person in that same general area walking north,

7   northwest from that area.

8   Q.   Now, are you aware of any other cameras that captured this

9   group's movements before you caught sight of them?

10  A.   No.

11  Q.   Let's take a look at Exhibit 7.  Now, is this a more

12  horizontal view of that same area?

13  A.   Yes.

14  Q.   And the bright yellow line, is that the international

15  border?

16  A.   Yes, at the bottom portion of the screen, that's the

17  international border.

18  Q.   Now, what does that green pin signify?

19  A.   This location is where three people were arrested that

20  morning, at approximately 8:45 in the morning.

21  Q.   That morning, did you observe anyone crossing the border?

22  A.   No.

23  Q.   Do you know exactly where or when that group crossed the

24  border?

25  A.   No.

1  Q.   Could you see the part of the border south of where this
2  group was arrested from your scope?
3  A.   The area to the immediate south, I'm not able to see the
4  border.  There are other locations further east from the area
5  directly south that I could see small portions of the border,
6  but I cannot see the border in that -- in that area directly
7  south.
8  Q.   Now, could you explain to the jury why you couldn't see the
9  area directly south?
10  A.   The mountain that's there, Otay Mountain, is pretty tall,
11  and a little bit higher than the scope location.  So several
12  ridges that are coming from the mountain towards the east,
13  where this group was located, obscure the border from -- from
14  my view at that spot.
15  Q.   How about the other scope where the gray balloon is, could
16  it have seen the part of the border south of where this group
17  was arrested?
18  A.   No.
19  Q.   And how come?
20  A.   It's -- again, it's much lower in elevation, and
21  it's -- because of the terrain features, it's not able to see
22  the border.
23  Q.   All right.  So after that fourth person ran away, how long
24  did you watch the scope looking for him after the other three
25  were arrested?

1    A.   For the remainder of my shift.

2    Q.   And approximately how long was that?

3    A.   It was another approximate six hours.

4    Q.   Okay.  And do you know how far away that scope is that you

5    were using from the area where you were looking?

6    A.   It's a few miles from that arrest location.

7    Q.   Now, did you later spot someone in that vicinity where you

8    were looking?

9    A.   Yes.

10   Q.   And around what time did you first spot them?

11   A.   I believe it was sometime after 10:00 in the morning,

12   sometime closer maybe to 11:00 in the morning that I observed

13   one individual walking from that same general area.

14   Q.   And I should clarify.  When I say first spot them, I mean

15   after this group was arrested, when did you see someone again,

16   is that correct?

17   A.   Yes, approximately around 11:00 a.m.

18   Q.   Now, what did you see at around that time?

19   A.   A single individual walking through the bushes in a north,

20   northwest direction, away from where the other three

21   individuals were arrested.

22   Q.   And while you were looking for him, did you see anyone else

23   out there?

24   A.   No.

25   Q.   Are you aware of any other cameras that captured anyone

1  moving during those hours between when that group was arrested

2  and when you spotted this person?

3  A.  No.

4  Q.  And during those same hours, did you hear any radio chatter

5  about anyone else being out there besides agents?

6  A.  No.

7  Q.  And now looking here at Exhibit 7, can you point out the

8  area where you spotted that individual at noon -- or I'm sorry,

9  at around 11:00 a.m.?

10 A.  Yes.  Somewhere roughly in between the two pin drops, I

11 observed one individual walking north, northwest over the

12 ridges and among the bushes, and not necessarily on any trail.

13 Q.  Now, roughly how far away is that area from where the green

14 pin is?

15 A.  It's approximately one mile.

16 Q.  Now let's take a look at Exhibit 8.

17         MS. SAPTHAVEE:  And if we could clear the screen

18 marking, that would be great.  Thank you.

19 BY MS. SAPTHAVEE:

20 Q.  Now, is this a zoomed in view of the hill where you spotted

21 the individual?

22 A.  Yes.

23 Q.  And what are those roads used for that we see winding in

24 front?

25 A.  These dirt roads function as fire breaks to keep fires from

 1   moving quickly through an area, but then they also function as

 2   dirt roads that Border Patrol can utilize to patrol the border.

 3   Q.  And to back up one step, is that yellow pin still marking

 4   where the defendant was ultimately arrested?

 5   A.  Yes.

 6   Q.  All right.  Let's take a look at Exhibits 9 and 10 side by

 7   side, if we can.

 8       Now, are these on the ground photos of the area where the

 9   defendant was arrested?

10   A.  Yes.

11   Q.  And is the one on the left from close to the dirt road in

12   front?

13   A.  Yes, it's -- I believe it's from the dirt road that the

14   picture was taken.

15   Q.  And did you take these pictures?

16   A.  Yes.

17   Q.  The one on the right, is that a zoomed in view of that same

18   area?

19   A.  Yes, it is.

20   Q.  All right.  Please take a look at the disk -- I apologize.

21   Could you just briefly explain what's on the left and on the

22   right again for us, please?

23   A.  Yes, both photographs were taken from the same --

24   Q.  There we go.  Could you briefly explain what we're looking

25   at on the left and right here again, please?

1    A.   Yes, two photographs of the location where the individual

2    was arrested.   The one on the left is a more zoomed out

3    photograph from the road.   The one on the right is a little bit

4    more zoomed in of that same location.

5    Q.   Now, please take a look in the binder in front of you.   It

6    should be in the front left pocket inside, at the disk marked

7    for identification only as Exhibit 11.

8    A.   Yes.

9    Q.   Do you recognize it?

10   A.   Yes, I do.

11   Q.   Have you reviewed what's on the disk?

12   A.   Yes, I have.

13   Q.   And how do you know it's the same disk that you reviewed?

14   A.   I signed it after reviewing it.

15   Q.   And does this disk have about 38 minutes of scope video

16   from October 20th, 2020, starting just before noon?

17   A.   Yes.

18   Q.   Was the video a fair and accurate depiction of a portion of

19   what you observed on the scope camera on October 20th, 2020?

20   A.   Yes.

21   Q.   Now, please take a look at the disk in front of you in the

22   same pocket, hopefully, and it should be marked as Exhibits 12A

23   through 12H.

24   A.   Yes.

25   Q.   Do you recognize it?

```
 1    A.   I do.

 2    Q.   Is it a disk with clips marked 12A through 12H?

 3    A.   Yes, it is.

 4    Q.   And did you watch all the clips on this disk?

 5    A.   Yes, I did.

 6    Q.   And how do you know it's the same disk that you watched?

 7    A.   I signed this one as well after reviewing the material.

 8    Q.   Now, do the clips fairly and accurately depict portions of

 9    the longer scope video, showing what you saw on the scope

10    camera on October 20th, 2020?

11    A.   Yes.

12              MS. SAPTHAVEE:  At this time, Your Honor, we move to

13    admit Exhibits 12A through 12H into evidence.

14              THE COURT:  Any objections?

15              MS. SHERRON:  No, Your Honor.

16              THE COURT:  What's the length of these clips?

17              MS. SAPTHAVEE:  They're about 20 seconds to 25 seconds

18    each.

19              THE COURT:  All right.  12A through H are admitted.

20        (Government's Exhibits 12A through 12H were received in

21                            evidence.)

22    BY MS. SAPTHAVEE:

23    Q.   Let's start by looking at 12A, which shows someone walking

24    along a ridge.

25        And, Agent Huber, describe for us, what are we seeing here?
```

1  A.  This is the same general area of the photographs that we

2  just saw previously, slightly south of where the two

3  photographs that we just observed from the road.  It's the

4  ridge that would have been towards the left-hand margin of

5  those photographs, and this is an individual walking along that

6  ridge.

7  Q.  What time and date was this video taken?

8  A.  12:00.

9  Q.  And can you tell roughly where this video was taken?

10  A.  Yes, the general area that I was observing throughout the

11  course of the day.

12  Q.  Now, after spotting this person, what did you do next?

13  A.  Again, I requested assistance on the radio for an agent

14  that was working in that area to respond and speak with this

15  individual.

16  Q.  Next, let's watch clip 12B, showing more footage of that

17  person's movements.  What are we seeing here, Agent Huber?

18  A.  This is slightly northwest of where we were just looking at

19  a minute ago on the other video.  It's the same individual as

20  he's walking somewhat north, northeast down the ridge.

21  Q.  Now, Agent Huber, is this video clip about five minutes

22  after the last one we watched?

23  A.  Yes.

24  Q.  And is this still the same hillside?

25  A.  Yes.

1   Q.   Let's play clip 12C, showing the person coming to a stop.

2   And what are we seeing here, Agent Huber?

3   A.   This is still the same subject that I was monitoring

4   through the scope as he walked further down the ridge.

5   Q.   And where did he come to a stop?

6   A.   Just below the cross hairs there.

7   Q.   I'm sorry, did you say below the cross hairs?

8   A.   Below where the two sets of X and Y coordinate cross hairs

9   are listed in the middle of the screen there.

10  Q.   Could we play the video one more time?  It might have been

11  difficult to see.

12       Now, Agent Huber, could you circle on the screen where you

13  saw the defendant come to a stop?

14  A.   Yes, he's located at this location here.

15  Q.   Now, what happened next?

16  A.   I requested agents to drive in on the dirt roads.  There's

17  the dirt road that the photograph was taken, and there's

18  another dirt road on the other side of this ridge.

19       There were agents that were driving on both dirt roads that

20  were attempting to walk to this location where this individual

21  was in the bushes.

22  Q.   And were you able to guide agents directly to that

23  location?

24  A.   Roughly, yes.

25  Q.   Let's play clip 12D, showing when an agent arrives in the

1    area.

2        On the left side of the screen here, what's that movement

3    that we see?

4    A.   Just below the date and time is an agent, the first agent

5    that's arriving to this location.

6    Q.   Now, at the time this video was recorded, did you see the

7    defendant?

8    A.   No.

9    Q.   And why is that?

10   A.   He was hiding in the bushes there, in the general area

11   where I was directing the agent to go look.

12   Q.   Okay.  You say general area.  At that point in time, did

13   you still know the specific bush that the defendant was hiding

14   in?

15   A.   Not the exact bush, but the general location was within 50

16   to a hundred yards.

17   Q.   Now let's play the first half of clip 12E, which shows

18   other agents arriving on the scene.  And we're going to pause

19   it at around the 45-second mark.

20       Now, what are we seeing here, Agent Huber?

21   A.   This is the same general area where the subject was hiding,

22   and there were four -- now four Border Patrol agents that are

23   looking throughout this area, trying to locate the individual.

24   Q.   Now, could you mark for us the general areas where you see

25   these four agents?

1  A.  Yes.  Two agents are located here.  One agent is located

2  here.  And the fourth agent is down here.

3  Q.  Now, at this point, did you or the other agents know where

4  the defendant was exactly?

5  A.  Not the exact location.

6  Q.  And if you could see him on the scope at that point, would

7  you have been able to guide the agents directly to the

8  location?

9  A.  Yes.

10  Q.  All right.  Let's pull up clip 12F, showing the scope

11  zoomed out.  And we'll let it play uninterrupted.

12      What do we see here, Agent Huber?

13  A.  This is the scope zoomed out as far as out as it will zoom.

14      I backed the camera out to look for a helicopter that I had

15  requested to come to the area to help the four agents that were

16  looking for the subject, narrow down his location.  So I backed

17  the camera out to try and see the helicopter as it was coming

18  in to help us out.

19  Q.  And what time is this video being recorded?

20  A.  The time indicated is 12:19.

21  Q.  At this point in the video, has it been about 15 minutes

22  since we saw someone hunker down behind that bush?

23  A.  Yes.

24  Q.  And you wouldn't be able to see someone from this zoomed

25  out view, correct?

```
 1    A.   No.
 2    Q.   Now, did Border Patrol agents on the ground know where he
 3    was at this point, the defendant?
 4    A.   Approximately, but I gave them the last known location and
 5    they were attempting to search that area on a more meticulous
 6    level, trying to check each bush, in that general area that I
 7    had directed them to.
 8    Q.   Now we're getting to the last couple of clips now, so let's
 9    play clip 12G showing that helicopter's arrival.
10         Now, tell us what are we seeing here as it's playing?
11    A.   The road that I indicated earlier, the fire break that I
12    indicated where the photographs were taken, you could see the
13    helicopter as it approached that road.  And he's attempting to
14    maneuver around to where the agents are further south and west
15    from here in the draw that's towards the top of the picture.
16    Q.   And is the helicopter trying to assist in finding the
17    defendant?
18    A.   Yes.
19    Q.   Now, have you been on the ground when one of these
20    helicopters is circling above?
21    A.   Yes.
22    Q.   Based on your experience, is the helicopter pretty loud?
23    A.   Yes.
24    Q.   And does it cause dust to be kicked up?
25    A.   Yes.
```

1   Q.   Now, finally, let's look at clip 12H, showing the arrest.

2   And we'll watch the first few seconds, and pause at about the

3   36-second mark.

4        Now, what are we seeing here, Agent Huber?

5   A.   Again, this is the same area that the agents were looking

6   for the subject, and a little bit to the right of the middle of

7   the screen, you could see one of the agents walking through the

8   bushes.

9   Q.   And could you circle this admittedly grainy image where

10  that was?

11  A.   Yes.

12  Q.   All right.  Let's hit play again.  What are we seeing here?

13  A.   This is the agent actually locating the subject that was

14  hiding in the bushes.

15  Q.   And did other agents respond to that spot?

16  A.   Yes.

17           MS. SAPTHAVEE:  No further questions, Your Honor.

18           THE COURT:  Any questions?

19           MS. SHERRON:  Yes, Your Honor.

20                         CROSS-EXAMINATION

21  BY MS. SHERRON:

22  Q.   Good afternoon, Agent Huber.

23  A.   Good afternoon.

24  Q.   I have your report here, just in case you need to see it at

25  any time, just let me know.

1       So you stated on direct that you were a scope operator for

2   the last four years?

3   A.   Approximately, yes.

4   Q.   And that was at the Brownfield Station?

5   A.   Yes.

6   Q.   And you were on what's considered a scope assignment,

7   right?

8   A.   Yes.

9   Q.   So that meant that every day, you went to work you worked

10  the scope for about four years?

11  A.   Essentially, yes.

12  Q.   And you had to go through a specific training to be able to

13  work that scope, correct?

14  A.   Yes.

15  Q.   When you're on that scope assignment, and you're operating

16  the scope all day long, you don't leave the scope to patrol the

17  area by foot, right?

18  A.   No.

19  Q.   And not by car?

20  A.   No.

21  Q.   You stay with the scope and watch the video looking for any

22  action?

