```
1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,          )
                                       )
5        Plaintiff,                    )  No. 20-CR-3445-LAB
                                       )
6            v.                        )  August 4, 2021
                                       )
7   MANUEL VASQUEZ-PEREZ,              )  9:43 a.m.
                                       )
8        Defendant.                    )  San Diego, California
    _____)
9

10     TRANSCRIPT OF JURY TRIAL DAY 1 - EXCERPT OF JURY VOIR DIRE
                 BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                             By:  VIVIAN SAPTHAVEE, ESQ.
14                                MICHAEL DESHONG, ESQ.
                             880 Front Street
15                           San Diego, California  92101

16  For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
                             By:  LAUREN J. CLARK, ESQ.
17                                BRITTANY SHERRON, ESQ.
                             225 Broadway
18                           San Diego, California  92101

19  Court Interpreter:       DANIEL NOVOA

20  Court Reporter:          CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
21                           333 West Broadway, Suite 420
                             San Diego, California, 92101
22                           cynthia_ott@casd.uscourts.gov

23

24

25  Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA, AUGUST 4, 2021, 9:43 A.M.

2                          * * * *.

3          THE COURT:  My understanding is that the defendant is

4    en route now.  We had some kind of snag this morning, but he's

5    coming in.

6          MS. SHERRON:  Yes, Your Honor.

7          THE COURT:  And you've got your pages?

8          MS. CLARK:  Yes, Your Honor.

9          THE COURT:  Were they the same stuff or was it

10   different?

11         MS. CLARK:  Mr. Deshong did file a status report, Your

12   Honor.  There were approximately between 60 and 70 new pages of

13   discovery.

14         THE COURT:  Okay.

15         MS. CLARK:  And I did see Mr. Vasquez-Perez yesterday

16   and reviewed it with him.

17         THE COURT:  Anything heart stopping?

18         MS. CLARK:  There was information that may be used for

19   impeachment, depending on how testimony comes out, Your Honor.

20         THE COURT:  Okay.

21         MS. CLARK:  There is a matter that I would like to

22   bring to the Court's attention before we have the jury here.

23         THE COURT:  Let's go on the record for just a second,

24   then.  This is the matter of United States versus

25   Vasquez-Perez.  The defendant is not present.  Can we do it out

1    of his presence?  What's the nature of it?

2              MS. CLARK:  Yes, I think we can, Your Honor.

3              THE COURT:  Okay.

4              MS. CLARK:  But I don't know if Mr. Deshong would

5    rather wait for Ms. Sapthavee before, just out of courtesy in

6    case she wants to be here.

7              THE COURT:  Okay.

8              MS. CLARK:  Thank you, Your Honor.

9              THE COURT:  Counsel are both here now.

10             MS. CLARK:  This morning, we received an e-mail from

11   Ms. Sapthavee saying that out of an abundance of caution, that

12   she wanted to disclose that the helicopter that had been used

13   in surveillance that morning was not actually an Office of Air

14   and Marine helicopter, and instead it was one with Department

15   of Defense.

16             Without more information, Your Honor, I'm concerned

17   that we have a violation of the Posse Comitatus Act, and so I

18   would move to dismiss, or in the alternative, suppress any

19   evidence stemming from the arrest, including his fingerprints

20   and field statements, but we don't have discovery to really

21   develop the issue, Your Honor.  So I --

22             THE COURT:  Well, okay.  I think what I'd prefer to do

23   is just to table this.  If the defendant is convicted, you can

24   bring a post trial motion for relief.  If he's not, then it

25   becomes moot, right?

1          MS. SAPTHAVEE:  And, Your Honor, I have one point of

2    clarification.  That portion of the report was with regard to

3    the apprehension of the group.  And it's my understanding that

4    a different helicopter was used in assisting in the

5    apprehension of the defendant.

6          So this sort of misidentified helicopter was not the

7    one used in apprehending the defendant.  And it was our

8    understanding --

9          THE COURT:  What difference would that make, then?  If

10   it's not the helicopter -- did the helicopter assist in

11   locating the defendant after he broke from the group?

12         MS. SAPTHAVEE:  Yes.  I don't know what kind of

13   helicopter it was, but we do know that the helicopter described

14   in one of the witness's reports that was assisting in the

15   group's apprehension, it turns out it was a different kind of

16   helicopter, and that's what I wanted to disclose to the

17   defense.

18         THE COURT:  Okay.

19         MS. CLARK:  And, Your Honor, if I may briefly, I

20   believe the issue for the Posse Comitatus Act is at what point

21   they first saw the individual, whether it was inside the United

22   States or outside the United States.  And by the government's

23   account, they believed that Mr. Vasquez was part of this group

24   of four and are planning to introduce testimony about that

25   fact.

1           MS. SAPTHAVEE:  We will not be introducing such

2    testimony, Your Honor.

3           THE COURT:  Okay.  All right.  My instinct, as I said,

4    is to postpone any determination on this.  First of all, it

5    seems attenuated.  If it's not something that directly led to

6    the defendant's apprehension, then it's probably not covered by

7    the Posse Comitatus Act.  That act at 18 USC 1385 prohibits

8    only direct involvement in civilian law enforcement.

9           It permits indirect involvement.  It's not clear to me

10   whether helicopter surveillance notifying law enforcement on

11   the ground is direct assistance.  There's a test for it.  The

12   test is set forth in a case called Dreyer, U.S. versus Dreyer

13   at 767 Fed 3d. 826.  The test is the involvement must not

14   constitute the exercise of regulatory, prescriptive, or

15   compulsory military power.  I have to find out what that means

16   in the context of helicopter overflights.  Must not amount to

17   direct active involvement in the execution of the laws.

18          Boy, when it says direct and active, I wouldn't think

19   flying over and giving coordinates to somebody down below is

20   direct and active.  But, again, if there's cases on that,

21   they'll probably tell us what is meant by direct and active.

22   And it must not pervade activities of civilian authorities,

23   which I can't imagine that it did in this case.

24          The Ninth Circuit's also held that when there is a

25   violation of the Posse Comitatus Act, the exclusionary rule is

 1   not applied.  That's U.S. versus Roberts, 779 Fed 2d. 565 at

 2   568, Ninth Circuit, 1986.

 3          So the exclusionary rule doesn't apply if they're not

 4   even going to apply that sanction, it's unlikely in my judgment

 5   that dismissal would be a proper remedy, because it's much

 6   harsher.

 7          So for now, the motion is tabled.  If, as I said, the

 8   defendant is convicted, and you want to explore those cases and

 9   whether the Act applies to helicopter overflights with

10   communication being communicated -- with information being

11   communicated to law enforcement on the ground, you can

12   certainly look into that.

13          MS. CLARK:  I understand, Your Honor.  Under Rule 12,

14   I needed to raise it pretrial.

15          THE COURT:  Yeah.

16          MS. CLARK:  So I wanted to make sure to bring it to

17   Your Honor's attention.

18          THE COURT:  You've done the right thing.  You've made

19   it a matter of record, and it is now.  And to the extent the

20   motion is brought now, I deny it without prejudice.

21          MS. CLARK:  Thank you, Your Honor.  In the event

22   Mr. Vasquez-Perez is convicted, I need discovery, I don't have

23   any discovery on this, except for the proffer made --

24          THE COURT:  All right.  Again, it's an issue that we

25   can explore further in the event he's convicted.  And the

1    government can clarify any information that it has about which

2    helicopter and whether -- I mean, he's not -- it's not even

3    clear to me, at this point, because it was a point of argument

4    yesterday, you remember at the motions in limine stage, whether

5    he was part of this four person group.  So if he wasn't, you

6    know, to have standing, it seems to me, to bring this in the

7    instance of helicopter overflight, and what was observed the

8    first time, he's got to say, yep, I was with those guys, I was

9    a member of that four person group.

10          If he doesn't say that, then it's not at all clear to

11   me that he was one of the people observed in the first

12   instance.  They say the second helicopter was not military?

13          MS. SAPTHAVEE:  That's my understanding, Your Honor.

14          THE COURT:  All of that can be fleshed out afterwards,

15   if there's a need.  Anything else, then?

16          MS. CLARK:  No, Your Honor.

17          MS. SAPTHAVEE:  Your Honor, just to clarify, I said

18   that we weren't planning on introducing evidence, and I should

19   be precise that we will not plan on eliciting testimony

20   connecting the first group -- that that fourth individual was

21   the defendant, but we will be introducing evidence about that

22   first group.

23          THE COURT:  Okay.  I mean, the gist of it is that

24   early on 7:45 in the morning, Border Patrol got an alert that

25   there were four people.  Somebody went to the site, they caught

1    three.  The agent deduced that somebody escaped out of the

2    original group that was seen, and then they encountered the

3    defendant about four or five hours later.  And no one knows for

4    sure whether it was part of the group.  He doesn't admit to

5    that, but that's the suspicion because he was within a mile,

6    you say, of the area where the first observations were made?

7              MS. SAPTHAVEE:  Yes.

8              THE COURT:  I think that's what Ms. Clark represented.

9    It's about -- where he was actually encountered by the agent

10   was about a mile from the place where the observation of the

11   group of four was made.

12             MS. CLARK:  Relying on the government's

13   representation, Your Honor, yes.

14             THE COURT:  Okay.  I mean, if that's the scenario,

15   you're entitled to bring that out.  Okay.  Let me know when our

16   jury is here, Tish.

17             THE CLERK:  Yes, Your Honor.

18             THE COURT:  How many witnesses do you have,

19   government?

20             MR. DESHONG:  We have six, Your Honor.

21             THE COURT:  Huh?

22             MR. DESHONG:  We have six.  We have one more than the

23   last trial because there's no fingerprint stipulation, so we

24   have to have the agent who took -- was involved in processing.

25             THE COURT:  Wait, I thought, didn't they stipulate

1    that a card could be used?

2            MR. DESHONG:  They did not.  They stipulated to the

3    prior admissions.

4            THE COURT:  Oh, oh, not even for comparative purposes,

5    his booking card?

6            MS. CLARK:  No, Your Honor, we don't have the agent

7    who took the fingerprints testifying either.

8            THE COURT:  Well, yeah, all right.  But I don't know,

9    it's unremarkable.

10           I mean, did I grant the motion to fingerprint him a

11   third time?

12           MR. DESHONG:  You did.  We actually had it scheduled

13   to be done.  And then when the trial moved up, we elected not

14   to do that, because it would have involved rewriting the

15   report.

16           THE COURT:  All right.  Well, stipulations are

17   voluntary.

18           (Discussion off the record.)

19           (Prospective jury panel sworn.)

20           THE CLERK:  Calling number 1 on the calendar,

21   20-CR-3445, United States of America versus Manuel

22   Vasquez-Perez on for jury trial.  If counsel could state their

23   appearances for the record?

24           MS. SAPTHAVEE:  Vivian Sapthavee, on behalf of the

25   United States.