23  A.   Yes.

24  Q.   If you see something, that's when you make a call out on

25  the radio, right?

```
 1   A.   Yes.
 2   Q.   You ask for agents who are on the ground to go to wherever
 3   you saw?
 4   A.   Yes.
 5   Q.   And you sent -- you give them coordinates?
 6   A.   Yes.
 7   Q.   And then they go to those coordinates and try to find
 8   whatever it was that you saw?
 9   A.   Correct.
10   Q.   You -- on October 20th, 2020, you provided coordinates to
11   Agent Sells, right?
12   A.   I provided coordinates to all the agents that were
13   responding to that area, and Agent Sells was one agent that
14   responded, yes.
15   Q.   And he reported -- he went to those coordinates, and that's
16   where he found Mr. Vasquez in that area, right?
17   A.   Yes.
18   Q.   And those coordinates that you gave him, those were about
19   5.2 miles from the border, right?
20   A.   Yes.
21   Q.   Now, the Brownfield Station itself is in Otay Mesa, right?
22   A.   Yes.
23   Q.   And Otay Mesa is a border town?
24   A.   Yes.
25   Q.   The Brownfield Station's area of responsibility covers the
```

```
 1   entire area all the way down to the border, correct?
 2   A.  Yes.
 3   Q.  On any given day, your station could have up to seven
 4   scopes in operation, isn't that correct?
 5   A.  In a 24-hour period, yes.
 6   Q.  And that just depends on availability of people who can
 7   work the scopes?
 8   A.  Availability of the scopes, availability of personnel, yes.
 9   Q.  And each scope can cover a few miles, right?
10   A.  Approximately, yes.
11   Q.  On -- you stated on direct that on the morning of October
12   20th, 2020, there were two scopes in operation?
13   A.  Yes.
14   Q.  And you were operating one of them?
15   A.  Yes.
16   Q.  You were operating the scope closer to the border?
17   A.  No.
18   Q.  The other scope was closer to the border?
19   A.  I was operating -- the scope that I operate is further than
20   the other scope that was operational that morning.
21   Q.  Now, you testified on direct that you saw a group of four
22   people around 7:45 a.m., right?
23   A.  Yes.
24   Q.  And you couldn't tell from the scope video what those
25   people were wearing?
```

1  A.   Not exactly.   I did attempt to switch between infrared and

2  the daytime camera, to see what they were wearing.   But, no, at

3  that time of day, I was not able to identify articles of

4  clothing or anything that stood out.

5  Q.   And you couldn't tell, for example, what color hair they

6  had?

7  A.   No.

8  Q.   And that's because it's difficult to see more than a moving

9  image through the scope lens, correct?

10  A.   Yes.

11  Q.   It works -- you have two lenses, but it works partly

12  through an infrared lens, right?

13  A.   One camera is infrared and one camera is daytime, yes.

14  Q.   And the infrared only allows you to see basically shapes,

15  right?

16  A.   Yes.

17  Q.   And the lines are not really defined?

18  A.   Closer images are -- you're able to identify backpacks,

19  other items, they may have something in their hand.   So closer

20  images, you are able to see features of a face on infrared.

21  And it is almost like a regular photograph.   But at that

22  distance, no.

23  Q.   The scope videos are recorded, is that correct?

24  A.   Yes.

25  Q.   And they can be saved?

```
 1   A.   Yes.

 2   Q.   That's because sometimes they're used in court cases?

 3   A.   Yes.

 4   Q.   In fact, we just saw some of the videos from October 20th,

 5   right?

 6   A.   Yes.

 7   Q.   The videos we saw started at about 11:59 a.m., correct?

 8   A.   Yes.

 9   Q.   But there were videos from before that?

10   A.   Yes.

11   Q.   And those videos were destroyed?

12   A.   The videos that were made were of the arrest.  And when the

13   request went to the station, the request was made of video of

14   the arrest.

15   Q.   Right.  I understand that, Agent Huber.  I'm just asking,

16   the videos before 11:59 a.m., those videos were destroyed,

17   right?

18   A.   They're not available, no.

19   Q.   Okay.  No further questions, Agent Huber.  Thank you.

20            THE COURT:  Thank you.  You may stand down.  You're

21   excused as a witness.

22            Next witness, please?

23            MS. SAPTHAVEE:  Your Honor, may we have just one or

24   two redirect questions?

25            THE COURT:  No, he's been fully examined.
```

```
 1              Next witness.
 2              MS. SAPTHAVEE:  Your Honor, the United States calls
 3    Border Patrol Agent Aaron Sells to the stand.
 4              AARON JAMES SELLS, GOVERNMENT'S WITNESS, SWORN
 5              THE COURT:  Have a seat on the witness stand.  Keep
 6    your voice up, speak into the mic.  Take your mask down.
 7              State and spell your full name.
 8              THE WITNESS:  Aaron James Sells, A-A --
 9              THE COURT:  Speak into the mic.
10              THE WITNESS:  A-A-R-O-N, J-A-M-E-S, S-E-L-L-S.
11                           DIRECT EXAMINATION
12    BY MS. SAPTHAVEE:
13    Q.  Good afternoon, Agent Sells.  Could you tell us your
14    current occupation?
15    A.  I'm a United States Border Patrol agent.
16    Q.  And where are you an agent, currently?
17    A.  At the Brownfield Border Patrol Station.
18    Q.  How long have you been there?
19    A.  Roughly a year.
20    Q.  Have you received training in Spanish as part of your job
21    duties?
22    A.  Yes.
23    Q.  About how much training have you received?
24    A.  Approximately six months at the Border Patrol Academy.
25    Q.  And how often have you had to use Spanish during your work
```

1    as a Border Patrol agent?

2    A.   Every day.

3    Q.   Now, let's go ahead and turn right to what happened on

4    October 20th, 2020.

5         Did you arrest one individual that morning?

6    A.   Yes.

7    Q.   Now, is that person in the courtroom today?

8    A.   Yes.

9    Q.   Could you identify him by saying where he's sitting, and

10   pointing out an article of clothing?

11         MS. SAPTHAVEE:   Your Honor, may we have the mask

12   pulled down, please?

13         THE COURT:   Yeah, if you'll ask your client, please,

14   to temporarily remove his mask?

15         MS. CLARK:   Your Honor --

16         THE COURT:   Ask him to temporarily remove his mask.

17   Take it all the way down.

18   BY MS. SAPTHAVEE:

19   Q.   Now, could you identify that person saying where he's

20   sitting and pointing out an article of clothing?

21   A.   Yes, he's sitting over here to my left, wearing like a

22   checkered colored shirt.

23         THE COURT:   All right.   He's identified the defendant.

24   Go ahead.

25         MS. SHERRON:   Objection, Your Honor.   I'm sorry, it's

 1    just that this identification happened immediately after we

 2    asked him to take his mask off, meaning that --

 3              THE COURT:  Okay.  But ordinarily, people don't wear

 4    masks in court.  So for the agent to look at him and see him

 5    full face is totally proper.

 6              The objection is overruled.  Go ahead.

 7    BY MS. SAPTHAVEE:

 8    Q.  Now, let's back up and walk through what happened in more

 9    detail.  Let's take a look at what's been admitted as

10    Government's Exhibit 6.  And it's in the binder -- I'm sorry,

11    Exhibit 5, and it's in the binder in front of you.  Let me know

12    when you're done.

13        Oh, and it's actually on your screen in front of you as

14    well, which is probably easier.  Now, does this show the

15    general area where you found the defendant?

16    A.  Yes.

17    Q.  Does that pin mark the site of the arrest?

18    A.  Yes.

19    Q.  About how far is that site from the international border?

20    A.  Approximately five miles.

21    Q.  And is that if you kind of drew a straight line south from

22    the pin to the border?

23    A.  Yes.

24    Q.  Now, your report says nine miles.  How did that end up in

25    the report?

```
 1   A.   So when I was writing my report, I received the arrest time

 2   and location from our tactical operations center.  So at the

 3   time I was writing the report, that was the mileage I was

 4   given.

 5   Q.   About how much time have you spent patrolling this area?

 6   A.   At the time of arrest, approximately three months.

 7   Q.   Let's take a look at Exhibit 8.  Is this a closer view of

 8   where you found the defendant?

 9   A.   Yes.

10   Q.   Now, please explain to the jury how you ended up in this

11   area on October 20th, 2020?

12   A.   So at approximately 12:00 p.m., there was a call over the

13   radio from Border Patrol Agent Eric Huber that he had observed

14   one individual in an area that he described as north of the 63

15   gate, which is a landmark that we use.  So that is how I got

16   out to this area.

17   Q.   Now, did he give you coordinates or did he just describe

18   the area?

19   A.   He just described the area initially.

20   Q.   What direction did you come from to get to this area?

21   A.   So I came from the north, and drove south on this road that

22   we see here.

23   Q.   Did other agents respond as well?

24   A.   Yes.

25   Q.   Do you know how many agents responded?
```

```
 1   A.   At the least, five.

 2   Q.   And did you arrive on the scene on foot or in a vehicle?

 3   A.   In a vehicle.

 4   Q.   How about other agents?

 5   A.   In a vehicle as well.

 6   Q.   What happened when you got to this area?

 7   A.   So as I approached this area, behind this ridge line that

 8   we're seeing, the road kind of goes around it.  Got out on

 9   foot, and began walking up an old, like, ATV trail.  And that

10   is when I first observed the subject walking uphill.

11   Q.   Could you just point out for us by drawing on the screen

12   what you mean by the ridge line?  And is that where you saw the

13   defendant walking?

14   A.   Yes.

15   Q.   And at some point, did you lose sight of the defendant?

16   A.   Yes.

17   Q.   What did you do after you lost sight of him?

18   A.   I relied on the scope operator to tell me the last location

19   where he had seen the individual.

20   Q.   And did you, yourself, search for him as well?

21   A.   Yes.

22   Q.   How long did you search for him roughly before you found

23   him?

24   A.   Approximately 30 minutes.

25   Q.   And what were the other agents doing while you were
```

1    searching?

2    A.   Searching as well.

3    Q.   Now, how would you have known if one of the other agents

4    saw him before you did?

5    A.   I would have been notified via the radio.

6    Q.   And was your search being assisted by a helicopter

7    overhead?

8    A.   Yes.

9    Q.   How loud was that helicopter?

10           THE COURT:  What's the relevance of that?

11           MS. SAPTHAVEE:  Just showing --

12           THE COURT:  Why don't we get to the encounter.

13           At some point, did you encounter the defendant in the

14   area depicted in the photos?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Okay.  Go on from there, please.

17           MS. SAPTHAVEE:  Thank you, Your Honor.

18   BY MS. SAPTHAVEE:

19   Q.   And where did you find the defendant?

20   A.   I found him laying inside of a bush.  He was on his back

21   kind of intertwined in the brush.

22   Q.   How did you spot him?

23   A.   From the helicopter flying around, it was creating a lot of

24   wind.  And I just happened to turn around, and I could see his

25   shirt blowing from the wind.

```
 1   Q.   Do you recall what position he was in when you found him?

 2   A.   Yes, he was laying in the prone.

 3   Q.   And what does that mean?

 4   A.   He was laying down on his back.

 5   Q.   Now, was he next to the bush, behind, or inside?  How was

 6   he positioned?

 7   A.   He was inside the bush.

 8   Q.   When you approached him, was he making any noise or

 9   gestures?

10   A.   No.

11   Q.   All right.  Please look again at Exhibit 8.  Based on your

12   knowledge of that area, from the top of the ridge, can you see

13   if there are vehicles on the road that run by it?

14   A.   Yes.

15   Q.   You mentioned you and other agents arrived in vehicles.

16   Did your vehicles make noise on roads like these?

17   A.   Yes.

18   Q.   And do they kick up dust?

19   A.   Yes.

20   Q.   Finally, Agent Sells, when you found the defendant in that

21   bush, what did you say to him?

22   A.   I first identified myself as a United States Border Patrol

23   agent, then told him to put his hands up and come out of the

24   bush.  After doing so, I instructed him to sit down.  And then

25   I began my immigration inspection.
```

1    Q.   And do you ask those questions in Spanish?

2    A.   Yes, ma'am.

3    Q.   And now, at that point in October, how many times would you

4    have used those questions in the field?

5    A.   Roughly a hundred times.

6    Q.   And what did he tell you?

7    A.   So the first question I asked him was what country he was a

8    citizen of.  He replied with Mexico.

9         The second question was, what country he was born in.  That

10   was also Mexico.

11        The third question was, was he in possession of any

12   immigration documents to allow him to be here legally?  He

13   said, no.  And my last question was, was he in the United

14   States illegally.  And he said yes.

15   Q.   I want to make sure I caught that.  Did you say you asked

16   him whether he was in the United States illegally?

17   A.   Illegally.

18             MS. SAPTHAVEE:  No further questions, Your Honor.

19             THE COURT:  Cross-examination?

20             MS. SHERRON:  Yes, Your Honor.  Thank you.

21                        CROSS-EXAMINATION

22   BY MS. SHERRON:

23   Q.   Good afternoon, Agent Sells.  I have your report right here

24   just in case you need to see it.