```
 1              MR. DESHONG:  And Michael Deshong, on behalf of the
 2   United States, Your Honor.
 3              THE COURT:  All right.  Good morning.
 4              MS. SHERRON:  Brittany Sherron, on behalf of
 5   Mr. Manuel Vasquez-Perez.
 6              MS. CLARK:  Lauren Clark for Mr. Vasquez-Perez.  Good
 7   morning, Your Honor.
 8              THE COURT:  Good morning.  Ladies and gentlemen, good
 9   morning, and welcome here to the United States District Court
10   for the Southern District of California.  We have summoned you
11   here today in connection with a criminal case.  I'm going to
12   tell you a little bit about the case and about the procedure
13   that we'll go through, oh, probably until right up to noon, and
14   what you can expect.
15              This is a criminal case brought by the United States.
16   They have accused Mr. Vasquez, the gentleman seated next to
17   Ms. Clark with the headphones on and the blue mask, they've
18   accused him of being a removed alien who was found in the
19   United States.  The specifics of the accusation are these, that
20   on October 20th of last year, 2020, here in the Southern
21   District of California, Mr. Vasquez-Perez, whom the government
22   alleges is an alien, which is not a pejorative term, it means
23   someone who's not either a naturalized or a natural born
24   citizen of the United States.
25              Anyway, they accuse Mr. Perez, who they contend is an
```

1    alien who had previously been deported from the United States

2    of being found back in the United States.  And as of October

3    20th, the government alleges he had no official permission from

4    the United States Government to be here.  They go on to say

5    that he had been removed on an earlier occasion from the United

6    States sometime after November 1st, 2016.

7         So that's an additional allegation, not a crime, but

8    an allegation that's made as part of the crime that they've

9    charged.

10        The indictment is not evidence.  It's just a way of

11   framing the issue for 12 of you to decide.  It's not proof of

12   the defendant's guilt.  The government bears the burden of

13   proving the accusation that it's brought beyond a reasonable

14   doubt, and the defendant is entitled to be found not guilty,

15   unless the government proves the allegation to you.

16        It's expected that this case is going to last about a

17   day.  We have worked hard on the case to get it ready.  We're

18   going to make efficient use of your time, those of you who are

19   called, but it's going to be about a day long case.

20        We, for reasons beyond our control, started a little

21   later today than we expected to.  We expected to be underway at

22   9, but in all events, I expect that the evidence will be

23   complete, and we'll have the case to the 12 of you who are

24   selected to decide it by no later than noon tomorrow.  So for

25   your timing purposes, that's how long I think it'll take to

1    present the evidence.

2           The matter of deliberations is entirely up to the 12

3    jurors, but typically, I can tell you there's a relationship

4    between the time a jury deliberates and how long a case takes.

5    Shorter cases, deliberations are shorter.  Longer cases, maybe

6    they take longer.

7           But, again, that is entirely up to the jury.  So the

8    purpose of our inquiry of you in the next hour, hour and a half

9    will be to determine whether you can fairly sit on this case

10   and judge the case on the facts and on the law, not have it

11   controlled -- not have the outcome here predetermined or

12   controlled by some experience or opinion that you have.

13          There's no right answers here to the questions on the

14   questionnaire, only honest answers.  And as I said, our purpose

15   is to find 12 people who will be guided by the facts and the

16   law, and let the facts take them to where they will.  And then

17   analyze the facts against the principles of law that I give

18   you, and determine whether the government has met its burden of

19   proof, establishing beyond a reasonable doubt that the

20   defendant is guilty of this offense.

21          How many of you have been through jury selection

22   before, whether here or in state court?  Okay, quite a few of

23   you.  There's a questionnaire.  There's, I think, what, nine

24   questions.  It's that what it has on it now, nine?  And it's

25   basic biographical information.

1          I'll tell you why we ask those questions, and we ask

2    you to answer them.  The lawyers have substantial say in who

3    sits on their jury.  It's not complete say, but they have

4    substantial say.  They exercise that say in two ways.  They

5    have what are called challenges for cause.  So for example, in

6    a case like this, someone might say, you know, I think the

7    immigration system is all screwed up, and I have very strong

8    feelings about it, and I think it ought to be one way or the

9    other, and I think that would control how I decide this case.

10   Well, if that was someone's frame of mind, obviously, we

11   wouldn't want the person to sit on this case, because we want

12   this to be decided on these facts, and the existing principles

13   of law, whether people agree with them or not.

14          That's just an example.  You know, in other cases, in

15   drug cases, sometimes I have people that say, we had a problem

16   with a kid in my family that's drug addicted and it would be at

17   the forefront of my mind, and I don't think I can be fair.

18          Whatever the reasons are, if you don't think you can

19   fairly judge this case, then tell us.  This isn't a beauty

20   contest.  It's not about you.  It's just whether you can sit

21   conscientiously, make a business-like decision, objectively on

22   facts, and not have it controlled.

23          All of us, of course, have experiences that inform our

24   judgments, but the point here is we don't want something

25   external to control the outcome here.  We want you to apply

1    judgment and experience, but to apply it to the facts that are

2    given here.

3            So challenges for cause are one way that the lawyers

4    help shape the jury.  The other is what's called a peremptory

5    challenge.  And that kind of challenge, they don't have to make

6    any justification to me.  They don't have to say, well, juror A

7    or juror B can't be fair in this case evident from their

8    answers.

9            All they have to say is, Judge, I don't want juror A

10   or B to sit on this case.  Those are limited in number, the

11   defense gets 10 in a criminal case and the government gets six,

12   so peremptory challenges are the other way they shape a jury.

13           That process may be insulting to you, it may be

14   intimidating, but it's a very common practice both in state and

15   federal court.  And I guess it's thought that jurors -- lawyers

16   should apply their polygraph instincts, and listen carefully

17   and look you over, and maybe they have some preconceptions

18   about things in your background, experience.  You know, for

19   example, someone may have been a law enforcement officer.  I've

20   had law enforcement officers that have sat on juries in

21   criminal cases before, but someone may say, I'm not sure I want

22   somebody that's had prior law enforcement experience sitting on

23   the case.

24           I tell you what it says, and I know this because I was

25   a lawyer for many years before I became a judge.  It says more

1    about the lawyers than it does about you, the way they exercise

2    those peremptory challenges.

3            I know that because when I started as a lawyer, I was

4    24 years old.  You know what my rule of thumb was on

5    peremptories?  No one younger than I.  So if you were like 20

6    or 22, off you went.  Did I end up getting rid of a lot of

7    people who would have decided the case the way I thought it

8    should have been decided?  Of course.

9            Did it say more about me than it did about the people

10   that I was excusing?  Of course.

11           So bear that in mind, and keep a sense of -- a mild

12   sense of humor, I suppose, through this process.  So as I said,

13   this process of questioning you is going to take probably an

14   hour, hour and 15 minutes, and then we'll take a break.

15           The way the peremptory challenges are exercised is

16   after everyone has been questioned, we'll give a list to the

17   lawyers, and they'll exercise those peremptory challenges.  And

18   they do it without knowing what the other side is doing.  It's

19   conceivable that both sides might challenge the same

20   prospective juror, and we'll take the first 12 nonstricken

21   jurors as the jury in this case.

22           Who's been an alternate juror before, anyone?  What a

23   dud, right?  Absolute dud, because you sit, you're

24   conscientious, you listen, you want to go back and deliberate,

25   give your opinion, listen to the opinions of others, help

 1   decide the case, and then the judge says, well, thank you for

 2   your service, but bye-bye.

 3          I don't impanel alternate jurors on short cause cases

 4   because of that, because it's just a dud.  So one of the things

 5   I'm interested in is making sure all of you have the ability to

 6   sit let's say through Friday, just to be safe.  Let's say

 7   through Friday.

 8          I think, as I said, the case will be to you sometime

 9   between 9 and noon tomorrow, but just to be safe, let's say if

10   you have the ability, nothing on the horizon between now and

11   Friday -- if there is something, then let me know when

12   we -- when we get to you on the questioning.

13          So those things said, I want the lawyers to

14   reintroduce themselves to you.  These are fine lawyers, they're

15   decent, approachable people.

16          But they won't be able to communicate with you

17   throughout the trial.  And in past cases, I've had jurors say

18   to me, boy, those lawyers are sure stuck up, I passed them in

19   the hallway and said hello, and they didn't respond, or they

20   just kind of waved or kept walking.

21          They're doing that because they're under court order

22   to do that.  Think about the optics of it.  You're out in the

23   hallway, and one of the lawyers is talking to you, and the

24   other one comes by and says, trying to butter up the juror or

25   talking about the case.  So in all cases, we forbid the lawyers

1    from communicating, other than to say hello, or nod hello to a

2    juror.

3           And it leads, as I said, to the impression, some

4    jurors say, oh, they're sure arrogant, because they have a law

5    degree.  Nothing could be further from the truth.  These

6    lawyers are decent, approachable people.  And you'll get a

7    sense of that when they reintroduce themselves and tell you a

8    little bit about themselves.

9           Mr. Deshong, if you'll go first, and after you and

10   cocounsel have introduced yourself, if you'll read the names of

11   your prospective witnesses, so we can ascertain whether any

12   prospective juror is familiar with the witnesses you intend to

13   call.

14          MR. DESHONG:  Certainly, Your Honor.  May I go to the

15   podium to do it?

16          THE COURT:  Sure, of course.

17          MR. DESHONG:  So, hi, everyone, my name is Michael

18   Deshong.  I'm one of the attorneys representing the United

19   States in this case.  And as the Court encouraged us to tell

20   you a little bit about ourselves, I just share that my wife and

21   I just recently became foster parents, and we're awaiting our

22   first placement, which will probably happen this week.  Thank

23   you.

24          MS. SAPTHAVEE:  Good morning.  I have a far less

25   respectable fact to share about myself.  In law school, I once

1    competed in a rock band competition.  And before you think

2    that's a cool thing, I am talking about the video game Rock

3    Band, so there's no musical talent involved.

4            Thankfully, we did so horribly that we all just kept

5    to our studies and became lawyers, and I think that was for the

6    best.

7            THE COURT:  Mr. Deshong, your prospective witnesses?

8            MR. DESHONG:  My apologies, Your Honor.  First, we'll

9    be calling Border Patrol Agent Eric Huber, then Border Patrol

10   Agent Aaron Sells, Border Patrol Agent Rubens Alexandre, Border

11   Patrol Agent Daniel Alexander, Deportation Officer Manuel Pena,

12   and fingerprint expert, Laurie Torres.

13           THE COURT:  Is anyone familiar with any of those

14   people?  Do you think you know somebody by any of those names?

15   No one indicates any familiarity.

16           Ms. Clark and cocounsel?

17           MS. CLARK:  Hi, so I'm Lauren Clark, and I am similar

18   to Mr. Deshong, in that I am currently -- I have a foster

19   puppy, not a baby, but I have a foster puppy this summer.  He's

20   a rescue, and he's going to be placed next month.  He has

21   heartworm.  And if anyone is a pet parent, you know that is a

22   very difficult and painful journey for the pup.

23           But I am his sort of sick mom.  And as soon as he's

24   well, he'll be going on to his forever home, but it's been a

25   fun summer having a puppy around.

 1            THE COURT:  Ms. Sherron?

 2            MS. SHERRON:  Good morning, everyone.  My name is

 3   Brittany Sherron, and I struggled a little bit to figure out

 4   what to tell you all.  But I think that something funny is that

 5   way before the days of COVID, in my summer before I went off to

 6   college, I created a remote band.  I thought that I was going

 7   to be a great singer some day, and not a lawyer.

 8            And so some people that I met on my freshman Facebook

 9   page and I got together and made some music videos.  You can

10   find those on YouTube, if you feel so inclined.  But it was a

11   very silly fun thing that I did.

12            THE COURT:  Folks, Ms. Sherron alluded to COVID.  Let

13   me offer you some information about the precautions that we've

14   taken here.  I notice a number of you are wearing masks.

15   First, you certainly are free to wear a mask if you want to.

16            On the other hand, those who don't want to wear a mask

17   don't have to.  It's not required anymore here.  When the COVID

18   outbreak occurred in March of 2020, obviously it presented

19   challenges for our Court.  We responded by having medical

20   professionals come in and go through our facilities here, both

21   this building and the other building, and make recommendations

22   to us, all of which we followed.

23            We're in strict compliance with all of the CDC

24   guidelines.  We have not had a single person report that they

25   became infected in the court since March of 2020, not, not

```
 1    ever, but since the inception of this thing, not one person has
 2    reported that they contracted COVID because of interactions
 3    here in the court.
 4          And our Court did remain open.  We were obviously on a
 5    more limited schedule.  At the heart of the pandemic, we were
 6    conducting proceedings largely by video conference.  But we
 7    have been back to live proceedings since the first of the year
 8    and we've had no -- no problems.
 9          So, again, it's entirely up to you whether you want to
10    wear a mask or not.  I'm assuming many people here are
11    vaccinated.  The court staff is vaccinated.  I believe the
12    lawyers are all vaccinated.
13          We have air filtration systems here that are state of
14    the art, and they circulate all of the air in the room every
15    hour or so.
16          So all that to say, in my view, I'm not a doctor, but
17    in my view, there's very little risk that anyone will contract
18    COVID here.  Nonetheless, as I said, if you want to wear a
19    mask, if you want to take other precautions, you certainly may.
20          So with those things said, if you will hand the
21    microphone, Tish, to Angela Massucci.
22          Good morning.
23          PROSPECTIVE JUROR:  Good morning.  Thank you, sir.  My
24    name is Angela Massucci, you did that well.  I live in East
25    County.  I am in transportation for Sycuan Casino.  I am not
```

1    married.  I have two adopted daughters that are grown.  One is

2    currently battling cancer, and the youngest one just made me a

3    new grandma, so I'm real happy about that.

4           And I have never been on a jury before.  I've gone to

5    the El Cajon East County one a couple times, but got dismissed.

6    I have a lot of family members that are in law enforcement, but

7    that's all back East, none of them are here.

8           THE COURT:  Any in federal law enforcement?  Any

9    working, for example, for Customs or border protection, Border

10   Patrol, or anything like that.

11          PROSPECTIVE JUROR:  No, not at all.  And as far as

12   being impartial and fair, I like to think I would be.

13          THE COURT:  Have you formed or expressed strong

14   feelings about the immigration system or the enforcement of

15   immigration.

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Again, not disqualifying, but let me

18   elaborate on something I said in my general comments.  You

19   know, you can't help but turn on the TV these days and find

20   coverage of the border and what's going on in the border, and

21   some critical and some positive about it.

22          This is not a referendum on how people feel about the

23   border issue at all.

24          PROSPECTIVE JUROR:  Right.

25          THE COURT:  In all cases, we have a set of laws that

1    everyone has notice of, not just immigration cases, but other

2    cases.  And it's thought to be fair that everybody has notice

3    and this is the law.  It doesn't change day-to-day or courtroom

4    to courtroom.

5            And so it is with the immigration laws.  They're in

6    place.  We are charged with enforcing those laws, determining

7    whether they've been violated.  It's fine if somebody wants to

8    think that the law should be reformed or the enforcement should

9    be stepped up or stepped down.  That doesn't matter, as long as

10   the person can put their personal beliefs aside and perform, as

11   I said, the objective task of determining whether the facts

12   make out a violation of the law, according to the elements of

13   the -- of the charge in this case being found in the United

14   States.

15           That's what's involved here.

16           It doesn't sound like you -- even to the extent you

17   have opinions about immigration laws or immigration

18   enforcement, it doesn't sound like those would control your

19   judgment as to what the outcome should be here.

20           PROSPECTIVE JUROR:  Not at all.

21           THE COURT:  So you can try this case.

22           PROSPECTIVE JUROR:  I look at it as an individual

23   thing.

24           THE COURT:  You can try this case fairly and on the

25   facts?

```
 1              PROSPECTIVE JUROR:  Absolutely.
 2              THE COURT:  Good, welcome.  Luke Devine.
 3              PROSPECTIVE JUROR:  I'm Luke Devine.  I live in San
 4   Diego.  I'm a manufacturing engineer for a biotech company.  My
 5   wife is a nurse practitioner.  I do have some relatives and a
 6   few friends in law enforcement, but as well they are on the
 7   East Coast.  Nothing federal or Border Patrol, or anything.
 8              I have sat on a jury in 2006 for a criminal case that
 9   reached a verdict.  It was a very short trial.
10              THE COURT:  What was the nature of the case?
11              PROSPECTIVE JUROR:  A DUI.
12              THE COURT:  Okay.
13              PROSPECTIVE JUROR:  And I believe I could be
14   impartial.
15              THE COURT:  You deliberated in the DUI case that came
16   to a verdict?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  It's important for all jurors that they
19   withhold judgment as to what the outcome should be until
20   everything's said and done.
21              Obviously, that includes the presentation of evidence,
22   testimony, and other things, exhibits.  It includes the Court's
23   instructions on the law.  I mentioned to you that I will tell
24   you how the law is defined.  It's like a recipe on a cake box,
25   you know, eggs and flour, so the charge is broken down into
```

1    elements, and I'll read those to you.

2            It's important that you give respectful attention to

3    the lawyers at the end.  They'll get up and summarize the

4    evidence and suggest to jurors what they think reasonable

5    inferences and conclusions are that should be drawn from the

6    evidence.

7            But then as you know, as a fellow who's been on a jury

8    before, a very important fourth leg to this process is

9    listening to the viewpoints of equally conscientious people

10   who've heard the same evidence, expressing your viewpoint

11   before you make a final decision about what the outcome should

12   be.

13           Are you prepared to do that here?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  You look like a young guy.  Did you ever

16   see the movie Cool Hand Luke?

17           PROSPECTIVE JUROR:  I have.

18           THE COURT:  George Kennedy used to say, "that's my

19   boy, Luke."  Has anybody ever said that to you?

20           PROSPECTIVE JUROR:  A few times.

21           THE COURT:  Okay.  Figured as much.  Welcome.

22           PROSPECTIVE JUROR:  Thank you.

23           THE COURT:  Jacqueline Montoya.

24           PROSPECTIVE JUROR:  Yes.  Jacqueline Montoya, born and

25   raised in San Diego, born at Mercy Hospital.  I do customer

```
 1    service, I'm a cashier.  I have a couple jobs.  So the business

 2    I work for does, like, internet information for mechanical

 3    shops to run their business.  So I don't know if I can say the

 4    name of the business.

 5              THE COURT:  You said you don't know whether you can

 6    say the name of it?  Sure, give them a commercial.

 7              PROSPECTIVE JUROR:  It's Snap On, so they do the

 8    tools.

 9              THE COURT:  Yeah, yeah, and they have big trucks that

10    ride around that say Snap On Tools, yeah.

11              PROSPECTIVE JUROR:  Yes, yes.  And not married, no

12    children.  I do have a few friends in law enforcement, highway

13    patrol.  One was an El Cajon police, it's a detective, but he

14    went out of state.  I do have a friend that has been with the

15    Border Patrol.

16              THE COURT:  Do you think that on account of any of

17    those relationships, you'd tilt towards the government's side

18    of the case instinctively?  No?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Our rule with respect to witnesses is that

21    all witnesses are judged by the same standards.  And there's an

22    instruction that I'll read to you at some point, but let me

23    preview it for you.

24              It says, you know, you take into consideration with

25    each witness, whether law enforcement or not, whether they were
```

1    in a position to see or hear or know the things that they're

2    testifying to, what's their memory, what's the state of their

3    memory, you know, did they exhibit any behavior on the stand,

4    is there any nonverbal clues that help you with credibility.

5             These things are, like, universal.  So whether it's a

6    law enforcement officer or not, you would apply them.  And the

7    instruction says that, that law enforcement -- perhaps they

8    have some special training or expertise where you give them

9    more deference on that, but in terms of credibility,

10   believability, everybody starts off with a clean slate.  And

11   then it's up to the jurors to make individual assessments.  Can

12   you do that?

13            PROSPECTIVE JUROR:  Yes.

14            THE COURT:  Okay.  Wait, wait, I'm not sure we got to

15   the end.  Do you know any -- other than the law enforcement, do

16   you know anybody who's been involved in the criminal justice

17   system, whether as a defendant, or a witness, or a victim of a

18   crime?

19            PROSPECTIVE JUROR:  My nephew has been -- drug issues.

20            THE COURT:  Okay.

21            PROSPECTIVE JUROR:  So juvenile.

22            THE COURT:  On this, I should have mentioned this to

23   begin with, I apologize that I didn't.  What we're looking for

24   as to question 8 is just a very high level of generality.

25   Sometimes people have had some experience, either as a victim,

```
 1    or a witness, or a defendant in a case that has left a real bad
 2    residual attitude toward the justice system.  Maybe they don't
 3    like defense attorneys or prosecutors or heaven forbid the
 4    judge.
 5          And, you know, they bring that resentment here.  And,
 6    you know, we don't want that.  I don't need to get into the
 7    weeds and find out what the source is, but everybody probably
 8    knows somebody.
 9          PROSPECTIVE JUROR:  I wasn't involved in the legal
10    side of it.
11          THE COURT:  Yeah.
12          PROSPECTIVE JUROR:  I just knew he was arrested.
13          THE COURT:  But nothing about that that leaves you
14    with a resentment toward the system at all?
15          PROSPECTIVE JUROR:  No.
16          THE COURT:  Okay.  Thank you, Ms. Montoya, welcome.
17          Angela Palatsi.
18          PROSPECTIVE JUROR:  Yes, my name is Angela Palatsi.  I
19    live in Poway.  I'm a clinical laboratory scientist.  My
20    employer is UCSD.  I'm married and my husband is an engineer.
21    I have two children.  One is an X-ray tech and one is a
22    pharmacy tech.
23          I don't have any friends --
24          THE COURT:  Do they both work at UCSD, too?
25          PROSPECTIVE JUROR:  I do work at UCSD.
```

```
1                THE COURT:  Your children, do they work there, too?