25        So I want to start by asking you some questions about your

```
 1   job.  So first, you are -- you're a Border Patrol agent
 2   assigned to the Brownfield Station, correct?
 3   A.  Yes.
 4   Q.  And the area that you patrol is through the hills of Otay
 5   Mesa, is that right?
 6   A.  Yes.
 7   Q.  And you receive calls as you're patrolling, telling you
 8   where to search?
 9   A.  Yes.
10   Q.  Those calls come in on your radio?
11   A.  Most of the time, yes.
12   Q.  And those calls, they normally come from scope operators
13   that are working?
14   A.  No, not necessarily.  They can come from citizens' reports,
15   from the -- our checkpoint, from our dispatch, or from our
16   scopes.
17   Q.  Okay.  So they come from either dispatch or from scope
18   operators?
19   A.  It could be more options as well, like sometimes agents get
20   stopped as they're driving by other citizens that may have seen
21   something, so --
22   Q.  Okay.  In the area that you patrol, there are no houses
23   over there?
24   A.  In this specific area, no.
25   Q.  And there are no businesses?
```

```
 1   A.   No.
 2   Q.   The only roads through the hills are these rugged fire
 3   roads, is that right?
 4   A.   Yes.
 5   Q.   It can be difficult to drive on those roads?
 6   A.   Yes.
 7   Q.   And eventually, you have to get out of your car and walk?
 8   A.   Yes.
 9   Q.   You must be a pretty good hiker?
10   A.   I -- I guess so.
11   Q.   The area that you patrol, it's a popular place for migrants
12   who are trying to cross, is that fair to say?
13   A.   Yes.
14   Q.   You catch people there every day?
15   A.   I myself, no, not every day.  But as the Border Patrol, as
16   itself, yes.
17   Q.   Some days or your station, other agents that work at your
18   station, you all might catch more than 10 people in a day, is
19   that fair to say?
20          THE COURT:  Not relevant.  Next question.
21   BY MS. SHERRON:
22   Q.   You write reports for every -- for every undocumented
23   person that you find in the hills, correct?
24   A.   No.
25   Q.   Not for every person?
```

```
 1   A.   No.

 2   Q.   Okay.  You write reports for every person that -- that you

 3   do not turn away?

 4   A.   Can you ask that again?

 5   Q.   You write reports for every person that you bring back to

 6   the station?

 7   A.   No.

 8   Q.   You wrote a report in this case?

 9   A.   Yes.

10   Q.   Okay.  And you have been trained to write reports?

11   A.   Yes.

12   Q.   You know they're important because you may need to rely on

13   them in future trials, such as this case?

14   A.   Yes.

15   Q.   And you were trained to be truthful in your reports?

16   A.   Yes.

17   Q.   You were trained to write everything that you could

18   remember in that report?

19   A.   Say that one more time?  Sorry.

20   Q.   You were trained to be complete in your report, to write

21   everything that you could remember?

22   A.   Yes.

23   Q.   And in the report that you wrote for this case, you stated

24   that Agent Huber told you the last known location of a subject?

25   A.   Yes.
```

```
 1   Q.  And you stated in your report that that subject was wearing
 2   all black clothing?
 3   A.  Yes.
 4   Q.  You took that person that you apprehended in the hills to
 5   the Brownfield Station, right?
 6   A.  I myself did not bring him, but he was transported there,
 7   yes.
 8   Q.  Okay.  And he was interviewed there?
 9   A.  I'm unaware.  I'm not sure.
10   Q.  You don't know if he was interviewed there?
11   A.  I didn't conduct an interview, so I'm not sure.
12   Q.  Okay.
13           MS. SHERRON:  I'm sorry, Your Honor, I just need one
14   moment.
15           THE COURT:  Sure.
16           MS. SHERRON:  Okay.  No further questions.
17           MS. SAPTHAVEE:  May I just ask one question, Your
18   Honor, if possible?
19           THE COURT:  All right.  You can ask one question.
20                        REDIRECT EXAMINATION
21   BY MS. SAPTHAVEE:
22   Q.  Are there some things you leave out of your report?
23   A.  Yes.
24           MS. SAPTHAVEE:  That's all, Your Honor.
25           MS. SHERRON:  Your Honor, I'm sorry, I just have a
```

 1   brief redirect.  Is that permitted?

 2          THE COURT:  Go ahead.

 3                        RECROSS EXAMINATION

 4   BY MS. SHERRON:

 5   Q.  Agent Sells, if you leave something out of your report, you

 6   can then submit an addendum to your report, is that true?

 7   A.  I believe so.  What's in my report is what I found

 8   necessary at the time I was writing it.

 9          MS. SHERRON:  All right.  Thank you.

10          THE COURT:  All right.  Thank you.  You may stand

11   down.  Next witness?

12          MR. DESHONG:  The U.S. calls Border Patrol Agent

13   Daniel Alexander.

14          DANIEL ALEXANDER, GOVERNMENT'S WITNESS, SWORN

15          THE COURT:  All right.  Have a seat.  Adjust the mic,

16   speak directly into it.  Keep your voice up.  State and spell

17   your full name, please?

18          THE WITNESS:  Daniel Alexander, D-A-N-I-E-L,

19   A-L-E-X-A-N-D-E-R.

20                        DIRECT EXAMINATION

21   BY MR. DESHONG:

22   Q.  Good afternoon, Agent Alexander.

23   A.  Good afternoon.

24   Q.  You currently work as a Border Patrol agent, right?

25   A.  I do.

```
 1   Q.  And what's your current assignment with Border Patrol?

 2   A.  I'm currently assigned to the U.S. Attorneys Office as a

 3   liaison.

 4   Q.  And does part of your duties as a liaison include serving

 5   as a custodian for A-files?

 6   A.  It does, yes.

 7   Q.  Can you explain to the jury, what is an A-file?

 8   A.  An A-file is a file that holds the contents of an

 9   individual's immigration history.

10   Q.  And what does the "A" in A-file stand for?

11   A.  It stands for alien.

12   Q.  Now, in the immigration context, what does the word alien

13   mean?

14   A.  It means a non-U.S. citizen.

15   Q.  Okay.  And when would an A-file be created for a person?

16   A.  It could be created with an arrest or with any kind of

17   application to enter the United States.

18   Q.  And is there some criteria that immigration officials use

19   to distinguish one A-file from another?

20   A.  Yes, on the outside of the file, there's a nine-digit

21   number that's associated with the file.

22   Q.  And is there a term for that number?

23   A.  It is called an A-file number.

24   Q.  And would more than one person share the same A number?

25   A.  No.
```

```
 1    Q.   And when is an A number typically assigned to a person?

 2    A.   It's typically assigned if the person has applied for

 3    entry, or also if they've been arrested and they're going to be

 4    deported.

 5    Q.   Is it typically assigned when an A-file is created for the

 6    person?

 7    A.   Yes.

 8    Q.   Now, how long does an A-file and the A number stay

 9    associated with each other?

10    A.   I'm sorry, can you ask the question again?

11    Q.   Sorry, let me rephrase it.  That was poorly worded.  How

12    long does an A number stay connected to a person?

13    A.   Forever.

14    Q.   Now, when someone is arrested by Border Patrol, how does

15    Border Patrol determine if that person already has an A number?

16    A.   They will determine that by the records checks and the

17    fingerprints, I guess, that the records checks are based on.

18    Q.   Now, in your time as a Border Patrol liaison, how

19    many -- I'm assuming you've reviewed A-files?

20    A.   Yes.

21    Q.   How many would you say you reviewed?

22    A.   I'd say hundreds to a thousand or more.

23    Q.   Now, I want to turn to this case.  Have you come into

24    contact with an A-file with the number 072957986?

25    A.   Yes, I have.
```

1   Q.   Okay.  And do you recall the name associated with that A

2   number?

3   A.   It is Manuel Vasquez-Perez.

4   Q.   And how many physical files are associated with this A

5   number?

6   A.   Just one.

7   Q.   And I guess let me ask, why would an A number have more

8   than one physical file associated with it?

9   A.   There could be multiple files if the original A-file is at

10  a different location, and the individual is apprehended by,

11  say, Border Patrol in another location.  So you'd have to

12  create additional file to put the paperwork in, and then send

13  it to where the original file is.

14  Q.   And at that point, would those two files be merged?

15  A.   Yes.

16  Q.   Now, does any other person have the A number 072957986?

17  A.   No.

18  Q.   And did you review the contents of the A-file associated

19  with that number?

20  A.   I did.

21  Q.   Now, I'm going to ask you to look in the binder in front of

22  you at what's been marked as Exhibits 15 through 19.  Can you

23  look up at me when you're done?  And I will just note for the

24  record that includes Exhibits 16A and 18A.

25       Now, are those all documents that were in the A-file

1   associated with Manuel Vasquez-Perez?

2   A.   Yes.

3   Q.   And did each of those documents come from that A-file?

4   A.   They did.

5   Q.   And was each one prepared by a federal immigration agency

6   employee?  I guess with the exception of one, of 15.

7   A.   Yes, with the exception of 15, they were.

8   Q.   Okay.  And what is 15?

9   A.   15 is an order of immigration judge.  It's completed by the

10  Executive Office of Immigration Review.

11  Q.   And then is it typical process for that order to be

12  obtained and placed in an A-file?

13  A.   It is.

14  Q.   And including 15, were all of those documents prepared by

15  someone with personal knowledge of the information in the

16  document?

17  A.   Yes.

18  Q.   And was each one prepared in the regular course of

19  business?

20  A.   Yes.

21  Q.   And was each one made at or near the time the events

22  recorded in it?

23  A.   Yes.

24  Q.   Okay.  And are federal immigration agents, including

25  Executive Office of Immigration Review officials under a duty

1    to prepare those documents accurately?

2    A.   They are, yes.

3    Q.   And similarly, do immigration officials have an obligation

4    to make sure that an A-file contains a complete record of an

5    individual's immigration history?

6    A.   They do.

7    Q.   Now, some of those documents have redactions, don't they?

8    A.   Yes.

9    Q.   And just to be clear, those redactions were not in the

10   originals?

11   A.   They were not.

12   Q.   Okay.  Other than that, do those fairly and accurately

13   reflect the documents in the A-file?

14   A.   They do.

15   Q.   Now, I'm going to ask you to also take a quick look at

16   what's been marked as Government's Exhibit 13.

17   A.   Okay.

18   Q.   And is that a certificate relating to the documents marked

19   as Exhibits 15 through 19?

20   A.   Yes.

21   Q.   And does that indicate -- the certificate indicate that

22   each of those documents has been certified as a true and

23   accurate copy of an A-file document?

24   A.   Yes.

25   Q.   Now, I want you to just take a quick look comparing 16 and

1    16A, specifically the second page.  Are those the same document

2    except that 16A is a color copy?

3    A.  Yes, they are.

4    Q.  Can you look at 18 and 18A of the second page?  Same

5    question.  Are those the same document, except that 18A is a

6    color copy?

7    A.  Yes.

8           MR. DESHONG:  Okay.  Your Honor, we'd move to admit

9    Government's Exhibits 15, 16A, 17, 18A, and 19 at this time.

10          THE COURT:  Any objection to those exhibits,

11   Ms. Sherron?

12          MS. SHERRON:  None, other than the ones previously

13   raised in limine.

14          THE COURT:  The Exhibits 16 through 19, including 16A,

15   and 18A are admitted.

16    (Government's Exhibits 15, 16A, 17, 18A, and 19 were received

17                         in evidence.)

18          MR. DESHONG:  Thank you, Your Honor.  Now, can we put

19   Government's Exhibit 19 up on the screen, please?

20   BY MR. DESHONG:

21   Q.  What is this document, Agent Alexander?

22   A.  This is a fingerprint card.

23   Q.  Can we put up -- and I guess before we go on, what is the A

24   number associated with this fingerprint card?

25   A.  072957986.  It's on the left-hand side.

1  Q.  Okay.  And without circling, what is the date that it says

2  this fingerprint card was taken?

3  A.  The date of the arrest is 10-20 of 2020.

4  Q.  And can we look at page two of Exhibit 19, please?  And

5  what is the name associated with this fingerprint card?

6  A.  Manuel Vasquez-Perez.

7  Q.  Okay.

8      MR. DESHONG:  Now we can clear this, please.  And,

9  Your Honor, my co-counsel just handed me a note, just to

10 clarify, we did move to admit Exhibit 15, too, I believe, just

11 then?

12     THE COURT:  You said 15 also?

13     MR. DESHONG:  Yes.

14     THE COURT:  That's the attesting certificate.

15     MR. DESHONG:  That is the immigration judge order.

16     THE COURT:  Okay.  Any objection to 15?

17     MS. CLARK:  Your Honor, could we verify the exhibits

18 that were admitted just for our records?

19     THE COURT:  16 through 19, including 16A and 18.  He's

20 now moving 15 -- he may have moved that originally, but I

21 thought it was 16 through 19.  It's 15 through 19.

22     MS. CLARK:  I believe 16 and 18, the government did

23 not move to admit those.  Instead, they moved to admit 16A and

24 18A.

25     MR. DESHONG:  That's correct.  And we won't publish 16

```
 1   or 18 to the jury.  They're just black and white copies.
 2            THE COURT:  So let me go over this again, then.  15,
 3   16A, 17, 18A, and 19, those are the exhibits?
 4            MR. DESHONG:  That's correct, Your Honor.
 5            THE COURT:  All right.  Without objection beyond those
 6   raised, those exhibits are admitted.
 7            MR. DESHONG:  Thank you.
 8   BY MR. DESHONG:
 9   Q.  Now, as a Border Patrol agent, Agent Alexander, have you
10   been personally involved with the process of deporting
11   individuals from the United States?
12   A.  I have.
13   Q.  And have you personally attended hearings before an
14   immigration judge?
15   A.  I have, yes.
16   Q.  And have you personally prepared documents relating to
17   other aspects of the deportation process?
18   A.  I have.
19   Q.  Is it fair to say that through your training and your
20   experience in this role, you've become familiar with the
21   deportation process?
22   A.  It is.
23   Q.  And when you reviewed defendant's A-file, were there any
24   documents in there indicating that he had been deported from
25   the United States?
```

```
1   A.   There were, yes.

2   Q.   And I want to look at one of those documents.

3            MR. DESHONG:   Can we put up Exhibit 15?

4   BY MR. DESHONG:

5   Q.   Can you explain to the jury, what is this document?

6   A.   This is the order of immigration judge for Manuel

7   Vasquez-Perez.

8   Q.   And when does an immigration -- I guess what takes place

9   before an immigration judge issues an order like this?

10  A.   Before the order from the immigration judge, there will be

11  a notice of appearance issued to the individual that needs to

12  see the immigration judge.

13  Q.   Okay.  And let me ask you slightly differently.  Is there

14  typically some kind of hearing?

15  A.   Yes.

16  Q.   Okay.  And at that hearing, does the immigration judge,

17  like other judges, I guess, hear arguments and evidence?

18  A.   They do, yes.

19  Q.   And then after that hearing, do they typically issue an

20  order like this?

21  A.   Typically, yes.

22  Q.   Okay.  And who does this order relate to?

23  A.   It relates to Manuel Vasquez-Perez.

24  Q.   And do you recognize the case number for this order?

25  A.   If you mean -- do you mean the A number?
```

```
 1   Q.  I guess it's next to a field that says, case number?

 2   A.  I see.  Yes, that is the A number for the individual.

 3   Q.  Okay.  And it's the A number for the A-file we've been

 4   discussing?

 5   A.  It is.

 6   Q.  Okay.  And what is the date that the immigration judge

 7   issued this order?

 8   A.  It is dated April 10th of 1997.

 9   Q.  Okay.  And what did the immigration judge order?

10   A.  It states in the middle, "it is hereby ordered that the

11   respondent be deported from the United States to Mexico on the

12   charges contained in the order to show cause."

13           MR. DESHONG:  Okay.  And if we can clear that.

14   BY MR. DESHONG:

15   Q.  Does the order say anything about whether Manuel

16   Vasquez-Perez sought relief from deportation?

17   A.  It does.

18   Q.  And what does it say?

19   A.  Just above that, it says, "respondent has made no

20   application for relief from departure."

21   Q.  Okay.  Now, after an immigration judge orders a person

22   removed, what happens next, typically?

23   A.  The individual will be physically removed from the United

24   States.

25   Q.  And is that typically documented?
```

```
 1   A.  It is, yes.
 2           MR. DESHONG:  Can we put up Exhibit -- Exhibit 16A,
 3   please.
 4   BY MR. DESHONG:
 5   Q.  And what are we looking at in 16A?
 6   A.  This is a warrant of deportation for Manuel Vasquez-Perez.
 7   Q.  And if we could turn to page 2 of 16A, please.  And what is
 8   the significance of this part of 16A?
 9   A.  This is to identify the individual that's being removed.
10   And then also to verify that the individual actually has been
11   physically removed from the United States.
12   Q.  And when is this, I guess, documentation dated?
13   A.  It is dated April 10th of 1997.
14   Q.  Okay.  Now, besides the name, what other steps are taken to
15   document the identity of the person being removed?
16   A.  There's a photograph and a fingerprint of the individual
17   that is being removed.
18   Q.  And is the person typically asked to sign the form as well?
19   A.  Yes.
20   Q.  Now, if -- based on this form, can you say when and where
21   Manuel Vasquez-Perez was physically removed from the United
22   States on April 10th, 1997?
23   A.  I can.
24   Q.  And when and where was that?
25   A.  On the top of the page, it states, deported at port of
```

1    Nogales, Arizona, on April 10th, 1997, via afoot.

2    Q.   And based on your experience as a Border Patrol agent, what

3    does "afoot" typically mean?