2                PROSPECTIVE JUROR:  No.

3                THE COURT:  Just was wondering if you car pooled.

4                PROSPECTIVE JUROR:  I don't have any friends or

5    relatives in the law enforcement.  I have been in a jury as an

6    alternate.  And then last year, I was picked as a juror.  It

7    was about the lemon law.  It was about the car.

8                THE COURT:  So a civil case, then?

9                PROSPECTIVE JUROR:  Yes.

10               THE COURT:  Somebody suing for money damages?

11               PROSPECTIVE JUROR:  Yes.

12               THE COURT:  Okay.  How about that case, did that go to

13   deliberation and verdict?

14               PROSPECTIVE JUROR:  Yes.

15               THE COURT:  And that was a case where you did

16   deliberate as part of the jury?

17               PROSPECTIVE JUROR:  Correct.  No family member, close

18   friends has ever been as a witness, defendant, or victim in my

19   circle.  Yes, and I can be a fair and impartial juror in this

20   case.

21               THE COURT:  Okay.  I don't know if you remember this,

22   but as part of the civil case you sat on, the judge undoubtedly

23   read you instructions on the law.  And one of the instructions

24   in civil cases has to do with the standard of proof.

25               It's a lower standard of proof in civil cases.
```

1    Basically, all you have to do is kind of tip the balance in

2    your favor if -- and you win.  So 51 percent beats 49 percent.

3            In contrast here, I've told you that the standard of

4    proof is proof beyond a reasonable doubt.  The law doesn't

5    attempt to quantify that, we don't say, well, it's 90 percent

6    or 95 percent.  Instead, the instruction says, each juror has

7    to be firmly convinced at the end of the case that the

8    defendant's guilt has been proved, firmly convinced.  So it's a

9    different standard that you'll apply here.

10           You'll have no trouble making that transition between

11   the civil case you sat on and the instructions in that case,

12   and then the different instructions in this case, right?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Okay.  Welcome.

15           Selena Hinton.

16           PROSPECTIVE JUROR.  Yes.

17           THE COURT:  Good morning.

18           PROSPECTIVE JUROR:  Good morning.  My name is Selena

19   Hinton.  I'm from San Diego County.  I'm a lab analyst for

20   Envirochec.  I'm not married, I don't have children.  I don't

21   have any friends or relatives in law enforcement.  I have not

22   sat on a jury before, and I don't have any family or close

23   friends involved in the justice system.  And I believe I can be

24   a fair and impartial juror.

25           THE COURT:  A counterpart to the legal principle I

1    just spoke of with Ms. Palatsi, that is the standard of proof,

2    proof beyond a reasonable doubt, a counterpart to that is the

3    presumption of innocence.  In our country, regardless of the

4    nature of the charge, from traffic tickets, if they're

5    criminal, all the way up to murder cases, we require the

6    government who makes the accusation to prove it, and prove it

7    beyond a reasonable doubt.  The burden is never on the accused

8    to prove anything.

9           In this case, Mr. Perez may decide he doesn't want to

10   testify.  His lawyers may decide they don't need to put on any

11   evidence.  In all events, the jury should always look to the

12   government to say, have you proved this accusation, regardless

13   of who puts on what evidence, the burden remains with the

14   government throughout the case to convince every juror --

15   firmly convince each juror that the charge is true.

16          Would you have any problem following that instruction

17   and observing the presumption of innocence?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  Okay.  Welcome.

20          PROSPECTIVE JUROR:  Thank you.

21          THE COURT:  Judy Raucy from San Marcos.

22          PROSPECTIVE JUROR:  Yes, my name is Judy Raucy, just

23   as you said, and I live in San Marcos, just as you said.

24          My occupation, I have a Ph.D. in biochemistry, and I

25   own my own company.  I do pharmaceutical research for -- or I

1    do research on drugs for pharmaceutical companies.

2             I'm married.  My husband works with me in my business.

3    He's an accountant.  I have children.  One is -- lives here in

4    San Diego, and is -- I don't know what you call it, coder, I

5    guess.  He does -- he does work for an EV company.

6             I have one friend in law enforcement and he's on the

7    CHP, California Highway Patrol.  I've never sat on a jury, and

8    I don't have any family members or anybody involved in the

9    criminal justice system.  And honestly, on the last question,

10   I'm not sure.

11            THE COURT:  What are your concerns?

12            PROSPECTIVE JUROR:  I understand that this is about

13   the law, and the law being what it is currently, but I'm afraid

14   I would have sympathies towards the defendant.

15            THE COURT:  Okay.  So if -- let's assume, and this is

16   entirely hypothetical, I don't know how the evidence is going

17   to come out, but let's assume that, intellectually at least,

18   you're convinced that the government has proved that the

19   defendant returned to the United States, had no permission, was

20   found in the United States and had been deported before, you're

21   certain of that, would you have difficulty bringing back a

22   guilty verdict because of your disagreement with immigration

23   law.

24            PROSPECTIVE JUROR:  I think I would.

25            THE COURT:  Okay.  All right.

```
 1              PROSPECTIVE JUROR:  I'm just being honest.

 2              THE COURT:  No, no, that's fine.  And I was going to

 3      say, you're ready on the questionnaire, and you're in an

 4      exacting profession.  And it sounds like your husband is, too.

 5      He's an accountant.  So I think that's probably an unvarnished

 6      assessment by you.

 7              Given Ms. Raucy's answer that she'd have a difficult

 8      time following the law, I propose that we excuse her for cause.

 9              Any objection?

10              MR. DESHONG:  Not from the government, Your Honor.

11              THE COURT:  Any objection from the defense?

12              MS. SHERRON:  No, Your Honor.  Thank you.

13              THE COURT:  Okay.  Ms. Raucy.  Thank you.

14              As I said, only honest answers here.  You don't have

15      to apologize.  We have other cases that are going out.  Federal

16      law covers maritime, so things that happen on boats.  We have

17      this act called the Jones Act, if somebody slips and falls,

18      they can sue the boat owner for injuries.  Any strong feelings

19      about that?

20              PROSPECTIVE JUROR:  My company's being sued.

21              THE COURT:  We may send you out on a Jones Act case.

22              Thanks.  If you'll go back down to the jury reception

23      area, you'll get further instructions there.  Nice meeting you.

24      Appreciate your answers.

25              Let's see.  Natalie Powell.
```

```
1              PROSPECTIVE JUROR:  Yeah, that's me.  Natalie Powell.
2    I live in Escondido.  I'm retired.  I worked at UCSD as a post
3    award sponsored research accountant.  Worked with grant money.
4              I'm married.  My husband's a barber.  I have no
5    children.  I have friends in law enforcement, Fed, and Superior
6    Court judges.
7              THE COURT:  Tell me about -- some friends or
8    acquaintances are in federal law enforcement.
9              PROSPECTIVE JUROR:  Yes, I have a brother who I go to
10   church with in La Mesa who works for Border Patrol.
11             THE COURT:  A brother in the religious sense.
12             PROSPECTIVE JUROR:  In the religious sense, yes.
13             THE COURT:  And do you discuss his work with him from
14   time to time?
15             PROSPECTIVE JUROR:  No, not really, no.
16             THE COURT:  Okay.  Would it influence you how you
17   decide this case that you have a friend, a brother as you call
18   him, who's --
19             PROSPECTIVE JUROR:  No.
20             THE COURT:  A Border Patrol officer, would that cause
21   you to tilt in favor of the government here?
22             PROSPECTIVE JUROR:  No.
23             THE COURT:  Okay.
24             PROSPECTIVE JUROR:  I have sat on a jury before, both
25   civil and criminal.  The civil was about 30 years ago.  The
```

```
 1   criminal was 20 years ago, and both reached a verdict.

 2            THE COURT:  What was the nature of the criminal case,

 3   if you remember?

 4            PROSPECTIVE JUROR:  The criminal case was a three

 5   strikes.

 6            THE COURT:  So over in state court, some --

 7            PROSPECTIVE JUROR:  Yes.

 8            THE COURT:  Felony over there?

 9            PROSPECTIVE JUROR:  Yes.

10            THE COURT:  But having nothing to do with immigration,

11   right?

12            PROSPECTIVE JUROR:  No.

13            THE COURT:  Okay.

14            PROSPECTIVE JUROR:  The civil did.

15            THE COURT:  What was the civil case about?

16            PROSPECTIVE JUROR:  The civil was the death of an

17   undocumented worker.

18            THE COURT:  Okay.

19            PROSPECTIVE JUROR:  Up North County.

20            THE COURT:  All right.  Anything about that, that

21   would spill over here and push you in one direction or the

22   other?

23            PROSPECTIVE JUROR:  No, no, not really.

24            THE COURT:  Okay.

25            PROSPECTIVE JUROR:  Yes, I have had family members
```

```
 1   involved in the criminal justice system.
 2           THE COURT:  Okay.  Without going into any detail at
 3   all, is there anything about any of the experiences or
 4   instances where that happened that would push you in one
 5   direction or the other, or control how you decide this case?
 6           PROSPECTIVE JUROR:  No, not really.
 7           THE COURT:  Okay.
 8           PROSPECTIVE JUROR:  And I think I could be a fair and
 9   impartial juror.
10           THE COURT:  Good, welcome.
11           PROSPECTIVE JUROR:  Thank you.
12           THE COURT:  Diane Quashnock.
13           PROSPECTIVE JUROR:  Very good, Your Honor.  Yes, my
14   name is Diane Quashnock.  I live in the City of San Diego.  I
15   am retired from civil service.  The first part of my career, I
16   worked in HR.  The second part of my career, I worked in a
17   program office doing engineering management.
18           My husband is also retired from civil service.  He was
19   an engineer.  I have no children.  I don't have any friends or
20   relatives in law enforcement.  I have not sat on a jury before.
21   And I or any member of my family or close friend have not been
22   involved in the criminal justice system.  And I believe that I
23   could be impartial hearing this case.
24           THE COURT:  All right.
25           The allegation, as I read it to you, goes back to
```

1    October 20th, 2020, that's the -- the government says that the

2    offense that they've alleged occurred on that date, October

3    20th, 2020.

4         I don't know where any of these lawyers were on that

5    date, I doubt they could tell you now.  They probably couldn't

6    say, well, yes, I remember -- unless it's their birthday or

7    something, but I know where they weren't, they weren't down

8    where this encounter was taking place, and where the facts that

9    give rise to the accusation occurred.

10         That is to say, they don't have any historical

11    connection to this case.  They've had to prepare by

12    interviewing and reading reports and coming to understand what

13    happened from people that do have historical connection.  I

14    make that distinction because it's an important one that all

15    jurors who sit on this case should keep in mind.

16         The evidence on which you have to base a verdict comes

17    in three forms.  It comes from witnesses, typically the

18    witnesses have some historical connection to the case.  They're

19    actually observers of things that happened or they have

20    personal knowledge of things having to do with the case, not

21    derivative from reading reports, but they actually experienced

22    it.

23         Exhibits, you probably get some records in this case,

24    maybe some photographs, that type of thing, anything that comes

25    into evidence as an exhibit, that's a form of evidence.  And

1    then the third form of evidence is that the law gives a fancy

2    term to agreements between the two sides.  It calls them

3    stipulations.

4          Those are essentially agreements that things are

5    important, but they're not contested.  And I've encouraged the

6    lawyers to reach stipulations, to the extent they can, to help

7    make efficient use of everybody's time, so we don't call a

8    witness when there's really nothing in controversy that a

9    witness has to say.

10          So those three forms of evidence, testimony, exhibits,

11   and stipulations, that's what the jury must base its findings

12   of fact on.

13          The tricky part here is that the lawyers are the

14   facilitators of the evidence, so they'll say things and they'll

15   characterize things.  And all jurors, all people who sit on

16   these cases have to be vigilant that what's being said, what's

17   being represented mirrors what you heard.

18          And if there's any discrepancy, if there's any

19   difference in the way evidence is characterized, then by all

20   means, the juror's responsibility is to rely on their

21   recollection of the way it came across from a witness, rather

22   than the way it's characterized by a lawyer.

23          I don't mention that to disparage the lawyers.  No one

24   is going to try to mislead you, no one is going to deliberately

25   say things that aren't true.  But let's face it.  This is an

1    adversarial process, right?  Both sides are hoping to achieve

2    an end.  And sometimes the line gets a little blurred with

3    that.  But it's important, if you sit on this case, that you

4    take the evidence from witnesses and the other forms that I've

5    mentioned, not just how it's characterized.

6           If, for example, a question asked by a lawyer has a

7    premise to it, you have to ask yourself, is there evidence that

8    supports that premise, or does that come from anything we know

9    about this case.  And if it doesn't, then you disregard the

10   premise.

11          Are you able to do that?

12          PROSPECTIVE JUROR:  Yes, Your Honor, I think so.

13          THE COURT:  That wasn't directed peculiarly to you, I

14   wanted everyone to listen and know that that's a principle.  So

15   thank you, if you'll pass the mike all the way down the front

16   to Stephanie Charlebois.  Did I pronounce your last name

17   correctly?

18          PROSPECTIVE JUROR:  Charlebois.

19          THE COURT:  Charlebois, okay.  Welcome.

20          PROSPECTIVE JUROR:  Thank you.  I'm Stephanie

21   Charlebois.  I live in Oceanside.  I'm a behavior analyst for

22   Autism Learning Partners.  I'm not married.  I have no

23   children.  My brother is a deputy for San Diego Sheriff's

24   Department.

25          THE COURT:  Where does he work right now, where is he

1    assigned?

2           PROSPECTIVE JUROR:  Lakeside.

3           THE COURT:  Okay.

4           PROSPECTIVE JUROR:  But he does overtime in various

5    parts of the county.

6           THE COURT:  And how long has he been with the

7    sheriff's department.

8           PROSPECTIVE JUROR:  I think it will be six years in

9    September.

10          THE COURT:  Would that influence you in how you decide

11   this case that, your brother's in law enforcement?

12          PROSPECTIVE JUROR:  No, sir.

13          THE COURT:  All right.

14          PROSPECTIVE JUROR:  I've never been on a jury.  And my

15   brother has been -- not a defendant, sorry, a witness.

16          THE COURT:  A witness, yeah, of course.

17          PROSPECTIVE JUROR:  Because of his job.  But I haven't

18   really spoken to him about any of those cases.  And I think I

19   can be fair and impartial.

20          THE COURT:  So you're in a good seat if you keep that

21   seat, you'll be in prime position to watch the witnesses while

22   they testify.  I mentioned earlier that it's the exclusive duty

23   of the jury to determine credibility, what's believable, what's

24   not.

25          Sometimes it has to do with the way witnesses say

```
 1   things or come across, divided attention task, it's not just

 2   what they say, but it's how they say it.  And then you apply

 3   experience and judgment to that, and say, well, I'm not sure

 4   that -- you know, that doesn't sound like the way things would

 5   ordinarily happen.

 6           But the point is that jurors judge credibility of

 7   witnesses and the information has to be what you determine to

 8   be credible.  Are you up to that task?

 9           PROSPECTIVE JUROR:  I think so.

10           THE COURT:  Okay.  I talked about the lawyers having

11   polygraph instincts, so, too, the jury has polygraph instincts,

12   we want you to apply those.  You can do that?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Okay.  Welcome.

15           PROSPECTIVE JUROR:  Thank you.

16           THE COURT:  Maximilian Parron.

17           PROSPECTIVE JUROR:  Max Parron.  I live in the City of

18   San Diego.  I'm a mechanical engineer, working for a controls

19   company called Climatech.  I'm not married and don't have any

20   children.

21           I used to be a base police officer in the Navy, many,

22   many years ago.

23           THE COURT:  How long ago was that?

24           PROSPECTIVE JUROR:  '95 through '99.

25           THE COURT:  You obviously enforced uniform code of
```

```
 1    military justice and other special rules for the places where

 2    you were assigned?

 3              PROSPECTIVE JUROR:  That's correct.  We adopted local

 4    San Diego --

 5              THE COURT:  Okay.

 6              PROSPECTIVE JUROR:  -- laws.

 7              THE COURT:  Did you -- in your capacity, did you make

 8    arrests yourself from time to time?

 9              PROSPECTIVE JUROR:  I did.

10              THE COURT:  And did you testify at court martials or

11    administrative proceedings to impose discipline?

12              PROSPECTIVE JUROR:  I never had to.

13              THE COURT:  All right.  Anything about that past

14    experience that would cause you to be a partisan for one side

15    or the other here?