4    A.   Afoot means walking into Mexico.

5    Q.   Okay.  And is there also a space on this form where an

6    immigration official signed that they witnessed this removal?

7    A.   Yes.

8    Q.   And could you circle that space?

9         Have you ever signed a form like this?

10   A.   I have.

11   Q.   And based on your experience with participating in this

12   part of the process, at what point does the official typically

13   sign this departure verification?

14   A.   You would sign this form after you've actually seen the

15   individual physically removed from the United States.

16   Q.   And if we could just briefly return to page 1?  Do you see

17   the A number we've been discussing anywhere on this page?

18   A.   Yes.

19   Q.   And where is that?

20   A.   On the top right corner, there's a number, A72957986.

21          MR. DESHONG:  Okay.  And if we can clear this.

22   BY MR. DESHONG:

23   Q.   Now, what happens if someone returns to the United States

24   after they've already been ordered deported, typically?

25   A.   Typically, they'll be arrested and redeported.

1    Q.   Okay.  And is there special, I guess, term for redeporting

2    someone after they've already been ordered?

3    A.   Yes, if somebody's been ordered removed from the United

4    States by an immigration judge, they can do what's called a

5    reinstatement of that removal.

6    Q.   Okay.  And what's the first step in that process?

7    A.   The first step would be to notify the individual that

8    they're being ordered removed.

9            MR. DESHONG:  Can we publish Exhibit 17, please?

10   BY MR. DESHONG:

11   Q.   What is Exhibit 17?

12   A.   It is a notice of intent/decision to reinstate a prior

13   order for Mario Vasquez.

14   Q.   Okay.  And I think we forgot to highlight this earlier.

15   This says Mario Vasquez.  Some of the other documents we were

16   looking at said Manuel Vasquez-Perez.  Do you recognize the

17   name Mario Vasquez?

18   A.   I do.

19   Q.   Where do you recognize it from?

20   A.   From numerous other documents in his file.

21   Q.   Okay.  Now, does this document have an A number on it?

22   A.   It does.

23   Q.   And do you recognize that A number?

24   A.   I do.

25   Q.   Is it the same one we've been discussing?

1    A.   It is, yes.

2    Q.   Okay.  And what is the date on this notice?

3    A.   This is dated May 23rd of 2012.

4    Q.   Okay.  And does it indicate what deportation order is

5    reinstated -- is being reinstated, excuse me?

6    A.   Yes.  At the top of the page, under number 1, it states

7    that they are removing him under the orders from the April 10th

8    of 1997 order.

9    Q.   Okay.  And do you recognize that date, April 10th, 1997?

10   A.   I do.

11   Q.   Is that the date of the immigration judge order we just

12   looked at?

13   A.   It is.

14   Q.   Now, is there any indication that this document was

15   explained to the defendant in Spanish?

16   A.   There is, yes.

17   Q.   And where is that?

18   A.   In the middle of the page, it states, "the facts that form

19   the basis of this determination and the existence of a right to

20   make a written and oral statement contesting this determination

21   were communicated to the alien in the Spanish language."

22   Q.   Now, you mentioned this form is called a notice and a

23   decision.  Is there anything on this form that actually

24   indicates a decision was made to reinstate the prior order?

25   A.   Yes, the bottom box states it.

```
 1              MR. DESHONG:  Okay.  And if we could clear this.
 2   BY MR. DESHONG:
 3   Q.  What happens after the decision is made to reinstate a
 4   prior order?
 5   A.  The individual would be removed from the United States.
 6   Q.  And can we take a look at Exhibit 18A?  Is this the warrant
 7   of removal associated with the reinstatement we just looked at?
 8   A.  Yes.
 9   Q.  Okay.  And is there more than one name on this form?
10   A.  There is, yes.
11   Q.  What are those names?
12   A.  It shows Manuel Q. Vasquez-Perez.  And then there's an AKA,
13   which stands for also known as, and it shows Mario Vasquez.
14   Q.  And once again, do you recognize the A number on this
15   warrant?
16   A.  I do.
17   Q.  And is it the A number we've been talking about?
18   A.  It is.
19   Q.  And is that the number associated with Manuel
20   Vasquez-Perez?
21   A.  It is.
22   Q.  Now, can we turn to page 2 of 18A.  When does this page
23   indicate that the defendant was last removed?
24   A.  On the top of the page, just after port, date, and manner
25   of removal, it shows, Brownsville Texas, POE afoot, on October
```

1   12th of 2020.

2   Q.  Now, let me ask you, because when we were looking at the

3   first page, it said this was prepared in May of 2012, right?

4   A.  That is correct.

5   Q.  Does it raise any flags for you that there's this gap

6   between the date it was prepared and the date it was carried

7   out?  Let me rephrase that.  Is it uncommon for there to be

8   some time gap between the date a form is prepared and the date

9   a removal is carried out?

10  A.  It is not uncommon.

11        MR. DESHONG:  Now if we could clear this.

12  BY MR. DESHONG:

13  Q.  Now, after someone is deported from the United States, is

14  there a process for them to attempt to legally return?

15  A.  There is, yes.

16  Q.  And is there an official they have to get, I guess,

17  permission or consent from?

18  A.  Yes.

19  Q.  And who is that official?

20  A.  It would be the Department of Homeland Security or the

21  Attorney General.

22  Q.  And is -- how would someone go about trying to seek that

23  permission?

24  A.  They have to apply and fill out a -- what's called a form

25  I-212.  It's the application for permission to reapply for

```
 1   admission to the United States after deportation.
 2   Q.   In the course of your duties as a Border Patrol agent and
 3   an A-file custodian, have you seen an I-212 application?
 4   A.   Yes.
 5   Q.   And if a person files such an application, is that a
 6   document that should be placed in the A-file?
 7   A.   Yes.
 8   Q.   And if an I-212 is granted, are there documents associated
 9   with that approval?
10   A.   Yes.
11   Q.   And are those also things that should be placed in an
12   A-file?
13   A.   Yes.
14   Q.   Okay.  And in reviewing defendant's A-file, did you see
15   anything to indicate that he had submitted an I-212 or that an
16   I-212 had been approved on his behalf?
17   A.   I did not.
18   Q.   Okay.  Now, just to clarify real quick, if your I-212 is
19   approved, are you -- is someone free to just walk into the
20   United States at that point?
21   A.   No.
22   Q.   What else would they have to do?
23   A.   They would then have to apply for entry to the United
24   States.
25   Q.   So is it fair to say an I-212 is essentially an application
```

1    to apply?

2    A.  It is.

3    Q.  Okay.  Now, did you check -- I guess let me ask you this.

4    Are there any databases that would also track someone getting

5    approval to come back to the United States after deportation?

6    A.  There is, yes.

7    Q.  Okay.  And what are those databases?

8    A.  Well, that database, in particular, would be the CLAIMS

9    database.  It stands for computer-linked application

10   information management system.

11   Q.  Is there another database that tracks individuals'

12   immigration status?

13   A.  Yes.

14   Q.  What is that one called?

15   A.  That is the CIS database, which stands for central index

16   system.

17   Q.  Okay.  And have you received training as to what kinds of

18   information are entered in both CLAIMS and CIS?

19   A.  Yes.

20   Q.  And have you used CLAIMS and CIS as part of your regular

21   duties?

22   A.  Yes.

23   Q.  And is the information maintained in these databases in the

24   regular course of business for the Department of Homeland

25   Security?

```
 1    A.   Yes.
 2    Q.   Okay.  And is the data entered into these databases by
 3    people who have personal knowledge of the information they're
 4    entering?
 5    A.   Yes.
 6    Q.   Okay.  And is the data entered near or at the time of the
 7    events it's recording?
 8    A.   Yes.
 9    Q.   And finally, is it entered by individuals with a duty to
10    maintain the database accurately?
11    A.   Yes, it is.
12    Q.   Okay.  Now, based on your training and experience, should
13    I-212 -- should there be some indication of an I-212
14    application in the CLAIMS database?
15    A.   Sorry, could you ask the question again?
16    Q.   Sure.  And I guess I should say, if a person submits an
17    I-212, should it be reflected in the CLAIMS database?
18    A.   Yes, it should.
19    Q.   Okay.  And have you personally searched the CLAIMS database
20    to see if defendant -- you could find any evidence defendant
21    submitted an I-212?
22    A.   Yes, I did.
23    Q.   And when did you last search it?
24    A.   This morning.
25    Q.   And what was the result?
```

```
 1   A.   It showed no applications submitted for that I-212.

 2   Q.   Okay.  And similarly, in case there was, you know, an

 3   error, would the CLAIMS database reflect if an I-212 was

 4   approved for someone?

 5   A.   It would, yes.

 6   Q.   Okay.  And when you searched this morning, did you see an

 7   indication that an I-212 had been approved for defendant?

 8   A.   There was no indication of that.

 9   Q.   Now, turning to the CIS database, I think we already asked

10   you this, but is that a database that essentially tracks

11   someone's current immigration status?

12   A.   It is.

13   Q.   And similarly, did you personally search the CIS database

14   for information relating to defendant?

15   A.   I did.

16   Q.   And when did you do that?

17   A.   This morning.

18   Q.   And did you search by his A number?

19   A.   Yes.

20   Q.   Did you search by his name?

21   A.   I did.

22   Q.   And, you know, we looked and we saw there's two different

23   names on some of these forms.  Did you check both those names?

24   A.   I did.

25   Q.   And did you find anything -- I guess let me ask you.  Did
```

1   you find an individual matching defendant's description in CIS?

2   A.  I did.

3   Q.  Okay.  And did it indicate that that individual -- I guess

4   what it did it say for his immigration status?

5   A.  It showed that he was a Mexican citizen, and that he does

6   not have permission to enter the United States.

7   Q.  And when you searched those -- excuse me, those variations

8   of his name or aliases, did you find anything that says, hey,

9   Mario Vasquez with this A number is not deportable?

10  A.  No.

11  Q.  Okay.  Now, based on that search, when it says someone's

12  deportable, does that mean their prior deportation order is

13  still in effect?

14  A.  Yes.

15  Q.  Now, to wrap it up, did you see anything in defendant's

16  A-file or any of these databases indicating that he had applied

17  for permission to reapply for admission to the United States?

18  A.  I did not.

19  Q.  Okay.  And did you see anything in any of those places to

20  indicate he had actually received such permission?

21  A.  I did not.

22  Q.  Okay.

23          MR. DESHONG:  No further questions, Your Honor.

24          THE COURT:  Cross-examination?

25                  CROSS-EXAMINATION

```
1    BY MS. SHERRON:

2    Q.   Good afternoon, Agent Alexander.

3    A.   Good afternoon.

4    Q.   I just want to begin by asking you a few questions about

5    your job.

6    A.   Okay.

7    Q.   You described your job as the custodian of the A-file,

8    right?

9    A.   I believe I described my job as a liaison, but it's a part

10   of my duties to be a custodian, yes.

11   Q.   And that means that you maintain physical custody of the

12   A-file?

13   A.   A part of it, yes, is to do that.

14   Q.   Okay.  And that means that you're basically in charge of

15   taking care of it while it's here in San Diego?

16   A.   Correct.

17   Q.   The file originally was stored at a different location,

18   though, is that right?

19   A.   Yes.

20   Q.   Okay.  And you were not the original custodian of this

21   particular A-file; is that correct?

22   A.   That is correct.

23   Q.   You also did not create this A-file, right?

24   A.   I did not.

25   Q.   And you did not add any deportation documents into the
```

```
 1   A-file yourself?

 2   A.   I've added the stuff from his arrest this time to the

 3   A-file, yes.

 4   Q.   Okay.

 5   A.   But that's it.

 6   Q.   And the documents that you just went over with Mr. Deshong,

 7   you did not create any of those documents; is that correct?

 8   A.   That's correct.

 9   Q.   Okay.  Someone else, in fact, placed those documents into

10   the A-file?

11   A.   Yes.

12   Q.   And you have no personal knowledge, meaning you were not

13   there when those documents were created?

14   A.   That's correct.

15   Q.   And you were not there when any of those events that those

16   documents are about took place?

17   A.   That's correct.

18   Q.   You did not create those documents?

19   A.   I did not.

20   Q.   You did not sign them?

21   A.   I did not.

22   Q.   And you have never met Mr. Vasquez-Perez before; is that

23   correct?

24   A.   I don't believe that I have.

25   Q.   I'd like to take a look quickly at Government Exhibit 15.
```

1          MS. SHERRON:  If we could pull that up.

2    BY MS. SHERRON:

3    Q.   Now, Agent Alexander, this entire document is in English,

4    correct?

5    A.   That is correct.

6    Q.   And there's no Spanish version of this order in the A-file?

7    A.   I do not believe so.

8    Q.   Now, turning to Government's Exhibit 17, as you stated on

9    direct, this notice is for Mario Vasquez; is that correct?