16              PROSPECTIVE JUROR:  I don't believe so.

17              THE COURT:  Okay.

18              PROSPECTIVE JUROR:  I have a friend who works for

19    immigration, was Border Patrol.  I don't believe that would

20    influence me.  And my mother was a retired federal interpreter.

21              THE COURT:  Okay.

22              PROSPECTIVE JUROR:  I believe here.

23              THE COURT:  Really.  What's her first name?

24              PROSPECTIVE JUROR:  Marcia Parron.  She retired in

25    2013.
```

1          THE COURT:  I've been around that long.  I probably

2    know her, and she probably knows me, but I can't place her face

3    at this time.  How long was she an interpreter here?

4          PROSPECTIVE JUROR:  She moved out here in '03.  She

5    may have started right away, because she came from the New

6    York, the Brooklyn courts.

7          THE COURT:  Do our interpreters remember?

8          THE INTERPRETER:  She was a contractor, Your Honor.

9          THE COURT:  Okay.  So our two interpreters remember

10   her.  If I saw her, I would probably remember.

11         PROSPECTIVE JUROR:  You may.  I know she spent many

12   years here.

13         THE COURT:  So she probably interpreted on cases,

14   probably immigration cases when she was here, but it doesn't

15   sound like there's anything about that that would cause you to

16   decide the case.

17         PROSPECTIVE JUROR:  No, I don't think so.

18         THE COURT:  What about immigration law?  Have you

19   formed or expressed strong feelings about either the law,

20   immigration law or the enforcement of the law?

21         PROSPECTIVE JUROR:  No, my mother is an immigrant, but

22   I believe I'm pretty fair and impartial.

23         THE COURT:  Okay.  And you can judge this case that

24   way with those traits?

25         PROSPECTIVE JUROR:  I believe so.

```
 1              THE COURT:  Welcome, Mr. Parron.
 2              Karen Leland from San Marcos.
 3              PROSPECTIVE JUROR:  Yes, I am Karen Leland from San
 4    Marcos.  I'm a retired software developer.  My husband is a
 5    retired business owner.
 6              THE COURT:  What was the nature of his business?
 7              PROSPECTIVE JUROR:  Plastics manufacturing.
 8              THE COURT:  Okay.
 9              PROSPECTIVE JUROR:  We have three boys, all 18 and up,
10    two of them are college students, and the oldest is a college
11    graduate looking for work.
12              We don't have friends or relatives in law enforcement.
13    I have not sat on a jury.  And we don't have -- I don't have
14    family or friends who've been involved in the criminal justice
15    system.  And I would do my best to be fair and impartial.
16              THE COURT:  Do you have any concerns about that?
17              PROSPECTIVE JUROR:  No, I -- not having been through
18    this process before, I hope I would --
19              THE COURT:  Just a little anticipation, then.
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  So you raised three boys.  I raised two.
22    I know from doing that that sometimes a no answer meant yes.
23    And a yes answer meant no.  You know, when there was an
24    accusation that something had happened, and I knew who the two
25    suspects were.
```

1          That phenomena comes up from time to time when

2    witnesses testify.  You'll see like body language that suggests

3    maybe they're -- maybe they're not telling the truth or maybe

4    they don't really know, they're kind of out on a limb.

5          I alluded to this earlier that it's important for the

6    jury to watch and see if there are nonverbal clues that a

7    witness gives off.  You're probably expert at that task having

8    raised three boys, right?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Welcome.

11         PROSPECTIVE JUROR:  Thank you.

12         THE COURT:  Ken Brown, Spring Valley.

13         PROSPECTIVE JUROR:  Yes, Ken Brown from Spring Valley.

14   I retired from the title industry.  Worked for First American

15   Title for 40 years.  My wife still works there.  I have two

16   children.  One is a school teacher up in Corona, and the other

17   works for a different title company here in town.

18         I don't have any friends or relatives in law

19   enforcement.  I have never sat on a jury before, and I don't

20   have any family or relatives or close friends in the judicial

21   system.  And I definite ly could be fair and impartial.

22         THE COURT:  Okay.  I mentioned this earlier, it's

23   worth mentioning again.  Mr. Vasquez-Perez doesn't have that

24   obligation to testify.  If any one of us were accused, we'd

25   have the choice that's entirely ours.  No inference can be

1    drawn that a person's, like, probably guilty because they're

2    not giving their account.

3         There's a lot of reasons people wouldn't want to

4    testify.  They could have stage fright.  They could be not --

5    there might be a language barrier.  I don't know what the

6    reasons are, but the law forbids a jury from taking into

7    consideration -- and I don't know whether he's going to testify

8    or not, but the law forbids the jury from taking into

9    consideration in any way in reaching a verdict whether the

10   defendant exercises that right or not.

11        Would you have any problem following that -- there's

12   an instruction on it.  Would you have any problem following

13   that instruction?

14        PROSPECTIVE JUROR:  No, not at all.

15        THE COURT:  Thank you, welcome.  Scott Gutting.

16        PROSPECTIVE JUROR:  Yes, I'm Scott Gutting.  I live in

17   Santee, California.  I sell furniture for Macy's.  My wife is a

18   realtor.  Let's see.  I do have two children, the oldest of

19   which recently turned 18.  She has her first summer job working

20   for Ross.  She's getting ready to go to college.

21        As far as law enforcement, my grandfather was the

22   chief of police of Southgate, California for many years.

23   Unfortunately, he's no longer with us.

24        I have served on two juries.  About 20 years ago, I

25   was on a civil case.  And about 30 years ago, I was on a

1    criminal case.  Pretty fuzzy on the details of both.  It's been

2    quite a while back, but they both did come to resolution.

3            THE COURT:  Did you remember, on the criminal case,

4    did it have anything to do with criminal immigration laws?

5            PROSPECTIVE JUROR:  No, it did not.  It had to do with

6    theft.

7            THE COURT:  Okay.

8            PROSPECTIVE JUROR:  And let's see -- oh, and I do

9    think I could be a fair and impartial juror.

10           THE COURT:  Have you formed or expressed strong

11   feelings about immigration law, immigration enforcement,

12   Mr. Gutting?

13           PROSPECTIVE JUROR:  Well, I definitely have some

14   strong opinions on what's gone on in the country over the last

15   four years, in particular, but I don't think that would impede

16   me being able to be fair in this case.

17           THE COURT:  Again, this is the nonpolitical --

18   nonpolitical branch of government, so we apply the laws that

19   the other side, the legislature enacts and the President signs

20   into law.

21           This isn't a referendum on anybody's political views

22   or, you know, views about any particular law.  But as I said,

23   the fairness of this process is inherent because we've got a

24   standard in place, everybody knows what the standard is.  If

25   they want to advocate to have the standard changed, which

```
 1    sometimes happens, they can, but they go to the political

 2    branches to do that.

 3            But the fairness of this process is that we know what

 4    the standard is.  And whether you like it or not, this is the

 5    standard.  That's the one juries apply.

 6            You can do that here?

 7            PROSPECTIVE JUROR:  Yes.

 8            THE COURT:  Okay.  You probably haven't told your

 9    customers there's going to be an unexpected delay in the

10    delivery of their products, right?  I've heard that it really

11    hit the furniture industry hard.  There's sometimes a six-month

12    delay in getting things?

13            PROSPECTIVE JUROR:  COVID has really impacted the

14    furniture industry.  There's huge supply shortages of foam and

15    wood right now that have really slowed down production.

16            THE COURT:  What's the delay?  How long?

17            PROSPECTIVE JUROR:  Well, if you came in and you're

18    looking to do a fresh custom order right now, we're probably

19    talking about six to seven months.  If we had talked about two

20    years ago, I would have quoted you about eight to 12 weeks.

21            THE COURT:  Does that dissuade people from buying at

22    this time?

23            PROSPECTIVE JUROR:  Some.  The hardest thing is for

24    somebody who has just moved into a brand new place.

25            THE COURT:  They don't want it looking like Steve
```

1    Jobs' house?

2            PROSPECTIVE JUROR:  They're like, what do you have I

3    can deliver now, and it's very limited.

4            THE COURT:  Well, I hope that changes.  Thank you.

5            PROSPECTIVE JUROR:  Thank you.

6            THE COURT:  Anthony Vincent.

7            PROSPECTIVE JUROR:  Yes.  Anthony Vincent.  I live in

8    San Diego.  My occupation is I'm a senior director of corporate

9    finance at a biotech company locally.  I'm not married,

10   divorced, which felt like a federal case, a separate topic for

11   later.

12           I do have a stepson who's 23 and a younger son who's

13   15.  I have a cousin who is in law enforcement in the Midwest.

14   He's basically a SWAT officer.

15           I have been on a jury before.  I was, I think, 19 and

16   so the attorneys must have been like 18, because they didn't

17   kick me out.  That was a civil case.

18           THE COURT:  Not everybody followed that convention,

19   so --

20           PROSPECTIVE JUROR:  That was a civil case.  I think it

21   was a wrongful termination, if I remember it correctly, and we

22   did see it through to a verdict.

23           THE COURT:  Okay.

24           PROSPECTIVE JUROR:  Don't have anyone close to me

25   that's been involved in the criminal justice system, certainly

```
 1    not in any meaningful capacity that would impact my perspective

 2    on it.

 3          And I can definitely be impartial as it relates to the

 4    facts of the case.

 5          THE COURT:  And the law, I assume?  You can follow the

 6    law as I give it to you?

 7          PROSPECTIVE JUROR:  Absolutely.

 8          THE COURT:  If you'll hold off handing the mic to

 9    Ms. Shanahan for just a minute.  Hand it back to Mr. Gutting.

10          Mr. Gutting.

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  My courtroom deputy here, Ms. Wisebeck,

13    sent me a note.  I didn't have a chance to look at it while you

14    were answering questions.  It said, Scott Gutting, my daughter

15    is friends with his daughter -- daughters.  Do you know

16    Ms. Wisebeck here?

17          PROSPECTIVE JUROR:  I'm embarrassed now, because I

18    don't recognize you.

19          THE COURT:  That's actually a good thing, then, I

20    suppose, because that's a concern.  It wouldn't affect you at

21    all, knowing that there's that relationship between your kids?

22          PROSPECTIVE JUROR:  No, no, and I feel very

23    embarrassed now.  I'm sorry.

24          THE CLERK:  You're Sakura and CC's dad, correct?

25          PROSPECTIVE JUROR:  Yes, I am.
```

```
 1              THE COURT:  Well, she's neutral on this, so that
 2    shouldn't matter either.
 3              PROSPECTIVE JUROR:  It will not influence me.
 4              THE COURT:  Okay.  So if you'll pass the mic all the
 5    way down now to Ms. Shanahan.  Good morning.
 6              PROSPECTIVE JUROR:  Good morning.  Rebecca Shanahan.
 7    I live in Encinitas.  I am the director of client experience
 8    for a wealth management firm.  My husband is a wealth manager.
 9              I do have a friend who was a SWAT officer in Northern
10    California.  I have sat on a jury, it was a civil case, and we
11    did come to a verdict.
12              THE COURT:  How long ago was that?
13              PROSPECTIVE JUROR:  That was about five years ago, I
14    believe.
15              THE COURT:  Okay.
16              PROSPECTIVE JUROR:  And my father-in-law has been an
17    expert witness in many cases, most have been civil, but a few
18    criminal.
19              THE COURT:  And what's his field of expertise?
20              PROSPECTIVE JUROR:  Medical accident investigation,
21    that sort of thing.
22              THE COURT:  Okay.  So he has testified regularly in
23    the past?
24              PROSPECTIVE JUROR:  Oh, yes.
25              THE COURT:  Okay.
```

1          PROSPECTIVE JUROR:  But like I said, most civil cases,

2    a few criminal.

3          THE COURT:  You said nothing criminal.

4          PROSPECTIVE JUROR:  A few criminal.  I don't know the

5    details of them.

6          THE COURT:  It doesn't sound like that's going to

7    control how you decide this case if you're selected.

8          PROSPECTIVE JUROR:  No, it would not.

9          THE COURT:  All right.

10          PROSPECTIVE JUROR:  And I do believe I can be fair and

11    impartial.

12          THE COURT:  Okay, welcome.  Mary Shipman from Santee.

13    We have a lot of people from Santee today.

14          PROSPECTIVE JUROR:  Yes.  My name is Mary Elizabeth

15    Shipman, and I go by Liz.  I am from Santee.  I'm involved in

16    the theater as a director, choreographer mostly.  But I also

17    have an acting studio that I own, so I'm a small business.

18          Let's see.  I'm not married.  I have no children.  I

19    have distant friends in law enforcement, but no one that I'm

20    really in contact with.

21          I've gotten to this point in jury selection before,

22    but never been chosen.  I have had two close people involved as

23    victims --

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR:  -- in violent crime.

```
 1            THE COURT:  This is, I think in the vernacular, this
 2   is a no victim type case.
 3            PROSPECTIVE JUROR:  Right, right.
 4            THE COURT:  This is a status type case, rather than
 5   victim -- victims involved.  So would anything about those
 6   friends of yours, their involvement as victims, would that
 7   influence how you decide this?
 8            PROSPECTIVE JUROR:  No, not at all.
 9            THE COURT:  All right.
10            PROSPECTIVE JUROR:  In terms of being fair and
11   impartial, I find myself in sympathy with the defendant, having
12   strong opinions about our immigration system.
13            THE COURT:  Okay.  I mean, strong enough that they
14   would control how you decide this case, or it would be a
15   torment for you if you thought the evidence showed the
16   defendant was guilty, to find him guilty.
17            PROSPECTIVE JUROR:  More in that -- more in that
18   category.
19            THE COURT:  All right.  So -- one --
20            PROSPECTIVE JUROR:  I have many students that are
21   DACA.
22            THE COURT:  Okay.
23            PROSPECTIVE JUROR:  So that's where I am.
24            THE COURT:  All right.  Again, the instructions I give
25   are general application instructions.  They apply not just in
```

1    criminal immigration cases, but all cases.  But one of them

2    says that the decision you make here cannot be based on such

3    thing as personal opinion, personal likes and dislikes,

4    sympathy.  It even says that.  It says you can't decide the

5    case on that basis.  You have to make a business-like decision,

6    business people sometimes -- well, you own a small business,

7    and so you do what's best.

8              PROSPECTIVE JUROR:  Emotional.

9              THE COURT:  Even in your business decisions.

10             PROSPECTIVE JUROR:  That, too, but, yes.

11             THE COURT:  Okay.  Well, in standard business

12   decisions, sometimes you have to make like cold-blooded

13   decisions, particularly with this last year, you know, with

14   letting, having people -- letting them go from work because

15   there's not enough revenue coming in.

16             PROSPECTIVE JUROR:  Right.

17             THE COURT:  Those have to be incredibly emotional,

18   tough decisions, but, you know, they're made objectively, I

19   would think.  And I think that's what this instruction talks

20   about.

21             That's the mentality that we would aspire for each

22   juror to have, objective one.  You're probably not old enough.

23   When I was a kid, there was this program called, what, Dragnet.

24   And this guy named Joe Friday.  And he would say, just the

25   facts, just the facts.  And I can't imagine anybody that was

1    more cold-blooded and business-like than Joe Friday.

2            But maybe it doesn't rise to that level, but we want

3    you to make an objective decision on facts and law, without

4    regard to sympathy or personal opinion or sentiment.

5            Could you do that, or do you think you'd have some

6    difficulty?  I'm not trying to push you one way or the other.

7    I just need to ascertain that.

8            PROSPECTIVE JUROR:  It would be anxiety producing

9    and --

10           THE COURT:  Okay.  Would you rather not have to be in

11   that position, then, to test yourself?

12           PROSPECTIVE JUROR:  I don't want to feel -- I don't

13   want to feel like I'm trying to get out of something.

14           THE COURT:  No, I don't sense that you are at all.

15   Believe me, I have a good meter for people that are just trying

16   to get out of jury service, and you don't seem like one, so --

17           PROSPECTIVE JUROR:  So you asked me what question?

18           THE COURT:  The question was, knowing your frame of

19   mind, and understanding this is going to be a challenge, I

20   wouldn't want that to be competing all along.

21           I'd want you to feel comfortable sitting here and

22   saying, yes, at the end, I'll be able to analyze the evidence,

23   I'll be able to use my analytical skills to evaluate the

24   evidence in light of the instruction that I get from the Court

25   on what the law is.  And then I can make a business-like

1    decision without regard to sentiment or sympathy, regardless of

2    which way the decision goes.

3            PROSPECTIVE JUROR:  That would be difficult for me.

4            THE COURT:  Okay.  All right.

5            Well, I would propose then -- and, again, I appreciate

6    your answers.  There's no right answers here, just honest ones.

7    That's the purpose of this whole exercise, is to ascertain

8    whether people can fairly sit on this.

9            I would propose, given Ms. Shipman's answer, that we

10   excuse her and send her down for a Jones Act case.  You don't

11   have any problem with people slipping and falling on boats,

12   right?  That doesn't hit a nerve?

13           PROSPECTIVE JUROR:  No.

14           MR. DESHONG:  All right.  And no objection to the

15   striking.  No comment on the Jones Act.

16           MS. SHERRON:  No objection, Your Honor.

17           THE COURT:  Okay.  Thank you very much.  Appreciate

18   your answers, appreciate your time.

19           You're free to go back to the jury reception area.

20   You'll get further instructions.  I don't know if they've got a

21   Jones Act case going or not.

22           PROSPECTIVE JUROR:  I was looking forward to it.

23           PROSPECTIVE JUROR:  Excuse me, Judge.  I wanted to

24   note from the note earlier, me and Max, we know each other from

25   outside.