10   A.   That's correct.

11   Q.   And you were not present during this proceeding?

12   A.   That is correct.

13   Q.   You -- I'm sorry, other officers were involved?

14   A.   Correct.

15   Q.   For example, the notice -- the notice of intent to

16   reinstate the prior order was issued by an Officer Christopher

17   Andress?

18   A.   That is correct.

19   Q.   And his signature appears on the document?

20   A.   Yes.

21   Q.   And on the decision, order, and certification line, that

22   was issued by Curtis Hemphill; is that correct?

23   A.   Yes.

24   Q.   And on the signature line that says, signature of alien,

25   there is no signature, correct?

```
 1   A.  Are you talking about in the acknowledgment and response?

 2   Q.  Yes.

 3   A.  Yes.

 4   Q.  Yes, as in, yes, there's no signature?

 5   A.  Correct.

 6   Q.  Okay.  And you were not the officer who provided this

 7   notice to Mario Vasquez, correct?

 8   A.  Correct.

 9   Q.  This notice is completely in English, is that right?

10   A.  Yes.

11   Q.  And there's no version of this document in Spanish in the

12   A-file?

13   A.  I don't believe so.

14   Q.  Okay.  Thank you.

15       Lastly, I'd like to turn to Government Exhibit 18 -- I'm

16   sorry, 18A.  This warrant for deportation is completely in

17   English as well?

18   A.  It is.

19   Q.  And you were not personally there to execute it?

20   A.  I was not.

21   Q.  And it's signed by a different officer named Steven Branch?

22   A.  Yes.

23   Q.  Thank you.

24           MS. SHERRON:  No further questions.  Thank you.

25           THE COURT:  Anything else?
```

1          MR. DESHONG:  Very briefly, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MR. DESHONG:

4     Q.  Agent Alexander, you said you've attended IJ hearings,

5     right?

6     A.  Yes.

7     Q.  Was there an interpreter translating the proceedings?

8     A.  Generally, yes.

9          MR. DESHONG:  Nothing further, Your Honor.

10          THE COURT:  All right.  Thank you.  You may stand

11     down.

12          Ladies and gentlemen, we'll take our afternoon recess

13     at this time.  Let's go until 10 minutes to 4:00.  Remember

14     this admonition, don't form or express an opinion about the

15     case until it's finally submitted to you.  Please either go

16     outside during the break or into the jury room, so we can

17     continue to work -- I can continue to work with the lawyers in

18     your absence.

19          We're in recess until 10 to 4:00.

20       (At 3:33 p.m., the jury was excused, and the following

21     proceedings were held:)

22          THE COURT:  Have a seat.  The jury is not present.

23     Counsel and the defendant are present.  There was an objection

24     to the Court asking and eventually ordering the defendant to

25     remove the mask.

1          Look, these are unusual times with COVID.  People are

2     allowed to wear masks, but it's not a shield to being

3     identified in Court.

4          It's as if the defendant was putting his hands in

5     front of his face.  The Court would certainly order him to take

6     down.  So the objection is overruled on that basis.  It's a

7     frivolous objection, in my view, and it only makes the defense

8     look like they're trying to hide something.  So that's the

9     explanation for the ruling which I've made.

10          MS. CLARK:  I understand, Your Honor.  I just wanted

11     to point out for the record that there are several people on

12     defense counsel table.  And what we were trying to ask the

13     Court is to ask everybody seated here to remove their masks.

14          THE COURT:  There are -- directly proximate to the

15     defendant, there are three females.  It's obvious the person

16     that was asked to be identified was a male.

17          The defendant is the only one at your particular

18     table, not the one perpendicular to it, who's a male.

19          And that's where the witness's attention was directed.

20     So why would I ask females to pull down their masks when the

21     person being asked to be identified is Manuel Vasquez?

22     Wouldn't do it.  Anyway --

23          MS. CLARK:  Yes, Your Honor, but I was specifically

24     asked to turn and directly touch my client, so it would have

25     pointed to the witness, the specific person --

 1           THE COURT:  Ms. Clark, if you want to argue that, that

 2    somehow the identification is unreliable because the Court

 3    asked the defendant to remove his mask, go ahead.  Be my guest.

 4    Knock yourself out.  But the objection is overruled.  Anything

 5    else while we're in recess?

 6           MS. CLARK:  Just to perfect the record, Your Honor, I

 7    do know that there have been times that the agents have

 8    identified, for example, interpreters or marshals as a person

 9    they have arrested.

10           THE COURT:  Of course.  Of course that's true, but,

11    Ms. Clark, again, acknowledge the obvious.  We're in a

12    different period of time.  People are wearing masks in Court.

13    That doesn't happen.  That doesn't happen when we don't have a

14    COVID pandemic on it.

15           So I don't know how you would accommodate it.  I mean,

16    somebody has to wear -- remove the mask.  In this case, the

17    defendant's mask is covering the nose, the full bottom part of

18    his face.

19           So how we're going to have reliable identification?

20    There's no evidence that he was masked at the time the agent

21    first saw him or during their conversation.  So we'll leave it

22    at that.

23           Anything else?

24           MS. CLARK:  Is the Court denying my access to the

25    record?

1          THE COURT:  What record?

2          MS. CLARK:  The record that we're making about this

3     issue?

4          THE COURT:  No, I think you've made your record.  You

5     objected to me asking him to take his mask down.

6          MS. CLARK:  What I'm trying to say, Your Honor, is

7     this could have been raised in limine, where we could have had

8     either a clear mask or it could have been addressed so that in

9     the presence of the jury --

10          THE COURT:  Ms. Clark, the whole thing is just so

11     preposterous.  It really is.  I think -- honestly, I think you

12     ought to think about this before you make these arguments to

13     the Court or to the jury, because it's a frivolous argument.

14     And all it does, I think, is diminish, you know, the validity

15     of some of your other arguments.

16          I mean, when you pursue something like this.

17     He's -- really, is that the scenario?  The witness is supposed

18     to look at him with the mask on and say, well, you know, guess

19     if that's the right guy.  Really?  That's what we do?

20          MS. CLARK:  If there are other times, Your Honor, that

21     the prosecutor would like to ask a witness to identify

22     Mr. Vasquez, I would appreciate knowing in advance, so he can

23     remove his mask before --

24          THE COURT:  I don't know.  Do you have anybody else

25     that's going to identify him?

```
 1              MR. DESHONG:  No, Your Honor.

 2              THE COURT:  Okay.  Done.  All right.  Back at 10 to

 3    4:00, please.

 4              MR. DESHONG:  I will say, Your Honor, we're on track.

 5    There's a chance that we may rest today.

 6              THE COURT:  So you need to be ready with any witnesses

 7    that you may have.

 8              MS. CLARK:  Thank you, Your Honor.

 9         (A recess was taken from 3:37 p.m. to 3:50 p.m.)

10              THE COURT:  All jurors are present.  Counsel and the

11    defendant are present.  Next witness, please?

12              MR. DESHONG:  United States calls Deportation Officer

13    Manuel Pena.

14              THE COURT:  Mr. Pena, if you'll stop and raise your

15    right hand?

16               MANUEL PENA, GOVERNMENT'S WITNESS, SWORN

17              THE COURT:  Have a seat.  Keep your voice up, speak

18    directly into the mic.  Last thing, state and spell your full

19    name.

20              THE WITNESS:  My name is Manuel Pena.

21              THE COURT:  Can you spell it, please?

22              THE WITNESS:  M-A-N-U-E-L, P-E-N-A.

23                          DIRECT EXAMINATION

24    BY MR. DESHONG:

25    Q.  Good afternoon, Officer Pena.  And, I'm correct, you're a
```

```
 1  deportation officer with Immigration and Customs Enforcement,
 2  right?
 3  A.   Correct.
 4           THE COURT:  You're not talking loud enough.
 5           THE WITNESS:  Correct, yes.
 6  BY MR. DESHONG:
 7  Q.   And how long have you been a deportation officer?
 8  A.   25 years.
 9  Q.   And where -- what state have you served as a deportation
10  officer in during that time?
11  A.   Texas.
12  Q.   And is it fair to say one of your main responsibilities is
13  carrying out removal orders?
14  A.   Yes.
15  Q.   And what does it mean to carry out a removal order?
16  A.   It means you have to execute a warrant of deportation, and
17  that's pretty much it.
18  Q.   Okay.  And does part of the job involve documenting when
19  you carry out a warrant of removal?
20  A.   Yes.
21  Q.   Now, is it fair to say you've been carrying out removals
22  for your entire 25-year career as a deportation officer?
23  A.   That is correct.
24  Q.   How many would you say you've carried out?
25  A.   Over a thousand.
```

```
 1   Q.   Over just one thousand or thousands?

 2   A.   Thousands.

 3   Q.   Now, I want to talk to you about the process of removing

 4   someone, your process.  When you work in Texas, where you work,

 5   where do you receive people who are being, I guess, sent to you

 6   to carry out the removal orders?

 7   A.   Sometimes at the airport and sometimes at the -- our local

 8   facility.

 9   Q.   Okay.  And I guess regardless of whether you receive them

10   out of your local facility or an airport, as part of the

11   process, do you, I guess, compare the identity against the

12   warrant?

13   A.   Yes.

14   Q.   Okay.  And when you're, I guess, preparing -- I guess let

15   me ask you, do you typically do this with groups of people?

16   A.   The majority of the time, yes, in groups, at least two.

17   Q.   And when you receive a group, do you typically go through

18   everyone in the group and check who they are against the

19   warrant of removal?

20   A.   Yes.

21   Q.   And why do you do that?

22   A.   To make sure that we have the right person.

23   Q.   And what do you do after you've confirmed that you have the

24   right person?

25   A.   We -- we put them in -- right after I check them or my
```

```
 1    partner checks them, we put them in either a van or a bus by a

 2    contract company.  And then we head to the port of entry.

 3    Q.   Okay.  And what port of entries do you typically head to?

 4    A.   It can be either the Brownsville port of entry or the

 5    Hidalgo port of entry.

 6    Q.   What was the second one?

 7    A.   Hidalgo, Texas port of entry.

 8    Q.   Now, what happens when you get to the port of entry?

 9    A.   Once we get there, the contract company gets the people

10    down or the person.  And they -- we give them their property

11    and make sure they get all their documents back, passports,

12    whatever IDs.  And then we escort them to the midpoint of the

13    POE.

14    Q.   And just because in California, our ports of entry don't

15    have midpoints, what's the midpoint of the port of entry?

16    A.   At the Rio Grande city -- I mean Rio Grande River.

17    Q.   Is the midpoint on a bridge?

18    A.   The midpoint is on the bridge.

19    Q.   And what happens when you reach the midpoint?

20    A.   We walk them all the way to the midpoint.  And then pretty

21    much we make sure that they cross over to Mexico.

22    Q.   Okay.  And after you've witnessed a person or group cross

23    over to Mexico, what's the last part of the process?

24    A.   We head back to the office and we sign the documents that

25    we verified the departure or the removal.  And we return the
```

```
 1   documents back to the office where they came from.

 2   Q.   Okay.  Now, I'm going to ask you to take a look at what's

 3   been marked as Government's Exhibit 18A.  Do you recognize this

 4   document?

 5   A.   That's the I-205.

 6   Q.   What's the, I guess, plain English name for an I-205?

 7   A.   An I-205, the warrant of removal and deportation form.

 8   Q.   Okay.

 9   A.   It's an immigration form.

10   Q.   And when you were talking about your job carrying out

11   removal orders, is this the form you're typically executing?

12   A.   Yes.

13   Q.   Can we turn to page 2 of this document?  Do you recognize

14   the name and signature in about the middle of the page on this

15   form?

16   A.   That is my stamp, along with my signature.

17   Q.   Okay.  And do you, I guess, remember this exact removal?

18   A.   Not really.  I remember -- that's my stamp, my signature.

19   Q.   Okay.  And let mel ask you, you said you've been doing

20   thousands of removals carrying out these forms during your

21   career as a deportation officer, right?

22   A.   Yes.

23   Q.   Okay.  And the process you just ran us through, do you

24   follow that every time you do a removal?

25   A.   Yes.
```

```
 1    Q.   Okay.  And that process, does it always include comparing

 2    the identity in these 205s against the person you're physically

 3    removing?

 4    A.   Correct.

 5    Q.   And would you ever carry out a warrant of removal without

 6    having verified -- either you or your partner verifying the

 7    person's identity?

 8    A.   I'm sorry?

 9    Q.   Would you ever, I guess, carry out a removal without either

10    you or your partner verifying the person's identity?

11    A.   Yes.

12    Q.   You would carry one out without verifying --

13    A.   Oh, no, no, no.  I'm sorry, no.

14    Q.   And I apologize for poorly wording the question.  Let me

15    ask it differently.

16         Do you verify -- you or your partner verify the identity in

17    every single removal you carry out?

18    A.   That is correct, yes.

19    Q.   Would you ever sign the departure witnessed by spot, if you

20    had not personally witnessed the person leave the United

21    States?

22    A.   Yes.

23    Q.   Yes, you would or --

24    A.   No, I'm sorry, no.

25    Q.   Sorry.  And I'll try to ask the questions a little simpler.
```

1        And so based on your signature on that field in this form,

2   would you conclude that you witnessed this individual leave the

3   United States through Brownsville, Texas port of entry?

4   A.  Yes.

5   Q.  And what date would you conclude that you witnessed that

6   on?

7   A.  On 10-12-2020.

8           MR. DESHONG:  Nothing further, Your Honor.

9           THE COURT:  Cross-examination?

10          MS. CLARK:  Yes, Your Honor.

11                          CROSS EXAMINATION

12  BY MS. CLARK:

13  Q.  Hi, Officer Pena, how are you?

14  A.  Fine.

15  Q.  So we just were talking about your typical procedure when

16  you are executing a deportation; is that right?

17  A.  Yes.

18  Q.  And you've been an officer for 25 years?

19  A.  Correct, yes.

20  Q.  And you have seen thousands of people walk across the line?

21  A.  Yes.

22  Q.  So you don't remember Mr. Vasquez-Perez?

23  A.  No.

24  Q.  You don't remember, you know, what color pants he was

25  wearing that day, if he was wearing jeans or khakis or sweats?

```
 1   A.   No.

 2   Q.   If he had a sweatshirt?

 3   A.   No.

 4   Q.   Or a backpack?

 5   A.   No.

 6           THE COURT:  I assume you don't remember anything about

 7   him.

 8           THE WITNESS:  I don't.

 9           THE COURT:  Including what he was wearing, anything he

10   was carrying, all of that?

11           THE WITNESS:  No.

12           THE COURT:  Okay.  Next?

13           MS. CLARK:  That was my last question, Your Honor.

14   Thank you.

15           THE COURT:  All right.  Thank you, Mr. Pena.

16           MS. CLARK:  Oh, no, on that.  I'm sorry, not in the

17   whole thing.

18   BY MS. CLARK:

19   Q.   When you watch someone cross the border, there's a log that

20   you maintain?

21   A.   Yes.

22   Q.   In addition to the forms that we just reviewed?

23   A.   Yes.

24   Q.   You don't have that log here with you today?

25   A.   No.
```

1    Q.  And then when you watched someone walk across the border,

2    there's typically an agent from Mexico there?