```
 1              THE COURT:  I'll get to Mr. Romero in just a minute.
 2   Let me go back to that, then.  That's my boy Luke and Max.  For
 3   the record, this is Mr. Devine and Mr. Parron.  And how do the
 4   two of you know each other?
 5              PROSPECTIVE JUROR:  We're friends outside of jury
 6   duty.
 7              PROSPECTIVE JUROR:  Coincidentally, yes.
 8              PROSPECTIVE JUROR:  We hang out and things.
 9              THE COURT:  How long have you known each other?
10              PROSPECTIVE JUROR:  A couple years.
11              THE COURT:  And I don't want to get too cozy with
12   this, but in what capacity?  Are you guys part of a bigger
13   group or have you worked together, how did the friendship
14   begin?
15              PROSPECTIVE JUROR:  Group of friends.  We have mutual
16   friends.
17              THE COURT:  Okay.  So this doesn't come up very often,
18   but it comes up from time to time, where prospective jurors and
19   maybe people actually sit on the jury, are acquainted with one
20   another.  It doesn't disqualify either of you.  I mean,
21   everybody was randomly drawn from the community.  And you were
22   randomly selected to sit in the seats that you're at.  But
23   here's the deal.  Your vote can't control his, and his can't
24   control you.  You have to decide the case independently if both
25   of you are chosen.
```

```
 1              Mr. Devine, can you do that?

 2              PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  Mr. Parron?

 4              PROSPECTIVE JUROR:  Absolutely.

 5              THE COURT:  So even if it means telling your boy Luke,

 6    I don't agree with you on this, I see it differently, you can

 7    do that?

 8              PROSPECTIVE JUROR:  I believe so.

 9              THE COURT:  And you can the same, Mr. Devine?

10              PROSPECTIVE JUROR:  Absolutely.

11              THE COURT:  Okay.  Mr. Romero, do you have the mic?

12    Good morning.

13              PROSPECTIVE JUROR:  Good morning.  My name is Greg

14    Romero.  I reside in San Diego County, Claremont.  My

15    occupation is that I'm in sales and marketing for Gallus Golf,

16    and I do stagehand on the side.

17              I am married.  Two weeks will actually be three years.

18              THE COURT:  Congratulations.

19              PROSPECTIVE JUROR:  Thank you.

20              We have no kids.  I have no friends or relatives in

21    law enforcement.  I have never sat on a jury before, and I have

22    -- me or any member of my family or close friend have not been

23    involved in the criminal justice system.

24              And I have to say, I wouldn't be a fair and impartial

25    juror to this case.
```

```
 1              THE COURT:  You say you would be or wouldn't?
 2              PROSPECTIVE JUROR:  I wouldn't be.
 3              THE COURT:  Okay.  What concerns --
 4              PROSPECTIVE JUROR:  I do have sympathy for the
 5     defendant when it comes to immigration and my personal beliefs.
 6              THE COURT:  Okay.  So if I pose the same hypothetical
 7     to you, and, again, it's strictly hypothetical.  You were
 8     intellectually convinced at the end of the case that the
 9     government had proved its case, and that the evidence supported
10     a guilty verdict, you'd have difficulty returning a guilty
11     verdict because of your sympathy.
12              PROSPECTIVE JUROR:  Yes, I would.
13              THE COURT:  Okay.  All right.  Again, I'd propose that
14     we excuse Mr. Romero for cause at this point.  Any objection?
15              MR. DESHONG:  No, Your Honor.
16              MS. SHERRON:  Your Honor, may we have a sidebar?
17              THE COURT:  No, tell me what your concerns are.  If
18     you want to ask Mr. Romero some more questions, I think he's
19     provided a basis for excusing him for cause.  If you disagree
20     with that, then you can put other questions to him, but I put
21     it to him directly, and he said, I think I would have trouble
22     regardless -- tell me if I'm correct -- correctly
23     characterizing you.  Regardless of the evidence, you'd have
24     trouble finding guilt in this case because of your feelings
25     about immigration law or immigration enforcement?
```

```
1              PROSPECTIVE JUROR:  That's correct.

2              MS. SHERRON:  No objection, Your Honor.

3              THE COURT:  All right.  Thank you, Mr. Romero.

4              One thing is for sure.  You're going to make it to

5    that three-year anniversary not on jury service, right?

6    Congratulations, again, on that.

7              Karen Condon.

8              PROSPECTIVE JUROR:  Yes, Karen Condon.  And I live in

9    Carlsbad.  I work at a church preschool in the administration

10   side of it now, after teaching there for 21 years, and I am not

11   married.

12             But I have three adult children and one daughter is a

13   teacher, but now a stay at home mom, and one is in sales, and

14   then the other one actually worked at the preschool with me.  I

15   have one nephew that was in San Diego Sheriff, but now as of

16   two years ago, he's moved into pursuing a ministry field.

17             I have not sat on a jury before.  And don't have any

18   family members in cases before.  And I do feel I can be fair

19   and impartial.

20             THE COURT:  Okay.  This school you work at, is it a

21   church affiliated school?

22             PROSPECTIVE JUROR:  Church affiliated, yes.

23             THE COURT:  Anything about your moral or religious

24   beliefs that would prevent you from standing soberly in

25   judgment of another person?
```

```
 1                 PROSPECTIVE JUROR:  I don't think so.
 2                 THE COURT:  Okay.  Welcome.  Katherine Kaya.
 3                 PROSPECTIVE JUROR:  Good morning.  My name is Kathy
 4     Kaya.  I live in Carlsbad.  I'm a social scientist working --
 5     I'm self-employed as an organization -- sorry, I have a mint in
 6     my mouth, organization development consultant.  Not married and
 7     no kids.
 8                 THE COURT:  Ms. Kaya, does any of your work implicate
 9     issues in criminal justice?  You say you're a social scientist.
10     There are plenty of social scientists that are involved with
11     the criminal justice system.
12                 PROSPECTIVE JUROR:  No.
13                 THE COURT:  Nothing like that.  Okay.
14                 PROSPECTIVE JUROR:  Yeah.  Does law enforcement
15     include the DA's office?
16                 THE COURT:  Yeah, sure.
17                 PROSPECTIVE JUROR:  I have a very good friend who's a
18     retired deputy DA.
19                 THE COURT:  Okay.
20                 PROSPECTIVE JUROR:  From San Diego County.
21                 THE COURT:  Who is that person?
22                 PROSPECTIVE JUROR:  Giacomo Bucci [phonetic].
23                 THE COURT:  Okay.  I was there many, many years ago,
24     so it was probably after my day.  Unfortunately, a lot of
25     people after my day are now retired.
```

1          PROSPECTIVE JUROR:  I have not sat on a jury before.

2    I do have some distant relatives who've been involved in the

3    criminal justice system.  And I can be fair and impartial.

4          THE COURT:  Okay.  Your friend who was a deputy DA,

5    the immigration cases are all done here, whether civil or

6    criminal, it's an exclusive federal jurisdiction over that area

7    of law.

8          So your friend would not have ever prosecuted an

9    immigration case over there.  Do you -- are you still in touch

10   with your friend who was a DA?

11         PROSPECTIVE JUROR:  He hasn't prosecuted, but I think

12   when he retired, he volunteered to help with cases where people

13   were asking for asylum.

14         THE COURT:  Okay.  All right.  Anything about that

15   that would influence you or control how you decide this case?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Okay.  Thank you, Ms. Kaya.

18         Stephanie Boles from Chula Vista.

19         PROSPECTIVE JUROR:  Good morning.

20         THE COURT:  Good morning.

21         PROSPECTIVE JUROR:  My name is Stephanie Boles.  I

22   live in Chula Vista.  I'm a gymnastics coach at Compass

23   Gymnastics.

24         THE COURT:  You've probably been watching the

25   Olympics, then.

1          PROSPECTIVE JUROR:  Yeah.  I'm married 19 years.  Y

2    husband is a chief in the United States Navy.  I don't have

3    adult children.  I have twin 16-year-old girls.  None of my

4    family or friends works in law enforcement.  I've never been on

5    a jury, but I've been here to wait.  And then none of my family

6    members have any involvement in the criminal justice system at

7    all.  And I think I can be fair and impartial.

8          THE COURT:  Other than the people who've been excused

9    because they said they have some reservations about whether

10   they could fairly judge this case, if I had asked you some of

11   the questions I put to others, would your answers be

12   substantially the same as the answers that the other

13   prospective jurors have given who are still here?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Okay.  Welcome.

16         Sara Schulke.

17         PROSPECTIVE JUROR:  Hi, Sara Schulke, I live in San

18   Diego.  I'm a writer, currently seeking my day job.  I'm not

19   married.  I don't have any children.  No one in law

20   enforcement, a cousin in the Marines, I don't know if that

21   counts.

22         I've never sat on a jury.  My brother has been a

23   defendant.

24         THE COURT:  How long ago?

25         PROSPECTIVE JUROR:  He was a freshman in college and

```
 1  he's 30 now, so --

 2          THE COURT:  Anything about his experience, as far as

 3  you know of it, that would control how you decide this case?

 4          PROSPECTIVE JUROR:  It didn't make any terribly fond

 5  of cops.  The cop didn't have grounds to pull him over the way

 6  he did.

 7          THE COURT:  So you had -- you came away with some

 8  impression that he was not treated fairly?

 9          PROSPECTIVE JUROR:  Right, yes.

10          THE COURT:  Okay.  Does that spill over into -- in

11  this case, federal law enforcement?  Would you have a

12  perception without hearing from these folks that maybe they're

13  arbitrary, heavy handed, whatever it was.

14          PROSPECTIVE JUROR:  Probably.

15          THE COURT:  Oh.

16          PROSPECTIVE JUROR:  I don't think I could be fair and

17  impartial.  I wish I could.

18          THE COURT:  You think you might be biased because of

19  law enforcement witnesses?

20          PROSPECTIVE JUROR:  Partially.  And I've just been

21  conflicted and upset since you said the terms of the case.  I'm

22  sorry.

23          THE COURT:  No, no, again, you don't have to be sorry.

24  It's important that we do this, and we screen people who don't

25  think they can be fair for whatever reason.  We all have things
```

 1   that are important to us and experiences, right, that inform

 2   our judgments.

 3          Okay.  I propose, given Ms. Schulke's answers, that we

 4   excuse her for cause.

 5          MR. DESHONG:  No objection, Your Honor.

 6          MS. CLARK:  Your Honor, could we do a couple of

 7   follow-up questions?

 8          THE COURT:  Sure, go ahead.  Related to this, of

 9   course, related to the -- her concern that she couldn't be fair

10   hearing law enforcement testimony.

11          MS. CLARK:  I don't mean to pick on you, I'm so sorry.

12   I want to make sure that -- not just for you, but since we've

13   had a few people that have talked about their personal

14   opinions, of course, we all have personal opinions --

15          THE COURT:  Hold on a second, Ms. Clark.

16          Directed to this prospective juror.  This isn't for

17   the whole audience.  She's expressed concern that she can't

18   fairly judge law enforcement testimony because of an experience

19   with her brother some time ago.  So if you want to ask her

20   about that, we're dealing only with Ms. Schulke at this point.

21          MS. CLARK:  Thank you, Your Honor.  We all have

22   personal opinions and things we have gone through in life that

23   would influence who we are, and what we think, and how we feel

24   about certain things.

25          And Judge Burns acknowledged that as we -- at the very

1   beginning, that we all have those feelings.  So it's normal to

2   have some lingering thoughts about something that's happened to

3   you in the past.  Our civic duty here as jurors is to be fair

4   and impartial, and to judge a case based on what the prosecutor

5   presents to you.  And by determining whether the witnesses here

6   have credibly answered questions and talked about events that

7   have happened.

8           There's not an aspect of this case, or at least to my

9   knowledge, that will be regarding sympathy or certain personal

10  opinions of these agents.  It's going to be facts, things that

11  they witnessed, things that they investigated, things that they

12  looked up.

13          With that, would you be able to follow the law as the

14  judge tells you, to say, I can listen to this evidence, I can

15  put my brother's experiences to the side, and listen to what

16  the judge is telling me to do.

17          PROSPECTIVE JUROR:  I don't think I could.  I've been

18  sympathetic to the defendant since I heard the terms of the

19  case.

20          MS. CLARK:  I understand.  I appreciate your honesty.

21  Thank you.

22          THE COURT:  Any objection by defense counsel to the

23  excuse of Ms. Schulke, given her answers?

24          MS. CLARK:  No, Your Honor.  Thank you.

25          THE COURT:  Thank you, again.  Nice meeting you.

```
 1   Appreciate your participation in the process.  Another Jones
 2   Act juror, huh?
 3           Alejandro Angeles.
 4           PROSPECTIVE JUROR:  Alejandro Angeles.  I'm from San
 5   Diego.  I work at an architecture firm.  I'm married.  My wife
 6   is an architect.  I have two small children.  I have a couple
 7   family friends who are CHP.  Haven't been on a jury before.
 8   Don't know of any family member being in the criminal justice
 9   system.
10           THE COURT:  No close friend either, right?
11           PROSPECTIVE JUROR:  No.
12           THE COURT:  Okay.
13           PROSPECTIVE JUROR:  I believe I can be a fair and
14   impartial juror.
15           THE COURT:  All right.  Have you, Mr. Angeles, formed
16   or expressed strong feelings about immigration law, immigration
17   enforcement in the country?
18           PROSPECTIVE JUROR:  Yes.
19           THE COURT:  Can you put those aside?  You've heard the
20   explanation I've given.  We're not going to try -- I have no
21   motive to try to change anybody's attitude, one way or the
22   other, but I do have to insist that people with strong feelings
23   put those aside, and base the decision on facts and law, can
24   you do that here?
25           PROSPECTIVE JUROR:  Yes.
```

1              THE COURT:  Okay.  Welcome.

2              Sandra -- it looks like Acres.  Okay, Sandra Acres.

3              PROSPECTIVE JUROR:  Good morning.  My name is Sandra

4    Acres.  I live in Encinitas.  My occupation is I'm a home

5    maker, home schooling my three children.  I'm also a Casa

6    volunteer.

7              THE COURT:  I'm sorry, I missed that.

8              PROSPECTIVE JUROR:  Casa volunteer.

9              I am married.  My husband provides software solutions

10   to casinos.  I have one adult child, who's going to college

11   this year.

12             I do not have friends and relatives in law

13   enforcement.  I never sat on a jury, though I reported, this is

14   my third time reporting.

15             And my husband is currently in a lawsuit as a

16   plaintiff against several lawyers for wrongful use of civil

17   procedures.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR:  Yeah, in a tribal court.

20             THE COURT:  Sounds like that's very different from

21   what's implicated here to, do you agree?

22             PROSPECTIVE JUROR:  Absolutely.

23             THE COURT:  So it wouldn't affect you.

24             PROSPECTIVE JUROR:  No.  And I believe I can be fair

25   and impartial.