3    A.  Yes.

4    Q.  And the Mexican officials also have a log?

5    A.  I don't know they do, but they do sometimes meet us there.

6    And they take -- they take them.

7    Q.  And you don't know what officer was there that day?

8    A.  No.

9    Q.  You just testified that you travel to a port of entry to

10   effectuate a deportation and removal?

11   A.  Yes.

12   Q.  And that was either Brownsville or Hidalgo?

13   A.  Correct.

14   Q.  And there were cameras at the ports of entry, right?

15   A.  Yes.

16   Q.  And even along the border wall or fence, there are cameras

17   all along there, too, right?

18   A.  Yes.

19           MS. CLARK:  I don't have any further questions.

20           MR. DESHONG:  No redirect, Your Honor.

21           THE COURT:  All right.  Thank you.  Have a good trip

22   back to Texas.

23           THE WITNESS:  Thank you.

24           THE COURT:  Next witness?

25           MR. DESHONG:  Next witness, the United States calls

 1   Border Patrol Agent Rubens Alexandre.

 2           RUBENS ALEXANDRE, GOVERNMENT'S WITNESS, SWORN

 3           THE COURT:  Have a seat.  Keep your voice up.  Speak

 4   directly into the mic.  Spell your first and last name.

 5           Have a seat first.

 6           THE WITNESS:  My name is Rubens --

 7           THE COURT:  You're going to have to move closer to the

 8   mic.  Keep your voice up.

 9           THE WITNESS:  First name is Rubens, R-U-B-E-N-S,

10   Alexandre, A-L-E-X-A-N-D-R-E.

11           THE COURT:  You can adjust the mic a little bit

12   closer.  And I want you to try to project your voice to the

13   back of the courtroom, okay?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  All right.  Go ahead.

16                       DIRECT EXAMINATION

17   BY MR. DESHONG:

18   Q.  Good afternoon, Agent Alexandre.

19   A.  Good afternoon, sir.

20   Q.  How long have you been a Border Patrol agent?

21   A.  13 years.

22   Q.  And have you been at the Brownfield Station that entire

23   time?

24   A.  Yes, sir.

25   Q.  Okay.  And has one of your job at the Brownfield Station

1    involved processing duty?

2    A.   Yes, sir.

3    Q.   And can you explain to the jury, what does processing duty

4    involve?

5    A.   Being assigned to processing duty, we are in charge of

6    intake to looking after the subjects, to completing the case

7    work.

8    Q.   And is part of processing duty, can that involve running

9    fingerprints?

10   A.   Yes, sir.

11   Q.   Okay.  Now, I want to talk to you about intake duty.  And I

12   guess -- does intake duty involve, I guess, accepting custody

13   of people who've been arrested in the field?

14   A.   Yes, sir.

15   Q.   And when you accept custody from someone who's been

16   arrested in the field, what kind of information is received,

17   typically?

18   A.   We receive a zone intel sheet from the agent, so that zone

19   intel sheet has the subject's name, DOB, country of

20   citizenship, and whether they have any money in their

21   possession.

22   Q.   Okay.  And once you receive them, does part of the process

23   involve running their fingerprints?

24   A.   Yes, sir.

25   Q.   And why is someone's fingerprints run once they're taken

1    into custody?

2    A.   That's one of the ways that we have to confirm that the

3    information that they give us from the field is actually

4    accurate.  So it's an extra step to confirm the ID.

5    Q.   Okay.  And let me ask you, and I'm talking about, I guess,

6    when you fingerprint someone, what steps do you take to confirm

7    the person's identity before scanning, running their

8    fingerprints?

9    A.   Okay.  With that zone intel, we have to match it with a

10   different number that is created from the tactical operation

11   center.  So we access the A-file number that's on the zone

12   intel.  And then we go on and add a subject's name to the

13   A-file.  So once that's done, we call them up to the booth

14   where we're about to roll their fingerprint.  And we ask them

15   to, again, confirm the name and their date of birth.

16   Q.   And when you said this booth where fingerprints run, is

17   that run on ink and paper?

18   A.   No, sir.

19   Q.   How -- is it a machine?

20   A.   It's a machine, it's all digitalized.

21   Q.   And let me ask, does the machine, I guess, prompt what

22   finger to put in what order?

23   A.   So once we call the subject up, and we ask the subject

24   again to confirm his name and date of birth, once he confirms

25   that, we click on the camera icon that takes us to the

1    application to start taking his fingerprints.

2    Q.   And what -- what does the machine prompt you to do after

3    all the fingerprints are taken?

4    A.   So -- so first of all, the machine points you to take each

5    fingerprint.  Then at the end of taking all the fingerprints,

6    it prompts you to take a picture of the subject.

7    Q.   Okay.  And I want to ask you to take a look at what's been

8    marked as Government's Exhibit 19.  If we put up page 2.  I

9    should say what's been admitted as Government's Exhibit 19.

10        And I apologize, I misspoke.  Can we go to page 1?

11        Do you see your name on this form?

12   A.   Yes, sir.

13   Q.   And what is this form?

14   A.   This is a form that we refer to as the 249.  It's a form

15   that has the subject's fingerprints on there.  The fingerprints

16   that were taken at intake.

17   Q.   And do you see your name on this form?

18   A.   Yes, sir.

19   Q.   Does that mean, in this particular case, that you actually

20   took the fingerprints?

21   A.   No, sir.

22   Q.   Okay.  Is this -- if we can go down to the second page.  Is

23   this generated automatically by the machine that scans the

24   fingerprints?  Let me rephrase that.

25        Is this a printout from the machine that scans the

1    fingerprints?

2    A.   It's a printout from our processing system.  So once that

3    fingerprint is taken, it is saved to our processing module,

4    which we call NextGen.  And it is taken from those initial

5    fingerprints that were taken at intake, yes, sir.

6    Q.   And so while you didn't take the fingerprints on this card,

7    were you involved in preparing the paperwork associated with

8    this case?

9    A.   Yes, sir.

10   Q.   Okay.  And I just want to go back to when you were talking

11   about that process you have for verifying the identity and

12   fingerprints, have you been taking fingerprints on and off your

13   entire time as a Border Patrol agent?

14   A.   Yes, sir.

15   Q.   How many would you estimate you've done during that time?

16   A.   Well, for the past 13 years, I'd say thousands.

17   Q.   Okay.  And did another Border Patrol agent from Brownfield

18   train you to take fingerprints this way, where you verify name

19   and date of birth before you do it?

20   A.   Yes, sir.

21   Q.   Okay.  And have you watched other Brownfield agents take

22   fingerprints this same way?

23   A.   Yes, sir.

24   Q.   And is it fair to say, everyone you've observed at the

25   Brownfield Station follows that process?

```
1    A.   Yes, sir.

2    Q.   Now, and every time you've taken fingerprints as an agent,

3    at the end, it prompts a photo to be taken?

4    A.   Yes, sir.

5    Q.   Now, you mentioned you prepared some of the paperwork in

6    this case.  Did you sit down with Manuel Vasquez-Perez to

7    review that paperwork at the end of -- I guess as part of

8    preparing this paperwork?

9    A.   Yes, sir.

10   Q.   And how did you make sure that the person in front of you

11   was Manuel Vasquez-Perez at that stage?

12   A.   As I'm completing the paperwork, I have him there in front

13   of me.  And I ask him his information, and confirming them with

14   what information that were provided to us at the initial case

15   work.

16   Q.   And I guess let me clarify that.  You're sitting down after

17   the fingerprints have already been taken?

18   A.   Yes.

19   Q.   And after that photograph was taken?

20   A.   Yes, sir.

21   Q.   And do you have that photograph in front of you when you

22   sit down with him?

23   A.   Yes.  He's -- his picture is there.

24   Q.   Okay.  And do you use that photograph to visually confirm

25   it's the right person?
```

```
 1   A.   Yes, sir.

 2   Q.   Okay.  Now, you said you reviewed some of the paperwork.

 3   Is that without -- you know, just briefly, you're essentially

 4   just confirming that the information you have in it is correct

 5   for that individual, right?

 6   A.   Yes, sir.

 7   Q.   And at some point, did you ask him to initial part of the

 8   paperwork?

 9   A.   Some forms require signature and some forms require his

10   initials, yes, sir.

11   Q.   Does it require his initials to confirm, like, what

12   property has been taken into custody?

13   A.   It's another step to confirm the information that we have

14   is accurate, and we're asking him to confirm.

15   Q.   And when this individual -- did you ask this individual to

16   put his initials on a form regarding property that was taken?

17   A.   Yes, sir.

18   Q.   And do you recall what initials he put?

19   A.   I believe MV.

20   Q.   Okay.  Did you say M and V?

21   A.   I believe so.

22   Q.   Okay.  Now, based on your training and experience at

23   Brownfield, and your interactions with Manuel Vasquez-Perez,

24   are you confident that he's the person whose fingerprints are

25   on this card?
```

```
 1   A.   Yes, sir.

 2             MR. DESHONG:  Nothing further, Your Honor.

 3             THE COURT:  Cross-examination?

 4             MS. CLARK:  Yes, Your Honor.

 5                         CROSS EXAMINATION

 6   BY MS. CLARK:

 7   Q.   How are you doing, Agent Alexandre?

 8   A.   I'm good, thank you.

 9   Q.   I have your report here, so just let me know if you need to

10   take a look at it, okay?

11   A.   Okay.

12   Q.   So you were just testifying about your duties processing

13   intakes; is that right?

14   A.   My duties as a processing agent, yes, ma'am.

15   Q.   And part of that includes sitting down with people when

16   they are interviewed?

17   A.   Not necessarily.

18   Q.   Okay.  But you did sit down with Mr. Vasquez-Perez?

19   A.   Yes, ma'am.

20   Q.   And you were the witness of his post-arrest interview?

21   A.   Yes, ma'am.

22   Q.   You didn't personally take his fingerprints?

23   A.   No, ma'am.

24             MS. CLARK:  Can we pull up the first page of

25   Government Exhibit 19?
```

1  BY MS. CLARK:

2  Q.  And so you testified a few minutes ago that you do see your

3  name on this page?

4  A.  Yes, ma'am.

5  Q.  And it's under a heading called official taking

6  fingerprints?

7  A.  Yes, ma'am.

8  Q.  And it says name or number?

9  A.  Yes, ma'am.

10  Q.  And you wrote your name down?

11  A.  No, that's a digital marking of my printed name.

12  Q.  Okay.  Do you know who wrote your name down?

13  A.  Again, that's a digital -- when we go to start the case

14  work, the first part of this position to start the case work,

15  you have to add who's going to be the processing agent.  So you

16  add your name down as the processing agent.  And who's the

17  receiving agent, that's the supervisor.  And who's the issuing

18  agent, that's the watch commander.

19      So once you add your name down as the processing agent,

20  every form that you print out for that case will have your name

21  on there.

22  Q.  Even if you didn't have something to do with that specific

23  task?

24  A.  In this case, even if you didn't have it, that's -- yeah,

25  your name would show up on that form.

```
 1    Q.  So your name is on this form as the official taking

 2    fingerprints, even though you weren't the official who took the

 3    fingerprints?

 4    A.  And that's why I didn't sign it.  Like, I don't have my

 5    signature on the form.

 6    Q.  I'm going to show you what's going to be marked as Defense

 7    Exhibit M.

 8              MS. CLARK:  We need to turn the Elmo on for this.

 9              This will be for the witness only.

10              THE COURT:  Did you say M, as in Mary?

11              MS. CLARK:  M as in Mary, yes, Your Honor.

12    BY MS. CLARK:

13    Q.  At the top of this form, you can see the name Manuel

14    Vasquez-Perez?

15    A.  Yes, ma'am.

16    Q.  And that's the same picture that was on the report you

17    wrote?

18    A.  That's -- this picture is taken at the time of intake.

19    Q.  Right.  I understand.  That's the same picture that was on

20    the I-213 that you authored?

21    A.  Yes, ma'am.

22    Q.  And that was the report -- your report in this case?

23    A.  Yes, ma'am.

24    Q.  And then about midway through, I don't know if you

25    can -- if you can tell.  Can you see your name?
```

1    A.   Yes, ma'am.

2    Q.   Okay.  And I'm going to zoom in a little bit now.  There we

3    go.  And underneath your name, it says, Border Patrol agent?

4    A.   Yes, ma'am.

5    Q.   And underneath that, it says, signature and title of

6    immigration officer taking the print?

7    A.   Yes, ma'am.

8    Q.   And you signed that?

9    A.   Yes, ma'am.

10   Q.   But you didn't take his prints?

11   A.   This fingerprint on this form, I took.  Because it's

12   referring to the right index finger, as you see on the form

13   there.  It's referring to the right index fingerprint that's

14   placed on this form.

15        The fingerprint that's on this form is not digitized.  It's

16   actually -- you actually provide them an ink pad, and ask him

17   to put his right index fingerprint on the ink pad.  And place

18   it on the paper that's there.  So the fingerprint that's there

19   on the ink pad is not a digital copy.  It's actually placed on

20   to that form.

21   Q.   Okay.  And by fingerprint, we're talking about the

22   half-moon --

23   A.   Where it says, right index fingerprint of alien removed.

24   Q.   Okay.

25   A.   That I actually had him place his right index on there.

```
 1    Q.  And the 10 print card is what's digitized?

 2    A.  Exactly.

 3    Q.  And that's the card that Mr. Deshong showed you?

 4    A.  Yes, ma'am.

 5    Q.  And you mentioned a few minutes ago that you did observe

 6    the interview with --

 7              THE COURT:  Hold on just a minute.  Yes, sir.

 8              A JUROR:  We're not seeing any of these exhibits.

 9              THE COURT:  It hasn't been admitted yet.  Once it's

10    admitted, then it'll show up on the screen.  It's just been

11    shown to the witness at this point.  Go ahead.

12              MS. CLARK:  Thank you, Your Honor.

13    BY MS. CLARK:

14    Q.  I want to switch and talk about the interview that you

15    witnessed of Mr. Vasquez-Perez?

16    A.  Yes, ma'am.

17    Q.  You sat down and talked with him?

18    A.  No, I just sat down.

19    Q.  You sat down in the same room as him?

20    A.  Okay.  Are we talking about the interview, post the case

21    work?

22              MR. DESHONG:  Your Honor, I think we may need to have

23    a quick sidebar before this line proceeds.

24              THE COURT:  No, go ahead.  No, it's denied.

25              Did you interview him or just take information in
```

1    relation to fingerprints and identifying him?