```
 1            THE COURT:  I've been trying to ascertain the origin
 2    of your accent.  Where are you from originally.
 3            PROSPECTIVE JUROR:  Very French.
 4            THE COURT:  Good.  Welcome.  Theresa Nebrida.
 5            PROSPECTIVE JUROR:  Theresa Nebrida.  I'm from San
 6    Diego, I live in San Diego Rancho Bernardo.  I'm a business
 7    officer for UCSD Health, and married.  My husband is retired.
 8    I have two --
 9            THE COURT:  What did your husband do before he
10    retired?
11            PROSPECTIVE JUROR:  He was a business owner.  We had
12    thrift stores --
13            THE COURT:  Okay.
14            PROSPECTIVE JUROR:  -- in the past.  Two adult
15    children.  One works for UCSD Health also.  He's a hospital
16    assistant.  And my daughter is a health life science recruiter.
17    I have a nephew, my cousin's son, who works for the Border
18    Patrol.
19            THE COURT:  Okay.
20            PROSPECTIVE JUROR:  I don't know if he's still there.
21    My last contact, he was at Border Patrol.
22            Never been on a jury.  I have -- my sister-in-law's
23    husband is a lawyer here in San Diego.
24            THE COURT:  What kind of law does he practice, do you
25    know?
```

1          PROSPECTIVE JUROR:  I know that he has done criminal,

2     where he represented inmates.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  And --

5          THE COURT:  Anything about that -- this is your

6     brother-in-law?

7          PROSPECTIVE JUROR:  Yeah, he's like my brother-in-law.

8     He's my sister-in-law's husband.

9          THE COURT:  Oh.  Wait a minute, how does that work?

10     Sister-in-law's husband would be your brother, right?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Sister-in-law --

13          PROSPECTIVE JUROR:  It's my husband's sister, and her

14     husband.

15          THE COURT:  Ah, okay.  I wasn't expanding this far

16     enough, yeah.  You don't know what -- but you don't know how

17     often he practices criminal law, just that he does.

18          PROSPECTIVE JUROR:  Yeah, that he did.

19          THE COURT:  And that wouldn't -- that wouldn't

20     influence you?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Okay.

23          PROSPECTIVE JUROR:  And I have a cousin who is a

24     victim.  He was attacked in the Bay area.  He was a mailman and

25     he was attacked.

1          THE COURT:  How long ago was that?

2          PROSPECTIVE JUROR:  It was all over the news.  Maybe

3     three, four years ago.

4          THE COURT:  Again, this is considered to be victimless

5     crime.  It doesn't implicate violence or anything like that.

6          Do you think that would have any influence on how you

7     decide this case?

8          PROSPECTIVE JUROR:  No, it would not.

9          THE COURT:  All right.

10          PROSPECTIVE JUROR:  And, yes, I can be fair and

11     impartial.

12          THE COURT:  So I'm interested in -- when your husband

13     was running the thrift stores, where would he get the stuff

14     that he sold?  Various places?

15          PROSPECTIVE JUROR:  We had like a store front.

16          THE COURT:  Yeah, where would you get your items that

17     you were selling.

18          PROSPECTIVE JUROR:  Donations and we also had vendors.

19          THE COURT:  I ask you because I used to be fascinated

20     with this program called Storage Wars.  Did you ever watch

21     that?  I think some of those people ran stores and they'd go

22     bid on these lockers and sometimes they would get very valuable

23     stuff sometimes it was junk.

24          PROSPECTIVE JUROR:  Right, right.

25          THE COURT:  Is that realistic?  Do people that own

1   thrift stores go bid on storage lockers?

2           PROSPECTIVE JUROR:  We did not.

3           THE COURT:  You might have been on Storage Wars, had

4   you, huh?  Welcome.

5           MS. SAPTHAVEE:  Your Honor, the government would like

6   to just bring to the Court's attention that we have a

7   litigation services unit employee who is helping us who knows

8   one of the jurors, Juror Number 12, Kenneth Brown.

9           THE COURT:  Okay.  Who is it?

10          MS. SAPTHAVEE:  Ray Christianson, sitting out here.

11          THE COURT:  Let's see.  Mr. Brown, do you know

12  Mr. Christianson?

13          PROSPECTIVE JUROR:  Yes, he's gone to my church for 20

14  years at least.

15          THE COURT:  He's going to be helping out.  He's not

16  going to testify or anything else, but he's a crack IT guy.  I

17  know that because I've been to other functions, not

18  necessarily, you know, courtroom functions where he's in charge

19  of it, and they always run exactly precisely.

20          Anything about your relationship with Mr. Christianson

21  that would cause you to tilt in the government's favor in this

22  case.

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  And assuming, again, entirely

25  hypothetical at the end of the case, you and other jurors

```
1    aren't convinced, and you say, we don't just -- it wasn't

2    proved, Mr. Vasquez-Perez is not guilty, you wouldn't have any

3    trouble showing up at church and saying to Mr. Christianson,

4    look, that was a righteous decision based on what the judge

5    told us and what the facts were?

6              PROSPECTIVE JUROR:  Sure.

7              THE COURT:  Okay.  Thank you.

8              Let's see.  We're all the way up to Cynthia De Moss.

9              PROSPECTIVE JUROR:  So I'm Cynthia De Moss.  I live in

10   San Diego.  I am retired.  I was a real estate agent and an

11   X-ray tech through the years.

12             My husband is also retired.  He was an electrical

13   engineer.  We have no children.  We have friends who are

14   retired law enforcement.  I was on a jury three years ago in

15   North County.  It was a criminal case and we did come to a

16   verdict.

17             THE COURT:  What was the charge, Ms. De Moss?

18             PROSPECTIVE JUROR:  It was solicitation of a minor.

19             THE COURT:  Okay.

20             PROSPECTIVE JUROR:  My brother was a victim in a

21   criminal case, but that would not have anything to do with this

22   case.  And I can be a fair and impartial juror.

23             THE COURT:  Thank you.  Mr. Cafferty, Steven Cafferty?

24             PROSPECTIVE JUROR:  Yes, Your Honor.  I'm Steve

25   Cafferty.  I live in Oceanside.  I'm a retired software
```

1    developer.  Not married.  No adult children.  No friends or

2    relatives in law enforcement.

3            Never sat on a jury.  No friends in the justice

4    system.  Actually, my grandfather was an immigration attorney.

5    He died before I was born.  I don't think that'll have any

6    bearing on my judgment.  And I can be a fair and impartial

7    juror in this case.

8            THE COURT:  Okay.  Thank you very much, Mr. Cafferty.

9            Yasmin Rodriguez?

10            PROSPECTIVE JUROR:  Hi, it's Yasmin Rodriguez.  And I

11    live in Little Italy here in San Diego.  I'm a director at a

12    construction consulting firm, and we prepare estimates that are

13    used in litigation and we provide expert testimony.

14            Not married.  Child free.  No friends or relatives in

15    law enforcement.  And I've served on two juries, both civil.

16    One was probably about three or four years ago, and it settled

17    during lunchtime.

18            THE COURT:  Pretty common.

19            PROSPECTIVE JUROR:  And then I served on the first

20    Superior Court in-person trial in March.

21            THE COURT:  Oh, okay.  March of this year?

22            PROSPECTIVE JUROR:  Right.

23            THE COURT:  So fairly recently, huh, what was the

24    nature of the case?

25            PROSPECTIVE JUROR:  It was a car accident dispute --

```
 1              THE COURT:  So another civil -- civil case.

 2              PROSPECTIVE JUROR:  Correct.

 3              THE COURT:  All right.  And did that case go to

 4   verdict, did you deliberate and reach a decision?

 5              PROSPECTIVE JUROR:  Yes.

 6              THE COURT:  All right.

 7              PROSPECTIVE JUROR:  No friends or family are

 8   involvement in the criminal justice system, and I can be fair

 9   and impartial.

10              THE COURT:  Okay.  Welcome.

11              PROSPECTIVE JUROR:  Thanks.

12              THE COURT:  Dennis Hernando.

13              PROSPECTIVE JUROR:  Yes, Your Honor, thank you.  My

14   name is Dennis Hernando, I live in San Diego.  I work in the

15   Naval Medical Center San Diego in the laboratory

16   administration.  I'm part of our compliance team.

17              I'm married.  I have three minor children, ages 7, 8,

18   and 9.

19              I do have a distant relative in the CBP.  My family

20   and I spent some time with her, just within the last week and

21   this past weekend.

22              THE COURT:  Okay.  Does she work locally?

23              PROSPECTIVE JUROR:  She does, Your Honor.

24              THE COURT:  Did you have occasion to talk to her when

25   you were together about the nature of her work or what she
```

```
1    does?
2              PROSPECTIVE JUROR:  Not so much.  It was regarding the
3    death of her mother.
4              THE COURT:  Oh.
5              PROSPECTIVE JUROR:  So we did not talk about that.  In
6    the past, we have, Your Honor.
7              THE COURT:  Okay.  But you wouldn't -- I assume you
8    would not be influenced to decide this case, one way or the
9    other, based on conversations you may have had with her?
10             PROSPECTIVE JUROR:  No, Your Honor.
11             THE COURT:  Okay.
12             PROSPECTIVE JUROR:  I've never sat on a jury before.
13   None of my family or friends have been involved in the
14   criminal -- in the criminal justice system as witness,
15   defendant, or victim.
16             I do feel I can be a fair and impartial juror.
17             THE COURT:  Okay.  Is your work over at the Balboa
18   Naval Hospital?  Is that where you go?
19             PROSPECTIVE JUROR:  Yes, Your Honor.
20             THE COURT:  Good place.  I'll share this with you.
21   One of the benefits of being a federal judge is that we're
22   entitled to go over and use the medical services there.  And
23   I'm kind of put together with used parts, so they've done
24   surgery on my shoulder, my forearm, this and that.
25             They're terrific over there.  Really terrific.  It's a
```

1    great, great outfit.  The medical care there is really

2    topnotch.

3              PROSPECTIVE JUROR:  Thank you, Your Honor.  We do our

4    best.

5              THE COURT:  I'm going to try this as a Jazmine,

6    Jazmine Cope?

7              PROSPECTIVE JUROR:  It is Jazmine.

8              THE COURT:  Yasmin, I get wrong.  It's Yasmin.  And

9    Jazmine, it's Jasmin.  Ms. Cope.

10             PROSPECTIVE JUROR:  Yes, I'm Jazmine Cope.  I'm from

11   San Diego.  I'm a part-time music teacher and soon to be

12   barista.  I'm not married.  I do not have children.

13             I do not have any friends or family in law

14   enforcement.  I've never served on a jury before.  I have had a

15   family member serve as a defendant, but nothing related to this

16   case.

17             THE COURT:  Okay.  Anything about that experience that

18   left you with residual hard feelings about how your family

19   member was treated?

20             PROSPECTIVE JUROR:  Not so much with the Court, more

21   so the beforehand part.

22             THE COURT:  The, what, police or prosecutors or

23   defense attorneys?

24             PROSPECTIVE JUROR:  A little bit, yes.

25             THE COURT:  Okay.  Would that -- would that spill over

1    here?

2           PROSPECTIVE JUROR:  I don't believe that particular

3    instance would spill over to this particular case.

4           THE COURT:  All right.

5           PROSPECTIVE JUROR:  And I think, honestly, I would

6    have a little trouble being unbiased in this case.

7           THE COURT:  What are your concerns about the nature of

8    the case?

9           PROSPECTIVE JUROR:  Yes, I fear I would be a little

10   too sympathetic to the defendant and the same issue that the

11   others have had.

12          THE COURT:  Some have offered that, and I've excused

13   them.  Again, I'm not trying to push you, one way or the other,

14   but you have to tell me if this is going to be on the forefront

15   of your mind, and you think that there's a good chance you

16   decide this case based on sympathy rather than objectively on

17   facts and law, then you probably shouldn't sit.

18          On the other hand, if you can compartmentalize that,

19   and say, well, I have sympathetic feelings, but they can't

20   control the outcome here, I have to make an objective decision,

21   free of sympathy, free of personal opinion, I think I can do

22   that, then you would -- you would be able to sit.  Only you can

23   tell me where you are on that spectrum.

24          PROSPECTIVE JUROR:  I think it would be a disservice

25   of me to try.  I mean, I would love to be at a point in my life

1   where -- I think I've got a little life, I'm just 22 years old.

2   I don't know if --

3          THE COURT:  So it would be a challenge for you to

4   decide this case on the basis on which I've mentioned it should

5   be decided.

6          PROSPECTIVE JUROR:  I think so, yes.

7          THE COURT:  I'd suggest, then, to counsel that

8   Ms. Cope be excused for cause.

9          MR. DESHONG:  No objection, Your Honor.

10         THE COURT:  Ms. Sherron?

11         MS. SHERRON:  Sorry, Your Honor, attempting to use my

12   brain.  I think no objection in this case.

13         THE COURT:  Okay.  Thank you, Ms. Cope.  We're going

14   to have a full jury for that slip and fall on the boat.

15         Dawn Waxon?

16         PROSPECTIVE JUROR:  That's correct, thank you.  I live

17   in midtown San Diego.  My main occupation is as an antique

18   furniture archivist for ISA Imports.

19         I am not currently married, and I do not have

20   children.  I do have a couple friends in law enforcement.  I

21   have not sat on a jury before.  I have served as a witness in

22   an assault case here in San Diego about four to five years ago.

23         And regardless of my feelings on our current

24   immigration laws, I feel that I am fair and impartial regarding

25   facts of the case.

1          THE COURT:  Okay.  You mentioned your primary

2    occupation has to do with antiques and antique dealing or

3    appraisal or --

4          PROSPECTIVE JUROR:  I maintain an antique and vintage

5    furniture archive.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR:  For a European furniture importer.

8          THE COURT:  I see.  Do you have another occupation

9    besides that?  When you said main, it made me think you do

10   something else, too?

11         PROSPECTIVE JUROR:  Yes, I'm also employed as a book

12   seller at Blue Stocking Books in Hillcrest.  And I also own a

13   couple of my own businesses.

14         THE COURT:  And what's the nature of those businesses,

15   the other ones?

16         PROSPECTIVE JUROR:  I do search engine optimization.

17         THE COURT:  Okay.  I moved into a place that was a

18   historical house and they left some of the furniture.

19         I have this Henredon.  Have you ever heard of that

20   brand?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Are they still around?

23         PROSPECTIVE JUROR:  To some extent, under another

24   furniture group.

25         THE COURT:  Ah, my wife wanted to get rid of one of

1    the pieces and we put it on OfferUp, or something like that,

2    and it's still sitting there.

3            PROSPECTIVE JUROR:  It's the nature of Henredon.

4            THE COURT:  Yeah, yeah.  Welcome.

5            PROSPECTIVE JUROR:  Thank you.

6            THE COURT:  Junefredo Apon.

7            PROSPECTIVE JUROR:  Yes, Your Honor.

8            THE COURT:  Good morning.  Have I pronounced your last

9    name correctly?

10           PROSPECTIVE JUROR:  Apon.  I live in the Mira Mesa

11   area of San Diego.  And I currently work with the DHS, U.S.

12   CIS, as an immigration service officer.

13           THE COURT:  What are your duties?

14           PROSPECTIVE JUROR:  I adjudicate cases typical of the

15   defendant's.

16           THE COURT:  Okay.  For, what, like, asylum claims or

17   people wanting to remain in the United States?

18           PROSPECTIVE JUROR:  Benefits, Your Honor.

19           THE COURT:  Oh, benefits.

20           PROSPECTIVE JUROR:  Yeah.

21           THE COURT:  But does benefits include residency here

22   in the United States?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  So you make recommendations, or do you

25   make determinations yourself?

1          PROSPECTIVE JUROR:  I do the decisions.

2          THE COURT:  Okay.  And are those decisions based, in

3     part, on face-to-face contact with the people petitioning for

4     benefits?

5          PROSPECTIVE JUROR:  We do face-to-face interviews and

6     we do waive interviews on cases.

7          THE COURT:  Okay.  But what you do doesn't sound to be

8     criminal at all, it's all civil or administrative, having to do

9     with administrative immigration procedures?

10         PROSPECTIVE JUROR:  I think it's administrative,

11    because we grant benefits.

12         THE COURT:  Okay.  But nothing to do with, for

13    example, whether a person's violated a criminal law that might

14    subject them to criminal penalties?

15         PROSPECTIVE JUROR:  Well, I do come into evidence that

16    I resolve with the other agencies.

17         THE COURT:  So if somebody petitioning for benefits

18    has a criminal record, you're likely to know about that?

19         PROSPECTIVE JUROR:  I do.

20         THE COURT:  Okay.  How would that impact on whether

21    you can fairly judge this case?

22         PROSPECTIVE JUROR:  Not at all.

23         THE COURT:  Okay.  So whatever experiences you've had,

24    whatever judgments you've formed, you'll put it aside, listen

25    to the evidence here, listen to the criminal principles of law

```
 1    that I instruct the jury on, and make an objective decision?