2            THE WITNESS:  In the process of completing the case

3    work, I asked him questions, as far as, like, weight, height,

4    and family members' name --

5            THE COURT:  Okay.

6            THE WITNESS:  -- information.

7            THE COURT:  Go ahead, then, Ms. Clark.

8            MS. CLARK:  Thank you, Your Honor.  Let's for ease of

9    Mr. Alexandre, if we could perhaps pull up what's been marked

10   for identification purposes as Defense Exhibit L, as in Lauren.

11   BY MS. CLARK:

12   Q.  You're seeing where this is a document regarding

13   information taken from Mr. Vasquez-Perez?

14   A.  Yes, ma'am.

15   Q.  And your name is written there?

16   A.  As a witness agent.

17   Q.  Right.  So you sat down in the same room with him?

18   A.  Yes, ma'am.

19   Q.  You saw what he was wearing?

20   A.  Yes, ma'am.

21   Q.  All right.  And he was wearing a white shirt?

22   A.  I'm not -- yes, I can pretty sure say I say what he was

23   wearing.  But as far as remembering what he was wearing, no, I

24   cannot say for sure.

25   Q.  Would it refresh your recollection to see a still or a very

1   short clip of the post-arrest statement, about five seconds?

2   A.   I mean, if you show it to me, I will see.  But to recollect

3   exactly what he was wearing at the time of this -- of the

4   interview, I can't tell you for sure.

5   Q.   So if you watched your interaction with him, that would

6   help your memory?

7   A.   Sure.

8          MS. CLARK:  So if we could pull up, then, for the

9   witness only Defense Exhibit I?  And then if we could just go

10  from second 25 to second 31.

11  BY MS. CLARK:

12  Q.   Did you just see yourself walk into the screen?

13  A.   Yes, ma'am.

14  Q.   And there was another officer there?

15  A.   Yes, ma'am.

16  Q.   And there's also Mr. Vasquez-Perez?

17  A.   Yes, ma'am.

18  Q.   And he's wearing a white T-shirt?

19  A.   Yes, ma'am.

20         MS. CLARK:  If you can now just go to a still shot

21  from second 40 to 42.  Okay, if we could pause it.  Q.

22  BY MS. CLARK:

23  Q.   So, again, he's wearing a white shirt?

24  A.   Yes, ma'am.

25  Q.   And he's wearing light-colored pants?

```
 1   A.  Yes, ma'am.

 2   Q.  He's not wearing all black?

 3   A.  No, ma'am.

 4        MS. CLARK:  I don't have any further questions.  Thank

 5   you.

 6        THE COURT:  Any other questions of this gentleman?

 7        MR. DESHONG:  Just one, Your Honor.  Maybe two.

 8                    REDIRECT EXAMINATION

 9   BY MR. DESHONG:

10   Q.  Agent Alexandre, in the image you just looked at, the

11   defendant was wearing a T-shirt, correct?

12   A.  Yes, ma'am -- yes, sir.

13   Q.  Do you have any information if he was previously wearing a

14   long-sleeved shirt over it?

15   A.  No.

16        MR. DESHONG:  Nothing further, Your Honor.

17        THE COURT:  Thank you.  You may stand down.  You're

18   excused as a witness.

19        Next witness?

20        (Testimony of Laurie Torres not included herein.)

21        THE COURT:  Any additional witnesses?

22        MS. SAPTHAVEE:  No additional witnesses.  But at this

23   time, we would like to read a joint stipulation of fact into

24   the record.

25        THE COURT:  All right.  We don't need the preamble,
```

```
 1    just the facts.
 2            Folks, remember the third form of evidence is
 3    agreements between lawyers that certain facts are true, which
 4    will help by avoiding having to call another witness to prove
 5    these things when they're uncontested.
 6            You may accept evidence that's been stipulated to by
 7    both sides.  Go ahead.
 8            MS. SAPTHAVEE:  First, Defendant Manuel Vasquez-Perez
 9    was involved in a prior official proceeding on or about July
10    25th, 2012.  Second, during the proceeding, Mr. Vasquez-Perez
11    admitted the following facts were true as of May 12th, 2012:
12    That he was a citizen and national of Mexico and not a citizen
13    of the United States, that he had previously been removed from
14    the United States, and he had not obtained consent to reapply
15    for admission from either the United States Attorney General or
16    his successor, the Secretary of Homeland Security.  And
17    finally, these admissions were made under the penalty of
18    perjury.
19            THE COURT:  Are those four assertions agreed to by the
20    defense?
21            MS. CLARK:  Yes, Your Honor.
22            THE COURT:  All right.  Folks, as I said, you may
23    accept that as proven.
24            Any additional evidence?
25            MS. SAPTHAVEE:  No, Your Honor, the government rests.
```

1          THE COURT:  All right.  Do you intend to present

2   affirmative evidence?

3          MS. CLARK:  No, Your Honor.  I do have a motion.

4          THE COURT:  Okay.  So the defense rests?

5          MS. CLARK:  Yes, Your Honor.

6          THE COURT:  I'll take the motion up after we excuse

7   the jury for the day.

8          Folks, this completes the evidence that you're going

9   to hear in this case.  I'm going to work with the lawyers now

10  after you are excused for the day to get the instructions

11  ready.

12         So here's what you can expect tomorrow.  When you come

13  back, we'll have a set of instructions that have been settled,

14  agreed upon.  I'll give you those instructions.  Typically,

15  it's broken into two parts.  The bulk of the instructions, some

16  of which you've already received as preliminary instructions

17  will be read.  And then there are about five instructions that

18  concern the process of deliberation.

19         So what I do is I sandwich the arguments of the

20  lawyers in-between the giving of the first part of the

21  instructions and then the deliberation instructions, which I

22  give you at the very end.

23         I'll elicit an estimate of how much time the lawyers

24  are going to take to argue with you.  And I'll give them a

25  reminder.  I don't play chess, but I've found this is a very

1   handy device.  And I give them the option of having me tell

2   them when they've got about a minute left so that they can wrap

3   up, all, of course, not because we're in a rush, but just to

4   make efficient use of your time.

5           So you'll hear instructions tomorrow and then you'll

6   hear the arguments of counsel, and then you'll hear the

7   deliberation instructions.  And we'll send you out, I

8   anticipate probably be around 10:15 or so tomorrow.

9           Now, as far as coming and going tomorrow, everybody

10  needs to be here at 9:00.  Leave a little early if you're

11  concerned about traffic or unforeseen events.

12          And I'll offer you another incentive to arrive a

13  little early.  In the back, in the jury room, where many of you

14  have already visited, there'll be breakfast rolls.  So you can

15  grab a coffee or a tea.  This is like vacation, even if you're

16  trying to stay fit and stay away from jelly doughnuts, I don't

17  think they're jelly, right?  They're glazed.  Yeah, glazed or

18  other things.  There's some bagels, too, that's part of it.

19          THE CLERK:  Yeah, sometimes.

20          THE COURT:  So there'll be a variety.  Anyway, if you

21  want to come and bring your newspaper, or chitchat with each

22  other, have a breakfast roll or doughnut or something in the

23  morning before we get started, then we'll call you out at 9:00.

24          But in all events, whether you choose to get fat or

25  not, we'll see you back at 9:00, ready to go.  Have a nice

1    evening.  Remember the Court's admonition.  Don't form or

2    express an opinion about the case, don't try to do any

3    research.  The case will be to you tomorrow morning to begin

4    deliberations.  Have a nice evening.  Yes?

5              A JUROR:  What's the earliest we can be here.

6              THE CLERK:  I'll be here at 8:30.

7              THE COURT:  8:30 is the earliest you can arrive.

8              As far as your note pads are concerned, leave them

9    right on your chair, and no one will touch them.  They'll be

10   right where you left them tomorrow.

11             Again, have a nice evening.

12       (At 4:55 p.m., the jury was excused, and the following

13   proceedings were held:)

14             THE COURT:  Have a seat, please.  All jurors are

15   absent now.  Counsel and the defendant are present.

16             Ms. Clark, a motion?

17             MS. CLARK:  Yes, Your Honor, we make a motion under

18   Rule 29 as to all elements.

19             THE COURT:  All right.  The standard on Rule 29 is

20   this.  The Court must look at the evidence in the light most

21   favorable to the government, and ask whether any reasonable

22   trier of fact, again, viewing the evidence in the light most

23   favorable to the government can find all of the elements beyond

24   a reasonable doubt.  The Court does not assess credibility.

25   Here the evidence establishes that the defendant was

1    encountered approximately five miles inside the United States

2    on or around noon on October 20th.

3         He was hiding in a bush when he was first encountered

4    by the Border Patrol agent.  The agent did a brief field

5    interview.  The defendant admitted that he was not in the

6    United States legally, that he was not a citizen nor national

7    of the United States.  In fact, he was a citizen of Mexico.

8         And even admitted that he was illegally in the United

9    States.  The documentary evidence establishes that the

10   defendant, on at least two occasions, had been deported from

11   the United States, once in 2012 and then a reinstatement of

12   that.  I can't remember exact year.  But that documentation is

13   in place.

14        The testimony of the government's liaison officer

15   establishes that there's nothing in the A-file to indicate that

16   the defendant has been given official permission by the United

17   States Government to be back.

18        A check of corresponding databases CLAIMS, and I

19   forgot what the other one is called.  What's the acronym for

20   the other one?

21        MS. SAPTHAVEE:  CIS.  CIS.

22        THE COURT:  CIS, yeah, established that as of this

23   morning, August 4th, that there's no indication the defendant

24   has a right to be in the United States.

25        So the elements are here that the defendant is in the

1    United States, found in the United States without official

2    permission, and that he's been previously deported.

3             Whether he was under constant surveillance is really

4    not implicated here.  It's apparent that the defendant

5    was -- if he was one of the four, he was substantially inside

6    the United States when he was first spotted, so had been here.

7    So this isn't one of the cases implicating official restraint.

8             So I do find that a reasonable trier of fact could

9    find all of the elements beyond a reasonable doubt, and could

10   find the defendant guilty.  The Rule 29 motion is denied.

11            You have been presented now with a copy of the verdict

12   form that I propose and the instructions.  I'd like to go

13   through these.

14            To begin with, the Court uses standard Ninth Circuit

15   instructions.  I've made an alteration to one of them that

16   corresponds with one of the objections the defense made, and

17   I'll mention that when we get to them.

18            The first one is just the preliminary instruction that

19   tells them that they must decide the case on the basis of law

20   and evidence.

21            Speak up if you object to any of these.

22            The second tells them that the indictment is not

23   evidence.  This is the one that's been altered to take out the

24   word "until."

25            MS. CLARK:  Thank you, Your Honor.

1          THE COURT:  Because it's not inevitable that the

2    government will prove the case, but they must prove it, so

3    unless they do, the defendant must be found not guilty.

4          Do you want me to give the third instruction?  This

5    says the defendant is not on trial for anything else.  There's

6    no implication that he's done anything else.  I'll give it if

7    you want.  I'll take it out if you don't want it.

8          MS. CLARK:  We don't need it, Your Honor.

9          THE COURT:  Okay.  I'll remove it, then.

10         I'll give the instruction on the defendant not

11   testifying.  I'll give a reprise of the instruction on what's

12   evidence, and then the next one, what's not.

13         The Ninth Circuit pattern instruction on the defendant

14   having made statements will be given.  Ms. Torres offered

15   opinion testimony, so I'll give the Ninth Circuit opinion

16   instruction.

17         Again, I'll reprise the credibility of witness

18   instruction.  This is the latest one that includes a little bit

19   more information about innocent misrecollection, and so on.

20         I'm going to give the pattern instruction on

21   reasonable doubt.  I'll take up the defendant's alternative

22   instruction in a minute.  I intend to give the pattern

23   instruction on the charge.  The government's proposed a

24   revision.  I don't think the revision is necessary.  Again,

25   I'll take that up in just a minute.

1          I intend to give the instruction on the -- on the

2   prior deportation, that that alone is not enough to establish

3   the defendant's guilt.  You'll want that, I assume?

4          MS. CLARK:  Yes, Your Honor, if I can take a look,

5   though.  Is it this one?

6          THE COURT:  It says, "the fact that a person has been

7   deported by itself is not sufficient to prove that he's an

8   alien.  However, evidence that a person has been deported may

9   be considered in conjunction with all the other evidence to

10  determine whether the person is an alien."

11         MS. CLARK:  Yes, Your Honor.

12         THE COURT:  Okay.  And then the last five are just the

13  standard closing instructions on deliberations.

14         Those are the instructions that I would intend to

15  give.  Let me turn to the proposed instructions that are

16  revisions.

17         You've objected to the presumption of innocence

18  instruction.  I have remedied that, to some extent, in that as

19  I said, I took up your -- I took the "and until" language out.

20  Does that solve the problem, as far as you're concerned?

21         MS. CLARK:  Not with regard to the second proposed

22  instruction, Your Honor, but I would submit based on briefing.

23         THE COURT:  Okay.  So the Court rejects the -- the

24  defense has argued that I should take out both "unless" and

25  "until."  Unless doesn't presuppose anything.  Unless is very

1   conditional.

2          It suggests either, yes, they did do it or, no, they

3   didn't do it.  Until, however, as I said, I agree with the

4   defense that that sort of suggests a foregone conclusion.

5          So I've removed the "and until" language, left

6   "unless" in there.  And I find that revision meets the -- the

7   defendant's objections.  So I reject the other proposal to

8   alter the instruction.

9          I have your argument on the reasonable doubt

10  instruction.  Unless you want to add to it, the Court rejects

11  that, gives the Ninth Circuit pattern instruction.  I note that

12  the Ninth Circuit has, on many, many occasions, upheld the

13  pattern instruction as complete and accurate.

14         Destruction of evidence.  I mean, I honestly really

15  don't see it here.  I'm happy to hear from you, but I just

16  don't see a basis for it here.

17         It's not clear at all -- I shouldn't say it's not

18  clear at all.  It's not beyond doubt whether the defendant was

19  one of the four people.  He may have been, but he may not have

20  been.

21         Maybe that fourth person got away.  The scope operator

22  said, look, you know, I've got grainy pictures, I can't

23  identify anybody with the scope, even if I turn it up all the

24  way, at least not in this case.