 2              PROSPECTIVE JUROR:  That's what I do every day on my

 3    job.

 4              THE COURT:  So you can do it here?

 5              PROSPECTIVE JUROR:  I can --

 6              THE COURT:  In this context.

 7              PROSPECTIVE JUROR:  Yes, sir.

 8              THE COURT:  Go ahead and answer the other questions,

 9    then.

10              PROSPECTIVE JUROR:  I'm married.  I've got three adult

11    kids.  My son is a CBP officer, married to a CBP officer.

12              THE COURT:  Where does he work?

13              PROSPECTIVE JUROR:  Long Beach.

14              THE COURT:  Okay.  At the port?

15              PROSPECTIVE JUROR:  I believe so, yes.

16              THE COURT:  Okay.

17              PROSPECTIVE JUROR:  And my daughter is a registered

18    nurse.  And my youngest daughter is a housewife now, but used

19    to be a weather person.

20              THE COURT:  You say a weather person?

21              PROSPECTIVE JUROR:  Yes, on TV.

22              THE COURT:  Oh, on TV.

23              PROSPECTIVE JUROR:  Yes.  My brother is a retired CBP

24    officer.  I have two nephews in CBP.

25              THE COURT:  Now, do they work -- are the criminal
```

```
 1    enforcement, do they -- any of them work at ports of entry, for
 2    example?
 3              PROSPECTIVE JUROR:  They did.
 4              THE COURT:  Okay.
 5              PROSPECTIVE JUROR:  And they are right now, I think.
 6              THE COURT:  Would that push you to favor one side of
 7    the case over the other?  Obviously, the law enforcement side
 8    of the case.  I think they're going to call some CBP employees.
 9              PROSPECTIVE JUROR:  Not at all.  I just base my
10    decisions when they do cases on what I see on the files.
11              THE COURT:  Okay.  So you've heard me ask other people
12    whether they'd be influenced because they have a friend or
13    relative that's closely associated with one of the professions
14    that a witness may have.
15              If I'm understanding you correctly, you can decide
16    this case free of any kind of preconception, whether a witness
17    ought to be believed or disbelieved before they testify, free
18    of any preconception of whether what they say is accurate and
19    persuasive or otherwise, you'll wait and listen to the witness,
20    make that decision on an individual basis.
21              PROSPECTIVE JUROR:  Every case I do is unique, so I
22    look at the evidence, I look at what the applicant says to me,
23    body language and everything.
24              THE COURT:  Okay.  So here's what I'm getting at,
25    you've got a lot of relatives.
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Who are involved working in protecting the

 3    border and working at the ports of entry.

 4              One might say, well, maybe he's going to be inclined

 5    towards the government side of the case, because they're going

 6    to call some CBP officers.  It sounds like you're telling me,

 7    no, no, I wouldn't be inclined just on that basis, I'm going to

 8    listen to the evidence, I'm going to be objective about it.

 9              Maybe CBP officers made mistakes in this case, I'm

10    open to that possibility.

11              PROSPECTIVE JUROR:  That's correct, Your Honor.

12              THE COURT:  Is that your frame of mind?

13              PROSPECTIVE JUROR:  Yes, sir.

14              THE COURT:  Go ahead, you can finish the other

15    questions.  It seems to me probably your relatives have been

16    involved in the criminal justice system as witnesses, at a

17    minimum, right?

18              PROSPECTIVE JUROR:  That's a possibility.  But I'm

19    also a victim of a crime, so that's no problem.  And like I

20    said, I'll be fair and impartial, so --

21              THE COURT:  Okay.  Good.  Thank you, welcome.

22              Kevin Gross from El Cajon.

23              PROSPECTIVE JUROR:  Yes, Kevin Gross, El Cajon.  I'm a

24    maintenance and operations supervisor for San Diego County

25    Office of Education.  And I oversee the sixth grade camps out
```

1   Camp Cuyamaca, and Palomar, and Fox.

2           I am married.  My wife does work for the county in

3   Behavior Health Services, she's a supervisor in that area.

4           I do have one adult child.  He is a San Diego Police

5   Department SWAT officer.  I do have some friends and

6   acquaintances in law enforcement, but none in Border Patrol.

7           THE COURT:  Would your son's occupation cause you to

8   tilt in this criminal immigration case?

9           PROSPECTIVE JUROR:  Not for an immigration case, no.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  I've never sat on a jury.  Been

12  called in, but never selected.  And I have not, or no member of

13  my family has been involved in the criminal justice system,

14  other than my son obviously as witnesses in various things.

15          THE COURT:  How long has he been a San Diego police

16  officer?

17          PROSPECTIVE JUROR:  A little over seven years.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR:  And I do think I could be a fair

20  and impartial juror in the case.

21          THE COURT:  All right.  Thanks very much, Mr. Gross.

22          David Dent from Chula Vista.

23          PROSPECTIVE JUROR:  Yes, Your Honor, my name is David

24  Dent.  I live in Chula Vista, and I'm a financial analyst at

25  Scripps, at the corporate office.  So lots of budgeting, and

1    forecasting, things like that.

2             I'm not married.  I was married in my 20s, but I'm not

3    married.  I have a long term girlfriend and no kids, because I

4    get stressed out easily.

5             THE COURT:  Child free as somebody once said.

6             PROSPECTIVE JUROR:  Yes, sir.  Yes, Your Honor.

7             I don't really have any close friends or relatives in

8    law enforcement.  One of my cousins married a Secret Service

9    officer, but I haven't actually met him yet.

10            And then I have not sat on a jury before.  And I -- no

11   experience with the criminal justice system, other than a night

12   in the drunk tank.  And I did -- I worked for a company that

13   was sued for -- a shareholder lawsuit, and I was a financial

14   analyst and I helped prepare some exhibits for that.  It was

15   Quizno's Sub.  They had a civil case, I think it was a judgment

16   rendered against them, so my preparation was inadequate, I

17   guess.

18            And then as to the ninth question, I share the

19   sympathies of some of the folks here.  And I appreciate your

20   specificity about the guidance of adhering to the law, and I

21   certainly understand that.

22            The way I would say it is, I would be looking for a

23   reason to acquit Mr. Vasquez-Perez.  And the reason why relates

24   to prosecutorial discretion.  And what's troubled me, as a

25   corporate finance person, is I hear on Wall Street and

1    investments, and I've worked as a commercial real estate

2    analyst for some publicly traded companies, is that there's a

3    lot -- to be frank, there's a lot of money laundering that's

4    happening in the United States.  And it kind of gets a pass

5    because it's old, rich, white people.  And then we seem to have

6    resources to bring cases like this against people who are

7    trying to make a living.

8           And so I want to serve.  And if that's your guidance,

9    I want to do that and be part of the process, but I want you to

10   know, I would be looking for a reason to acquit, not as

11   to -- not unfairly as to the facts presented, but just -- my

12   sympathies are with the defendant.

13          THE COURT:  So, you know, one of my responsibilities

14   is to try to maintain a level playing field here, understanding

15   that the government has the burden of proof, that the

16   defendant's presumed to be not guilty, but it's conceivable

17   that the government can meet its burden of proof and establish

18   beyond a reasonable doubt that the defendant's guilty of what

19   he's been accused of.

20          I'm not taking a position on that, but I'm open to it.

21   The mind set that prospective jurors should have at this point,

22   with all respect, is that they should be open to that, too, not

23   necessarily an advocate for one thing or the other.  It's true

24   the defendant is presumed to be not guilty.  If I sent 12

25   people out now and said reach a verdict, it would necessarily

1    be not guilty, because no evidence has been presented,

2    certainly not evidence to the standard of beyond a reasonable

3    doubt.

4            On the other hand, you know, I wouldn't want you to

5    start off with an agenda, where you say, well, I'm hoping we

6    can get to this outcome.  I wouldn't want it either way.

7            I wouldn't want somebody to say, well, I'm hoping,

8    because of my feelings about immigration that we get to a

9    guilty verdict.  I wouldn't want to do that.  So I'm a little

10   troubled by that.

11           Do you have it in you to exercise the mental

12   discipline to say, I'm going to look at this -- you've been in

13   business, you know a lot about business.  Can you look at this

14   in a business-like way, and say, I'll go where the facts lead

15   me, without inclination to reach one verdict or the other?

16           PROSPECTIVE JUROR:  I don't know how to answer that.

17   I would maybe defer to your judgment.  I'm just troubled by the

18   fact that we're spending U.S. resources on cases like this,

19   when I think we have bigger --

20           THE COURT:  Well, with all respect, you know, you've

21   made some assumptions about the kind of case this is.  You know

22   what the allegation is, but you haven't heard any of the

23   evidence yet, none.

24           I mean, and I've commented that it's a victimless

25   case.  I don't mean to imply that there's something more to

1    this than a criminal immigration case.  But included in what

2    you said were some assumptions, for example, about the

3    defendant and what his purpose may have been or may not have

4    been.  And, you know, those things, again, are subject to

5    evidence, I suppose, but I'm concerned that you -- those

6    assumptions may control your thought process here, rather than

7    facts and law.

8              PROSPECTIVE JUROR:  I don't have a ton of issues that

9    bother me, but this is one that's been on my mind.  I'm from

10   Houston, originally.  And so I've kind of grown up hearing a

11   lot of folks on both sides.

12             THE COURT:  Sure.

13             PROSPECTIVE JUROR:  And my leanings have moved in a

14   certain direction over the years, just from my experience.

15             THE COURT:  Mr. Dent, again, I'm not judging your

16   views on immigration or even condemning, you know, sympathy for

17   people in the situation Mr. Vasquez is in.  What I am trying to

18   do is impanel a jury that is open-minded to either outcome,

19   will wait and listen to the evidence, listen to the

20   instructions on the law, listen to the lawyers' takes on

21   what's -- what inferences and conclusions should be drawn.

22             And then finally, be open to persuasion by fellow

23   jurors, and offer their point of view.  Only you can tell me,

24   if you think you'll have trouble performing those functions,

25   then probably you shouldn't sit on this case.  On the other

1   hand, if you can put aside the inclination to look for some

2   reason to reach a certain outcome, then, you know, you probably

3   could sit on this case.

4          I can't decide for you is the bottom line.  You have

5   to tell me.

6          PROSPECTIVE JUROR:  Yes, Your Honor.  I would be

7   nervous if I was a U.S. Attorney, and I was on the jury.

8          THE COURT:  Okay.  I think that probably comes close

9   enough.

10          Thank you, Mr. Dent.

11          PROSPECTIVE JUROR:  I'm sorry.

12          THE COURT:  And again, no recrimination here, no right

13   answers.  Hold on a second.  I have to get the acquiescence of

14   the parties before I excuse you, if that is what I do.  I

15   propose, given Mr. Dent's last answer, in particular, that we

16   excuse him for cause.

17          MR. DESHONG:  No objection, Your Honor.

18          MS. SHERRON:  I do have an objection, Your Honor.

19          THE COURT:  All right.  You can ask follow-up

20   questions, then, of Mr. Dent.  And, again, related only to

21   Mr. Dent.  He is -- as I understand it, he said he's not sure

22   he can do this.  It's going to be anxiety for him to do this

23   because his inclination is to look for a reason to reach a

24   particular verdict in this case.  Have I stated that correctly,

25   Mr. Dent?

1            PROSPECTIVE JUROR:  Yes, sir.

2            THE COURT:  Okay.  Go ahead.

3            MS. SHERRON:  Hi, Mr. Dent.

4            I, like my cocounsel, I don't mean to pick on you and

5    I really appreciate your honesty here today.  As Judge Burns

6    has said, you know, our interest here is putting together a

7    group of 12 reasonable folks.

8            It seems like you make decisions in your life where

9    you, in your career as a financial officer, that, you know, you

10   have to make reasonable decisions, and you have to compare, you

11   know, what the outcome might be based on the evidence that you

12   have or the facts that you have.

13           Do you feel like you make reasonable decisions in your

14   life?

15           PROSPECTIVE JUROR:  Yes.

16           MS. SHERRON:  Okay.  I know that seems like a trick

17   question, but I know some folks are persuaded more by emotion

18   than they are by the facts that they have in front of them.

19           So in your daily life, do you feel like you, you know,

20   make decisions based on the facts that you have presented in

21   your job?

22           PROSPECTIVE JUROR:  Yes.

23           MS. SHERRON:  Okay.  And I know you said you're from

24   Houston, and perhaps you have some personal experiences with

25   other people that you know.  Do you think that you could put

1    aside -- or at least consider the facts that are presented to

2    you in this case, and not let your previous interactions sway

3    you, one way or the other?

4              PROSPECTIVE JUROR:  Yes.

5              MS. SHERRON:  Okay.  So, you know, I think we come

6    to -- we all come with previous experiences, and that sort of

7    frames our world view.  And those are important, you know, it

8    makes us who we are, it makes us all unique.  And so I think

9    what Judge Burns is trying to say is that, you know, having

10   your own opinions doesn't mean that you're not reasonable, but

11   being able to set aside what you've experienced in the past,

12   and looking at this case, in particular, and looking at

13   Mr. Vasquez's case, and the facts just of his case, and making

14   a decision about whether or not the government has met the

15   burden is what your task is, right?  And it's the

16   most important task.  The group of 12 people --

17             THE COURT:  So, Ms. Sherron, ask the question.  Ask

18   the question of him.

19             MS. SHERRON:  Sure.  So I suppose what I'm asking is,

20   do you think that you could just focus on the facts of

21   Mr. Vasquez's case, and come to a decision based just on the

22   facts, understanding that you come to it with your own world

23   view?

24             PROSPECTIVE JUROR:  Yes, so the way I would state it

25   is, if there are facts and it's -- I don't -- it's basically

```
 1    airtight, then, yes, I'm happy to arrive at a logical
 2    conclusion.
 3           But if there's the least bit of doubt, you know, which
 4    direction I'm going to lean, and I'm just trying to be frank
 5    about that to both representations here.
 6           MS. SHERRON:  I understand.  Thank you.
 7           PROSPECTIVE JUROR:  Thanks.
 8           MS. SHERRON:  Thank you for sharing.
 9           THE COURT:  Mr. Dent, I don't know whether both sides
10    are going to call witnesses, but do you think as you evaluate
11    witness testimony, if both sides do call witnesses, you're
12    going to be looking for some reason to discredit the
13    prosecution witnesses and credit the defense witnesses?  Do you
14    think that given the inclination that you've spoken about, that
15    that would be one of the ways that your attitude manifests
16    itself?
17           PROSPECTIVE JUROR:  No, I'm not likely to assess the
18    witnesses and their veracity based on which side they
19    represent.
20           THE COURT:  Okay.
21           PROSPECTIVE JUROR:  Just if there are holes in kind of
22    the story that's told.
23           THE COURT:  Well, again, the standard here is proof
24    beyond a reasonable doubt.  But the instruction, I must tell
25    you, says it's not proof beyond all doubt.
```

1          It's not proof -- or a doubt based on speculation,

2   rather, you know, one based on reason and common sense.  That's

3   the standard that the instruction speaks of.

4          Can you apply that?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.  So, again, I don't think it's wrong

7   to have a mind set that said, well, I'm going to be searching

8   here, and I'm going to be trying to get to the truth.  I was

9   just a little concerned at the beginning when you said, I'm

10  going to be looking for a reason to reach one conclusion over

11  the other.

12         You've had a lot of questions put to you now, is that

13  still your mind set, that you'd look for a reason to acquit in

14  this case?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR:  To be frank, yes.

18         THE COURT:  All right.

19         PROSPECTIVE JUROR:  And I'm sorry, I'm a little

20  nervous.  I get nervous in situations like this.

21         THE COURT:  You've sort of been cross-examined by me

22  and by -- so that's completely understandable.

23         All right.  I'll reserve on this until we've finished

24  with the last two.

25         Thank you, Mr. Dent.

1           Gerri Jones.

2           PROSPECTIVE JUROR:  Yes, I'm Gerri Jones.  I live in

3    North County.  I work for a construction company as an

4    accountant.  My husband is a salesperson.  We have one child

5    over the age of 18 that is going to college.  I do not have any

6    friends or relatives in law enforcement.  I have not sat on a

7    jury before.

8           I do not have any close family or friends that have

9    been in the justice system, and I think I can be fair and

10   impartial.

11          THE COURT:  All right.  Let me put to you a question I

12   put earlier to a prospective juror.  Excluding those who have

13   been excused because they have expressed reservations about

14   whether they could be fair, if I'd asked you any of the

15   individual questions -- other than the follow-up question about

16   if you were running a thrift store, would you want to be on

17   Storage Wars -- if I asked you any of those questions, would

18   your answers be the substantially the same as those that have

19   been given by other prospective jurors?

20          PROSPECTIVE JUROR:  Yes, they would.

21          THE COURT:  Thank you.  And finally, Mr. Schmidt.

22   Thank you for being patient.  Robert Schmidt from Rancho Santa

23   Fe.

24          PROSPECTIVE JUROR:  Thank you, Your Honor.  Yes, I'm

25   Robert Schmidt.  I reside in the County of San Diego, just on

1    the outskirts of Rancho Santa Fe.  I'm a retired professor

2    after 25 years at the University of California, San Diego.

3              THE COURT:  What was your discipline?

4              PROSPECTIVE JUROR:  Biology.  Plant sciences, it was a

5    whole -- I'm married.  My wife is a neurosurgeon at Scripps

6    Green Hospital.  No children.  My father was in law enforcement

7    for about 25 years.  He served on the police force for

8    Riverside.

9              THE COURT:  I see.

10             PROSPECTIVE JUROR:  And then two terms as marshal of

11   Riverside.

12             THE COURT:  County marshal or U.S. marshal.

13             PROSPECTIVE JUROR:  No, county.

14             THE COURT:  Okay.

15             PROSPECTIVE JUROR:  I've served on a jury before.  It

16   was a criminal case, and we arrived at a verdict.

17             THE COURT:  How long ago was that, Mr. Schmidt?

18             PROSPECTIVE JUROR:  About 15 years ago.

19             THE COURT:  And the nature of it, do you remember?

20             PROSPECTIVE JUROR:  It was a welfare fraud case.

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR:  I have a brother who was a

23   defendant in a criminal trial, and I have a nephew who was also

24   a defendant in a criminal trial.

25             THE COURT:  How long ago were those instances?