25         He said in other cases, he might be able to.  So it's

1    not clear that the defendant was one of the four.  Maybe he

2    was, probably he was.  But maybe not.  I mean, maybe he came

3    across on his own.

4          So the -- the failure to preserve whatever pictures,

5    stills that he took from the scope beyond what we've seen

6    doesn't strike me as disadvantageous to the defendant at all.

7          One has to believe something that has not been proved,

8    that the defendant was one of the four first.  There's

9    certainly an inference of that, but it's not like it's clear

10   proof of the defendant's identity.  And even if it was, I can't

11   see what the prejudice would be to the defendant.

12         I mean, if it was, then he would have been identified

13   as one of the four, and that's even worse for him, because he's

14   in and then he's hiding in a bush later.

15         At least you have going for you that, you know, he

16   didn't run away when the initial apprehension of the three took

17   place.  So, Ms. Clark?

18         MS. CLARK:  I suppose the only thing I'd add to what

19   has already been briefed and considered is that the video would

20   have shed light about the events that Agent Huber testified

21   about.

22         He talked about the fact that there was nobody else

23   there that day.  And that would obviously lead to an inference

24   that that fourth person was Mr. Vasquez-Perez.

25         THE COURT:  Right.  To be clear, we're talking about

1    the first observations made around 7:45, right?  Because there

2    was, what I was told was a 20-minute video, and excerpts were

3    played from that, that just tracked apparently the defendant.

4    That's the one with the single person, and then the Border

5    Patrol closing in.

6              So the video you're talking about is the first one,

7    right?

8              MS. CLARK:  Well, there's one video, Your Honor.  The

9    Border Patrol agents preserved the video beginning at 11:59

10   a.m.

11             THE COURT:  I see.

12             MS. CLARK:  And up until about 12:30.

13             THE COURT:  But it was continuously running, is that

14   what it was?

15             MS. CLARK:  Yes, Your Honor.

16             THE COURT:  So the portion that was taken at 7:45 was

17   not preserved?

18             MS. CLARK:  From 7:45 until 11:59, that was not

19   preserved.

20             THE COURT:  Okay.

21             MS. CLARK:  That was destroyed.

22             THE COURT:  Okay.  I understand the context now.  Go

23   ahead.

24             MS. CLARK:  So having that video and being able to see

25   what Agent Huber was seeing would have -- could have given us

 1   information that would have helped cross examination, helped

 2   impeach him.

 3         THE COURT:  Tell me how.  Because, again, it's not

 4   definitive at all that the defendant was one of the four.

 5         Maybe he was.  But let's assume he was.  I don't know

 6   how that is to his advantage.  Because it would suggest that he

 7   split, ran, succeeded in hiding from the Border Patrol for

 8   about four or five hours, which only makes it seem worse.  I

 9   don't see how that's exculpatory at all.

10         MS. CLARK:  Well, Your Honor, I don't believe that

11   there was only one person that Agent Huber saw in those five

12   hours.  And if we had the scope video, we could have been able

13   to talk about that.  As it stands for --

14         THE COURT:  How far would that go, though, Ms. Clark?

15   I mean, it wouldn't necessarily have even started at 7:45.  If

16   you're right, they probably should have given you, you know,

17   video for many hours before the first encounter with the four

18   people, and then many hours afterwards, to see if there were

19   other people in the area.  But I still don't know where that

20   gets us.

21         I mean, what's clear from testimony is the defendant

22   was one of the people in the area, because they found him

23   there.

24         MS. CLARK:  So, Your Honor, what I'm saying here is

25   that Agent Huber testified that he only saw one person in the

1   entirety of that time.  And that leads to an inference that

2   Mr. Vasquez-Perez was that one person.  Now, we know -- I mean,

3   the video from the time of his arrest is a separate issue.  But

4   Agent Huber testified that from 7:45 until 11:59 --

5            THE COURT:  Right.

6            MS. CLARK:  -- there was only one person, which

7   indicates -- or the jury would even more -- more so infer that

8   that one person who fled from the group, as Your Honor pointed

9   out is not something that's helpful to the defense, is

10  Mr. Vasquez-Perez.

11           THE COURT:  How would it be exculpatory, though, if,

12  you know, we looked at the video, and saw, for example, nobody

13  else.  I mean, I don't even know we could make that

14  determination.  The first time they showed the several

15  excerpts, I had trouble even seeing who the people were,

16  because they were gray spots that tended to blend in with other

17  gray spots.  It became a little clearer in some of the

18  subsequent videos.  But honestly, pray tell, how would we know

19  that anybody else was in the area?  The scope was so far away

20  and the clarity was so poor that I think it would have been

21  very hard to ascertain.

22           It seems to me, the best evidence is the guy who's

23  eyeballing it through the scope at the time and trained to

24  detect movement.

25           MS. CLARK:  Well, Your Honor --

1          THE COURT:  And you had him.

2          MS. CLARK:  It also goes to official restraint

3     potentially and us knowing --

4          THE COURT:  How so?  Because this area, even where the

5     three were encountered, is five miles from the border.  And he

6     doesn't pick them up until they're in that area.  He doesn't

7     say, I followed them from the border here.

8          The official restraint doctrine means that from the

9     time of crossing until apprehended, you know, they have to be

10    under surveillance at some point.  You know, leave aside

11    moments where they're out of the picture, but under constant

12    surveillance.  They wouldn't have been here.

13         There's no evidence that they were surveilled from

14    wherever they came from, presumably the border all the way to

15    that spot five miles in.

16         MS. CLARK:  Perhaps there's no evidence because we

17    don't have the video, Your Honor.

18         THE COURT:  Yeah.  All right.  I have your position on

19    that.  The Court finds an insufficient basis to give an

20    instruction on destroyed evidence.  I don't find that the

21    evidence that is allegedly destroyed is material at all.

22         As I said, you know, if it's true, then there's

23    probably no ending point to saying how much of the video should

24    have been preserved.  And my goodness, I'd hate to think that

25    we're going to sit through hours and hours of video just to see

1    that, no, nothing is in the video, which is what it would take.

2    Either that or somebody saying, I looked at this, and there was

3    nobody there, which is what we got in this case.

4           MS. CLARK:  Could I add one brief point, Your Honor?

5           THE COURT:  Yeah, sure, of course.

6           MS. CLARK:  And that's the video could have showed

7    Mr. Vasquez-Perez or a sole person, in addition to the group of

8    four, which would have disassociated him from that group of

9    four.

10          THE COURT:  But I still don't see how that helps him.

11    I mean, he's charged singularly with being in the United States

12    -- found in the United States after being removed.  Who cares

13    whether the other three are there or not?  They're not on

14    trial.  He is.

15          And honestly, I don't see the relevance to it.  And I

16    certainly don't see the materiality or exculpatory value.  So

17    the Court denies the request to instruct on missing evidence.

18          You know, this presupposes, of course, that the

19    evidence has some relevancy or materiality to the charge.  And

20    here I find it just does not.

21          The Court finds that the requested implicit bias

22    instructions is covered by the instructions I've already given,

23    including the first instruction that tells the jury not to make

24    a decision, not just on the basis of sentiment, but it includes

25    such things as race, national ancestry, gender, profession,

1    position in the community.

2            All those things alert the jury that they must be

3    unbiased in making the decision, so I find that that's

4    covered.

5            Mr. Deshong, have you had a chance to look at the

6    charge that I've offered on the elements?  I don't think that

7    your recommendation improves on it at all.

8            If you look down at the bottom of page 6, it says,

9    "the defendant was free from official restraint, which means

10   that he was not deprived of his liberty and was not prevented

11   from going at large within the U.S. at the time he was found in

12   the United States."

13           In other words, to be under official restraint means

14   the defendant was under constant government observation from

15   the moment he first crossed and entered the territory of the

16   United States until the moment of his apprehension.

17           So this doesn't limit it to just the crossing time.

18   This goes all the way up and says, he has to be under constant

19   surveillance during that time.  As I mentioned to Ms. Clark,

20   the evidence doesn't -- at this point, doesn't support that he

21   was under official restraint during all of that time, so I'm

22   not inclined to give your modification.

23           MR. DESHONG:  The Court's proposed instruction

24   addresses our concern.  I guess the only proposal I'd have for

25   the Court to consider is the current form jury instructions

```
 1   include a definition of official restraint in the bottom, in

 2   the commentary.

 3            THE COURT:  It's not implicated here, so I'm not going

 4   to give it.  Why -- and I'm instructed, because I went through

 5   this with the Ninth Circuit years ago, I'm instructed to say,

 6   oh, if they ask about official restraint, tell them that that

 7   only relates to state of mind, not physical presence or not

 8   where you are.  It just means that the person has to have the

 9   intent to go free among --

10            MR. DESHONG:  I think that's in an attempt case.  In

11   found in, we have the burden of proving that he actually wasn't

12   under it.

13            THE COURT:  Is there any evidence at all that he was

14   under official restraint the whole time?  He's five miles in.

15            MR. DESHONG:  I think whether there's evidence and

16   whether defense argues it are two separate questions.

17            THE COURT:  You have a rebuttal argument, that's what

18   that's for.

19            If they argue that it's in evidence, you can say,

20   where?  Where's the evidence of that?  You didn't hear any

21   evidence.  You heard a guy talk about spotting him five miles

22   into the United States.

23            MR. DESHONG:  Very good, Your Honor.

24            THE COURT:  So I'm not going to give the revision that

25   you propose.
```

1          These are the instructions that I propose to give.

2     I'll assume that the Court's refusal to give any proposed

3     instruction by the parties is objected to, so your objections

4     are noted.

5          How about the verdict form, does it look right?

6          MR. DESHONG:  No objection from the government, Your

7     Honor.

8          I guess --

9          MS. CLARK:  Go ahead.

10          MR. DESHONG:  I was just going to say, and Ms. Clark

11     may be about to say the same thing, that there's only one count

12     in the indictment, so I don't know if --

13          THE COURT:  Does it say "counts"?

14          MR. DESHONG:  I believe it says count 1, so if it just

15     said in the indictment, that might be preferable.

16          THE COURT:  All right.  If you want me to -- I mean, I

17     don't know why they're not getting the indictment anyway.  I've

18     only read one count, so --

19          MS. CLARK:  It does imply that there's more than one.

20          THE COURT:  You say it does imply.

21          MS. CLARK:  I would say --

22          THE COURT:  You want me to take it out, "count 1 of"?

23          MS. CLARK:  Yes, Your Honor.

24          THE COURT:  Okay.

25          So, Tish, if you could redo this, just take out the

1     words "count one" and "of," so it reads "charged in the

2     indictment"?

3              THE CLERK:  Sure.

4              MS. CLARK:  And I would sort of echo that with regard

5     to the special or the interrogatory -- the special finding

6     about the date.

7              THE COURT:  You want me to take out "count 1"?

8              MS. CLARK:  Yes, Your Honor.

9              THE COURT:  I'll just leave it, if you find the

10    defendant guilty, do you further find.  Okay, since there's

11    only a single count now.

12             MS. CLARK:  Could we add underneath the line, not

13    guilty/guilty.

14             THE COURT:  No, it's a yes or no question there.

15             MS. CLARK:  No, above that, Your Honor.

16             THE COURT:  No, I'm just going to leave it blank and

17    tell them that if they find the defendant guilty, write that

18    word in.  If it's not guilty, write that word in, so that's the

19    way I'll do it.

20             Tish, did you get the other revision?  As to the

21    second part?  For the question, it should read, "if you find

22    the defendant guilty," and then strike "on count 1."  Do you

23    further find, go on from there.  So just take the "on count 1"

24    out of that, and "count 1 of" out of the above line.

25             THE CLERK:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  Now, the estimate of time, how
 2   long -- who's going to argue?  Ms. Sherron?
 3              MS. SHERRON:  Yes, Your Honor.
 4              THE COURT:  How long do you think you'll need?
 5              MS. SHERRON:  Truth be told, I haven't timed myself
 6   yet.
 7              THE COURT:  Okay.
 8              MS. SHERRON:  So --
 9              THE COURT:  What do you think, Ms. Clark?
10              MS. CLARK:  I would say no more than 20 minutes, Your
11   Honor.
12              THE COURT:  Okay.  Does that seem to work for you?
13              MS. SHERRON:  That seems fair.
14              MS. SAPTHAVEE:  Your Honor, I'll be doing the opening
15   closing, and Mr. Deshong will be doing the rebuttal closing.
16   And I think we'll need no more than 20 minutes total between
17   the two of us.
18              THE COURT:  Yeah, okay.  So I'll tell the jury, as I
19   promised, tomorrow that the parties have estimated 20 minutes.
20              I'm not going to be manic about it.  If you need to go
21   over just a little bit, but it's a time limit, it's not a
22   suggestion.  So when you do your practice, time it tonight, and
23   see if you're in, and allocate your time accordingly.
24              If you can be here a little early, particularly if
25   you're going to use video stuff.  You marked exhibits.  You
```

1    didn't move them into evidence.  That's the way you wanted to

2    leave it.

3           MS. CLARK:  Yes, Your Honor.

4           THE COURT:  Okay.  So -- and, Mr. Deshong, I assume

5    you've got everything on a thumb drive?

6           MR. DESHONG:  We have to make one revision.  I should

7    flag this for the Court.  Defense counsel raised an issue with

8    a handwritten note on one of the exhibits, so we're just going

9    to redact it, and that'll be the one that goes to the jury.

10          THE COURT:  But make sure they've had a chance to see

11   the revised exhibit, then.

12          MR. DESHONG:  Of course.

13          THE COURT:  And then everything else is on a thumb

14   drive and ready to go that you'll present to the Court

15   tomorrow?

16          MR. DESHONG:  Yes, we just have to swap out that one.

17          THE COURT:  And it's Mr. Christianson, right?

18          MR. DESHONG:  Yes.

19          THE COURT:  Have him here ready to go, so we don't

20   have a delay with the equipment.

21          MR. DESHONG:  Will do, Your Honor.

22          THE COURT:  Have a nice evening.  See you tomorrow

23   morning, 9:00.

24      (The proceedings concluded at 5:16 p.m., August 4, 2021.)

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3       I, CYNTHIA R. OTT, Official Court Reporter, United States

 4   District Court, Southern District of California, do hereby

 5   certify that pursuant to 28 U.S.C. §753 the foregoing is a

 6   true, complete and correct partial transcript of the

 7   stenographically reported proceedings had in connection with

 8   the above-entitled matter and that the transcript page format

 9   is in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12          DATED at San Diego, California, November 9, 2021.

13

14                              _____/s/ CYNTHIA R. OTT_____
                                CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25
```