```
 1          PROSPECTIVE JUROR:  Both of those were probably about
 2   10 years ago.
 3          THE COURT:  Any residual hard feelings arising out of
 4   the way they were treated or the outcomes of those cases?
 5          PROSPECTIVE JUROR:  No, Your Honor.
 6          THE COURT:  All right.
 7          PROSPECTIVE JUROR:  And, yes, I believe I could be a
 8   fair and impartial juror.
 9          THE COURT:  Again, thank you for being patient,
10   Mr. Schmidt.  Folks, that concludes the questioning.  As I
11   mentioned to you, what I'll do now, I'll give you a break until
12   12:15.  And then we'll come back in and announce who has been
13   selected for the jury.  And I'll release the others.
14          Come back right at 12:15, and take the seat -- take a
15   good look around, take the seat that you're currently sitting
16   in.  And we'll call those names.  And those who aren't selected
17   will be sent back to the jury reception area.
18          Those who are will get some final instructions, and
19   then I'll give the jurors an hour to go have lunch somewhere.
20          So we're in recess now.
21          Counsel, want to approach sidebar?
22          Mr. Deshong, we may not have to do this on white noise
23   but -- I used to try cases in front of a Superior Court judge
24   named Waldo Rosato [phonetic].  You know what his white noise
25   was?  Frank Sinatra music.  He'd turn it up.  He had a little
```

1    thing on his desk.  And every time he had a sidebar, you'd hear

2    Frank Sinatra.

3          All right.  All prospective jurors are not present.

4          I'm happy to take up, before we go on, any other

5    challenges for cause, I was inclined to excuse Mr. Dent for

6    cause, but I think his answers, he rehabilitated himself.  And

7    so if he's to be excused, it's going to be by peremptory

8    challenge.  And unless the government has something that I've

9    missed.

10          MR. DESHONG:  I mean, the only thing I was going to

11   raise, Your Honor, is that he made some comments indicating he

12   was bringing in preconceived notions about the case.

13          THE COURT:  Yes.

14          MR. DESHONG:  Particularly -- prosecutorial discretion

15   and whether this case is meritorious.

16          THE COURT:  Right.  He certainly did that.  And the

17   one comment about, well, coming over here to work maybe that's

18   a common reason people come, but we don't know what the reason

19   is here in this case.  No one's heard anything yet.  And it's

20   not really going to be the subject of evidence, but, yes, he

21   certainly has some preconceptions.  But as I said, you know, he

22   was questioned closely, he came around to saying, you know, I

23   can do this.

24          If I were a prosecutor, I'd probably strike him,

25   except I'd take into consideration his place in the order, and

1    say, not likely we'll get to him anyway.

2            MR. DESHONG:  I think we may with the other strikes

3    because I think if everybody took theirs, he'd be the last one.

4            THE COURT:  Anyway, anything more on that?

5            MR. DESHONG:  No.

6            THE COURT:  So I will not strike him for cause.

7            Do you have any other challenges for cause?

8            MS. CLARK:  Your Honor, I did want to bring something

9    to the Court's attention.  I've had an intern that's been

10   working under me this summer, Ms. Zaragoza, who's standing

11   behind me.  Ms. Zaragoza just wrote a note and passed it to me

12   as I was walking to sidebar saying that she knows one of -- two

13   of the jurors.  There is a blond woman.  Her name was Dawn W.

14   And apparently this woman did not recognize Ms. Zaragoza.

15           THE COURT:  Dawn Waxon.

16           MS. CLARK:  Yes.

17           THE COURT:  How do you know Ms. Waxon, Ms. Zaragoza?

18           MS. ZARAGOZA:  She and I were kind of friends about

19   four years ago.  I actually reported on her.  I interviewed

20   her, and we also had dinner.  And she is my Facebook friend

21   currently.

22           THE COURT:  You said you reported on her for what?

23           MS. ZARAGOZA:  I was a freelance reporter -- well, she

24   was part of the Sisters of Perpetual Indulgence.  And I

25   actually won an award for reporting on her.

```
 1              THE COURT:  Remind me, Ms. Waxon is not the one that
 2    does the antique stuff -- oh, she is, all right.
 3              MS. ZARAGOZA:  She did not recognize me.
 4              THE COURT:  And who is the other person you know?
 5              MS. ZARAGOZA:  A woman here, I have no idea who she
 6    is, I've never seen her, but she said she worked at Compass
 7    Gymnastics, and that's where my daughter trains.
 8              MS. CLARK:  Ms. Zaragoza is not an attorney in the
 9    case.
10              THE COURT:  I don't think it's a problem.  If they
11    make it on the jury, I'll raise it with them.
12              Ms. Waxon and the -- I can't remember who the other
13    prospective juror was that talked about working out.
14              MS. CLARK:  Number 20, Ms. Boles, Your Honor.
15              THE COURT:  Okay.  So I'll inquire of Ms. Boles.  In
16    fact, I'll do that, you know, before we announce the peremptory
17    challenges.  And if either party wants to inquire further, my
18    sense of things is they're both going to say, oh, yeah, I know
19    you, but, no, it's not going to influence anything.  That's my
20    sense of things, but we'll see.
21              So that's it, then?
22              MS. CLARK:  Yes, Your Honor.
23              THE COURT:  So you have seven minutes to make the
24    decisions and get the sheets to Tish.  We'll be in recess.
25     (A recess was taken from 12:08 p.m. to 12:17 p.m.)
```

1          THE COURT:  All right.  Tish, if you'll reconcile the

2   peremptory challenges, and give us the name of the first 12

3   unstricken prospective jurors.

4          The jury is not present.  Counsel and the defendant

5   are present.  The Clerk has reconciled the list.  Will you take

6   a look and make sure your peremptory challenges are correctly

7   reflected on the reconciled list, and tell me, either side,

8   whether they have any objection to the manner in which the

9   peremptories were exercised.

10          Tish, as to those in the jury box, rather than have

11   them sit them, just have them -- instruct them to stand here in

12   the well.

13          Mr. Deshong, are the government's peremptory

14   challenges correctly reflected on the sheet?

15          MR. DESHONG:  Sorry, I was jotting the defense's.

16          They are, Your Honor.

17          THE COURT:  Defense, peremptory challenges correctly

18   reflected?  Ms. Clark?

19          MS. SHERRON:  I'm sorry, Your Honor, I'm trying to --

20          THE COURT:  While she's verifying, Mr. Deshong, any

21   objection to the manner in which the peremptories were

22   exercised?

23          MR. DESHONG:  No, Your Honor.

24          THE COURT:  Defense, peremptories correct?  Ms. Clark?

25          MS. CLARK:  Your Honor, I do have one objection.

Case 3:20-cr-03445-LAB   Document 82   Filed 04/22/22   PageID.1089   Page 102 of 108

102

```
1              THE COURT:  Come to sidebar.  Mr. Deshong?

2              MR. DESHONG:  I'm just grabbing one thing, Your Honor.

3              (Sidebar.)

4              THE COURT:  Okay.  Okay, Ms. Clark.

5              MS. CLARK:  That is a Batson objection for number 22,

6    Alejandro Angeles.  This is the only Hispanic male on our voir

7    dire panel.  He said he had friends on the California Highway

8    Patrol.  He was an architect.  There was nothing that he had

9    said  --

10             THE COURT:  All right.

11             MR. DESHONG:  May I respond, Your Honor?

12             THE COURT:  You may or you can ask me to determine

13   whether she's made a prima facie showing based on the

14   allegation.  Up to you.

15             MR. DESHONG:  Just to complete the record, I'll get it

16   in.  He made a comment that he had strong opinions on the

17   immigration system.  He did indicate he could be fair.  We

18   struck Scott Gutting, which I believe was Juror 13, who was not

19   a protected group, for the same reason.

20             We did not strike Ms. Waxon who made a similar

21   comment.  However, she also indicated that she had many family

22   and friends in law enforcement and had been either the victim

23   of assault or witnessed an assault, and she worked with the

24   prosecutor's office in a capacity, and we felt that outweighed

25   the concern for her.
```

1          THE COURT:  The Court notes that other -- at least

2    people with Hispanic surnames had their name on the jury,

3    Dennis Hernando, Yasmin Rodriguez.  The Court accepts the

4    explanation.  I don't find that the challenge was exercised for

5    discriminatory reasons.

6          Do you have any reply?  But also Jacquelyn --

7    Jacquelyn Montoya, did you strike her?  That seems like a

8    Hispanic surname, too.  So we have plenty of Hispanic people.

9    It may be that he's male and they're female, but I don't see

10   it.

11         MS. CLARK:  Well, Your Honor, I don't know if Montoya

12   is a Hispanic surname.

13         THE COURT:  It sure seems like it to me.

14         MS. CLARK:  I couldn't tell by looking at her.

15         THE COURT:  That's often the case, though.

16         MS. CLARK:  She's ethnically ambiguous.

17         THE COURT:  That's often the case, and, of course, we

18   don't ask people how do you characterize yourself, but the

19   courts have used surname as a surrogate for -- at least with

20   Hispanics, at least for Hispanic background.

21         Do you have anything to say in response to what

22   Mr. Deshong said?

23         MS. CLARK:  Again, Your Honor, he's the sole Hispanic

24   male.  He spoke with an accent --

25         THE COURT:  No, no, I'm only going to take it from one

1   of the lawyers at a time.  And that'll go for the trial, too.

2   I want just one of you to speak and one of you to cross-examine

3   a witness.

4          Okay.  I have that in mind.  The Court finds that

5   there's no racial animus here.  I accept the government's

6   explanation as neutral.

7          I note that the government points out that they struck

8   another person with similar concerns who was not Hispanic which

9   shows a consistency in the bona fides of the explanation given

10  here, so the Batson challenge is denied.

11         MR. DESHONG:  And, Your Honor, just for the record,

12  the Court's finding no purposeful discrimination.

13         THE COURT:  I'm finding no prima facie case, first of

14  all.

15         MR. DESHONG:  Okay.

16         THE COURT:  And the explanation establishes, to my

17  satisfaction, based on looking at you, knowing you, judging

18  your credibility, that you've given me a bona fide answer

19  that's backed up by the consistent manner in which you exercise

20  other peremptory challenges.

21         MR. DESHONG:  Thank you, Your Honor.

22         (End of sidebar.)

23         THE COURT:  Okay.  The witching hour is upon us.

24         I had one other thing I promised to do.  It turns out

25  that there is a person working with the defense counsel in this

```
 1    case, an extern?  Remind me again of your extern's name?

 2              MS. CLARK:  Intern, Your Honor, Barbara Zaragoza.

 3              THE COURT:  Ms. Garagoza, with a G.

 4              MS. CLARK:  Zaragoza, with a Z.

 5              THE COURT:  Oh, okay, Zaragoza.  Ms. Zaragoza says she

 6    was sitting in a mask, so maybe the two affected jurors did not

 7    recognize her, but she knows Ms. Waxon.  She's had some contact

 8    before.  Ms. Zaragoza interviewed you at some point.

 9    Ms. Waxon, would that influence your judgment at all, that

10    she's now working as an intern with the Federal Defenders?

11              PROSPECTIVE JUROR:  No, it wouldn't affect my judgment

12    or my impartiality.

13              THE COURT:  Okay.  And also Stephanie Boles, where's

14    Ms. Boles?  Ms. Boles, you work out at a gym and apparently her

15    daughter -- Ms. Zaragoza, is it your daughter who works out at

16    that gym, too?

17              MS. ZARAGOZA:  Mimi Zaragoza.

18              PROSPECTIVE JUROR:  I don't know her.

19              THE COURT:  You don't even know -- okay.  So I assume

20    no one has any objection, then.  I don't know whether

21    Ms. Waxon, Ms. Boles have made it on, because I gave the Clerk

22    back the list, but I'm assuming no objection from the

23    government?

24              MR. DESHONG:  No objection, Your Honor.

25              THE COURT:  Okay.  Madame clerk, if you'll call the
```

```
1   names of the first 12 unstricken prospective jurors please.
2           THE CLERK:  Yes, Your Honor.  Juror Number 1, Luke
3   Devine; Juror Number 2, Angela Palatsi; Juror Number 3, Max
4   Parron; Juror Number 4, Kenneth Brown; Juror Number 5, Anthony
5   Vincent; Juror Number 6, Karen Condon; and Juror Number 7, if
6   you could have a seat in the front row please, Katherine Kaya;
7   and then Juror Number 8, Sara Schulke.  And Juror Number 9,
8   Sandra Acres.  And Juror Number 10, Steven Cafferty.  Juror
9   Number 11, Yasmin Rodriguez.  And Juror Number 12, Dennis
10  Hernando.
11          (Discussion off the record.)
12          THE COURT:  Ms. Sherron, what number -- did you say
13  21?  Yeah, Schulke was excused for cause.
14          THE CLERK:  Let me correct that, then.  Then our next
15  juror would be Dawn Waxon.
16          THE COURT:  Okay.  So if everybody will just move down
17  one seat on the front row.  And, Ms. Waxon, if you'll take the
18  last seat, please.
19          Ms. Sherron, Mr. Deshong, are these the ladies and
20  gentlemen you've chosen to try your case?
21          MR. DESHONG:  Yes, Your Honor.
22          MS. SHERRON:  I believe so, Your Honor.
23          THE COURT:  Okay.  Folks, those whose names were not
24  called, I'm going to excuse you down to the jury reception
25  area.
```

1          I want to thank you for participating in the process.
2     We guarantee the right to a jury trial, and the only way we can
3     make good on the guarantee is if conscientious folks like you
4     come in and agree to be part of this process, even though you
5     weren't selected.  Thank you very much.  Nice meeting all of
6     you.
7          Those whose names were not called are now excused.
8     Mr. Dent, thank you, everyone is now excused to the jury
9     reception area.
10         PROSPECTIVE JUROR:  Thank you.  You are very
11    approachable and very nice to talk to.  Thank you, sir.
12         THE COURT:  Likewise, thank you.
13         (End of jury voir dire excerpt.)
14         (The proceedings concluded at 12:28 p.m., August 4,
15    2021.)
16
17
18
19
20
21
22
23
24
25

1                    COURT REPORTER'S CERTIFICATE

2

3        I, CYNTHIA R. OTT, Official Court Reporter, United States

4    District Court, Southern District of California, do hereby

5    certify that pursuant to 28 U.S.C. §753 the foregoing is a

6    true, complete and correct partial transcript of the

7    stenographically reported proceedings had in connection with

8    the above-entitled matter and that the transcript page format

9    is in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12        DATED at San Diego, California, April 22, 2022.

13

14                         _____/s/ CYNTHIA R. OTT_____
                           CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25