```
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF CALIFORNIA


 3
     UNITED STATES OF AMERICA,    )
 4                                )  CASE NO.: 3:20-cr-03445
              Plaintiff,          )  DATE:  MONDAY, AUGUST 2, 2021
 5                                )  SAN DIEGO, CALIFORNIA
     v.                           )
 6                                )  MOTIONS IN LIMINE HEARING
     MANUEL VASQUEZ-PEREZ,        )
 7                                )  HONORABLE LARRY A. BURNS
              Defendant.          )  UNITED STATES DISTRICT JUDGE
 8   _____)  SOUTHERN DISTRICT OF CALIFORNIA

 9   APPEARANCES:

10   For the United States Government:

11        UNITED STATES ATTORNEY'S OFFICE
          SOUTHERN DISTRICT OF CALIFORNIA
12        BY:  MICHAEL DESHONG, ASSISTANT UNITED STATES ATTORNEY
               michael.deshong@usdoj.gov
13             VIVIAN SAPTHAVEE, ASSISTANT UNITED STATES ATTORNEY
               vivian.sapthavee@usdoj.gov
14        880 Front Street, Room 6293
          San Diego, California  92101-8893
15        Ph: (619) 557-5610

16
     For the Defendant:
17
          FEDERAL DEFENDERS OF SAN DIEGO, INC.
18        BY:  LAUREN J. CLARK, ESQ.
               lauren_clark@fd.org
19             BRITTANY L. SHERRON, ESQ.
               brittany_sherron@fd.org
20        225 Broadway, Suite 900
          San Diego, California  92101
21        Ph: (619) 234-8467

22
     Spanish Interpreters:  MARIA SANDOVAL
23                          MYLENE GREEN
     _____
24            Tricia Rosate, RDR, CRR, FCRR, CSR No. 10891
                    transcripts@primerealtimellc.com
25          Proceedings recorded by machine shorthand/stenography
         Transcript produced by computer-aided transcription software
```

1          SAN DIEGO, CALIFORNIA; MONDAY, AUGUST 2, 2021

2                    4:33 P.M. - 5:13 P.M.

3                        -   -   -   -

4          THE COURT:  All right.   Mr. Vasquez is present.

5          Good afternoon, Mr. Vasquez.

6          THE DEFENDANT:  Good afternoon.

7          THE COURT:  This matter's on for resolution of motions

8    in limine.

9              This case is set for trial tomorrow.

10             Let me begin with the defense motions in limine.

11             First, there's a motion to preclude field statements of

12   the defendant.  It's --

13             MS. SHERRON:  Your Honor, I'm so sorry to interrupt,

14   but there's actually a preliminary matter that I'd like to

15   discuss with the Court before we begin motions in limine.

16             THE COURT:  Okay.  If you'd sit down and speak into the

17   mic --

18             Your mask is muddling what you say a little bit.  It's

19   a little hard to hear.

20             MS. SHERRON:  I'll take it off you.

21             Is that okay?

22             THE COURT:  If it's okay with you.  Yeah.  I don't want

23   you to feel vulnerable.  If you want to wear your mask, you can,

24   but just speak into the mic.

25             MS. SHERRON:  Okay.  I just want to make sure that you

```
 1   can hear me.
 2             THE COURT:  I can now.  Yeah.
 3             MS. SHERRON:  I do feel okay sitting next to Ms. Clark.
 4             THE COURT:  Okay.
 5             MS. SHERRON:  So the matter I wanted to bring to your
 6   attention is principally that there is some missing discovery in
 7   this case.
 8             THE COURT:  You say additional?
 9             MS. SHERRON:  Missing.
10             THE COURT:  Oh.  Missing?
11             MS. SHERRON:  Yes.
12             What had happened is last November, soon after
13   Mr. Vasquez was arrested, Ms. Clark had requested an A-File
14   viewing.  As Your Honor might remember, COVID was rampant, both
15   of our offices were closed, so scheduling an A-File viewing was
16   difficult at that time.
17             There was some back-and-forth between Ms. Clark and the
18   assigned AUSA at the time, who is Mr. Wong, about when they could
19   schedule the A-File viewing.
20             In lieu of scheduling an A-File viewing, Mr. Wong had
21   said that all of the documents from the A-File were to be copied
22   and sent over digitally.
23             On January 5th, he actually made a representation to
24   Ms. Clark saying that the entirety of the A-File had been scanned
25   and sent over and that there was therefore no need to actually
```

4

1    have an A-File viewing.

2            We learned today, on the eve of trial, that actually

3    150 pages of the A-File had not been produced and that those

4    documents included fingerprint cards and also reports from

5    previous encounters, including -- I believe what was said, that

6    it's reports relating to past apprehensions.

7            So although the Government may make the representation

8    that that stuff is not material and that they don't intend to use

9    it, it's our job as defense counsel to be able to determine

10   whether or not it's material and then to review that with

11   Mr. Vasquez.

12           At this point --

13           THE COURT:  So you just have a vague idea of what the

14   150 pages consists of.  You haven't seen it.

15           MS. SHERRON:  Right.

16           THE COURT:  Okay.  But, Ms. Clark, you say that you

17   were specifically promised by Mr. Wong -- I don't know why he'd

18   make such a promise -- that he would give you everything in the

19   A-File.

20           MS. CLARK:  On December 7th, Your Honor, he e-mailed

21   the suggestion that he would just have the entirety of the A-File

22   copied and produced.

23           THE COURT:  But he didn't.

24           MS. CLARK:  Then on January 5th of 2021, he

25   affirmatively said that it had been produced and that we have

1    received the entirety of the A-File.  This morning we learned

2    that instead there were 150 pages outstanding pages of A-File

3    discovery.  We still do not have that.

4          THE COURT:  I assume the Government concedes that the

5    representation is correct?

6          MR. DESHONG:  Well, a couple things.  One, I wasn't

7    aware of the prior conversations.  So this morning, I looked at

8    the A-File just to see.  I'm told there's roughly 450 pages in

9    it.  I just eyeballed that around 300 pages have been produced,

10   and so I flagged it for defense counsel.

11         The only thing I will note, Your Honor, the A-File

12   often includes duplicative documents, like rap sheets and things.

13   So --

14         THE COURT:  Right.  Here's the problem, though,

15   Mr. Deshong.  They ought to be able to count on a representation

16   made by the Government lawyer.  I have no reason to question

17   Ms. Clark's representation that Mr. Wong said, "Everything.  You

18   get everything."

19         Now, raises a question as to why he would say such a

20   thing, because not everything is material.  In fact, my

21   experience is there are things in the A-File that are never

22   turned over, because they don't pertain to the offense and they

23   may disclose methods and techniques used, things that the

24   Government doesn't want to disclose in an ordinary case.

25         But the fact of the matter is he said it and then

didn't comply with what he said.

Is there any evidence that the other 150 pages came into the file after January, or is it stuff that's always been there?

MR. DESHONG:  I would have to look, Your Honor.  It's possible some of it is the documents from this apprehension being merged into the A-File.

THE COURT:  Well, Ms. Sherron tells me that it relates to prior contacts.  "Prior" means before this incident.

MR. DESHONG:  Well, I sent Ms. Sherron and Ms. Clark an e-mail, and it would have been nice if they raised this issue in response to that e-mail because then I could have looked into it before now.

THE COURT:  Well, when did you raise it?  When did you send them an e-mail?

MR. DESHONG:  I checked the e-mail this morning.  I don't have the time, but I imagine I sent it this morning.

THE COURT:  I don't fault them for not raising it before now.  They raised it at the first opportunity they could with me.

Honestly, it's an artful dodge for you to say that in light of the representation that Wong said, "I'll give you everything" and then apparently did not.

MR. DESHONG:  Well, let me go look at the A-File, and then I will confirm what exactly was not produced.  I'm going

solely on the number.

THE COURT:  What are you asking for here?  A postponement, then, so you can look at the things you were promised?

MS. SHERRON:  Well, Your Honor, I believe that actually the remedy here would be that I need to move to dismiss under Rule 16 --

THE COURT:  That's --

Yeah.  That's denied.  That's denied.  I can give you specific performance of what Ms. Clark says she was promised.

I mean, honestly, until I determine that something material has been withheld, dismissal would be like crushing an ant with a sledgehammer at this point.

It may be, as Mr. Deshong hypothesizes, that it's duplicate stuff or it's stuff pertaining to this, which you already have.  Obviously you can't know that until you know what the 150 missing pages are.

But what's salient and operative in my judgement is that the prosecutor made a promise that he'd give over everything -- he didn't have to, but he did -- and then he didn't do it apparently.

Now, if I'm wrong, then come back to me and correct me on that, Mr. DeShong, but it sounds like he didn't give everything over.

MR. DESHONG:  I did say for certain --

I did see some old fingerprint cards from the '90s that I don't believe were produced.

THE COURT:  Yeah.  That's a problem.  And, look, even that.  When you say you're going to give everything over without qualification, it implies a continuing duty to give things over even as they come in; right?  It doesn't mean that, you know, "In this finite period of time, I'll give you everything, but if other stuff comes in, I'm not giving you that."  "Everything" means everything.  That's how I would construe it.

If you want a continuance, I'll give you a continuance. This guy has been waiting for his day in court.  I can give you his day in court tomorrow.  We've scheduled it for a trial. We're all set; I'm ready to go.  But if you really think you need to have that and you can't review it overnight or something like that, then we'll postpone this.

Now, the problem is I'm all jammed up, and he's probably not going to get a trial until October, and he's in custody.  So --

THE CLERK:  You have an opening next week.

THE COURT:  Oh.  Next week, I do?

Oh.  I'm told I have an opening next week.  So, yeah. Lucky, lucky, lucky.

I think that -- 150 pages, you can review it between now and then, and then we'll put this on for motions in limine next Monday and reset the trial for Tuesday, then.

1    MS. SHERRON:  Your Honor, I'm thinking that a week

2    postponement is unnecessarily prejudicial to Mr. Vasquez who, as

3    you said, has been in custody for a long time.

4    THE COURT:  When else can I do it?  I mean, you can't

5    have both things.  You can't have the opportunity to review and

6    go over the missing 150 pages and yet his trial starts to

7    tomorrow, unless you're prepared to do it tonight.

8    MS. SHERRON:  I agree, Your Honor.

9    You know, I'm not an expert on Jencks, and I'm

10   wondering if the remedy here would be that the A-File custodian

11   is not allowed to testify, and that testimony be stricken.

12   THE COURT:  No.  That's a remedy.  The Jencks Act

13   actually doesn't help you very much, because it says the

14   Government has an obligation to turn over prior statements of a

15   witness after the witness has testified on direct.

16   Now, we don't follow that here.  We haven't followed

17   Jencks Act in years, because it would necessitate a lot of

18   continuances; right?  You know, "I haven't looked at this.  I

19   can't look at it."  But I know in other parts of the country, it

20   is enforced.  So if somebody testifies, then the Government comes

21   over and hands you their prior statements?

22   We don't do it that way here, and I've insisted, to the

23   extent I can, that the Government gives over all that stuff in

24   advance, but it's.

25   MS. SHERRON:  Right.

1    THE COURT:  Why would I bar the A-File custodian from

2    testifying?  He didn't do anything.  I mean, it was Wong that

3    apparently made the commitment, then didn't keep it.

4    MS. SHERRON:  Right.  But to the extent that the A-File

5    custodian is going to be relying on a review of documents that

6    have not actually been produced in discovery, there should be

7    some remedy.  I think --

8    THE COURT:  There is.  It's a continuance with an

9    opportunity to look at it and me ordering that they specifically

10   do what they promised they'd do.

11   Look, I can't know at this point whether any of those

12   documents affect anything the A-File custodian is going to say.

13   Typically it's really dry.  They come in and say, "No evidence

14   here that this guy has ever been lawfully admitted into the

15   United States or has a right to be here.  Besides that, I've

16   checked these databases as of this morning, and no evidence he's

17   been granted permission to be here.  In fact, all this shows is

18   that we've consistently thrown him out of the country," which is

19   sort of indicated in the Government's trial memo.

20   So I'd be out on a limb saying, "Well, I'm going to

21   preclude this fella from testifying."

22   It doesn't seem like a logical response to what the

23   problem is.  The logical response is to say, "Give her the stuff

24   you said you were going to give her."  You evaluate it, and then

25   we'll go from there.   And I think you can do it in a week, and

so we can still --

We're still under emergency provisions, so Speedy Trial Act doesn't -- and there's motions pending, so there's all kinds of exemptions.  But I think if they give you the other 150 pages by 5:00 o'clock today or thereabout, no later than 10:00 o'clock tomorrow morning, I think you can meet with the defendant.

Where is he believe held?

MS. SHERRON:  Well, he was being held at CCA.  We were told this morning that, because of trial, he had been moved here, but I'm not sure if he'll be transported back to CCA.

THE COURT:  I'll ask the Marshals to keep him here to facilitate that, assuming that we go forward next week.

MS. SHERRON:  I guess my last request, in lieu of a continuance, would be a curative instruction for the jury.

THE COURT:  I can do that, but you want to go forward without seeing the 150 pages?

And what would I tell them?  All I can say is "The Government promised to give all of this.  They've now given it all, but they didn't do it when they said they would."  You know, I don't know.  Usually it's, like, lost evidence or missing witness or something like that, but none of that applies here.

MS. CLARK:  We would ask for something analogous to the lost or destroyed evidence instruction, Your Honor; that --

THE COURT:  But it's neither lost nor destroyed, Ms. Clark.

1    MS. CLARK:  Because the Government had 150 pages of

2    discovery relevant to Mr. Vasquez's case, and they chose not to

3    produce it; that the jury --

4        THE COURT:  I can't tell them that.  I don't know if it

5    was negligence on his part.  When you say, "chose," it sounds

6    like he made a conscious decision.  I think he's probably just

7    lazy or forgetful or something.  I don't know what the reasons

8    are, but without a hearing, I couldn't instruct the jury that.

9        Ms. Clark, if I tell them, "Look, they said they'd give

10   everything over.  They withheld 150 pages, but they've now given

11   it," I think if I was the jury, I'd say, "Yeah.  And if my aunt

12   were a man, he'd be my uncle."  Right?

13       It's of no consequence to give an instruction like

14   that.

15       The remedy here is to give you a period of time to look

16   at the other 150 pages you were promised.  It's not a long period

17   of time.  Fortunately, we have an opening next week.  If you want

18   to grab that, you can grab it.

19       That's what I'm inclined to do, grant a continuance and

20   let you get the 150 pages, determine whether there's anything

21   material, and go over it with your client.

22       MS. CLARK:  May I speak with Mr. Vasquez, Your Honor?

23       THE COURT:  Sure.

24       MR. DESHONG:  Your Honor, just to clarify for the

25   record, I'm going solely off the numbers.  I haven't investigated

1  to confirm, so I will do that as soon as we get back.  I will

2  disclose anything that wasn't already produced to the defense and

3  note how many pages it was.

4      THE COURT:  I'm assuming Ms. Clark is accurately

5  representing what she was personally told by Mr. Wong.

6      MR. DESHONG:  I more meant that I can't actually

7  confirm whether -- how much of those 150 pages discrepancy is

8  because documents that were already produced are in there or

9  there's duplicates.  So I will investigate and confirm that.

10     THE CLERK:  I'm sorry.

11     (Discussion off the record.)

12     THE COURT:  I may have given you erroneous information.

13     My clerk now says I do have a trial set next week.

14  She's going to call and confirm with the AUSA whether that's

15  going or not going.  It may be a longer wait than just next week.

16  Let me find out.

17     MR. DESHONG:  Your Honor, I was going to say, also, if

18  this ends up being much ado about nothing after we've had a

19  chance to investigate, we could set it for later this week.

20     THE COURT:  That's what you're thinking too, Ms. Clark?

21     I know it's not your first position, but I've ruled on

22  those.

23     MS. CLARK:  We maintain our motion to dismiss,

24  Your Honor.  I think we can --

25     If it's okay with the Court, I'd like to wait until --

1          THE COURT:  Wednesday?

2          MS. CLARK:  -- we hear from the attorney for next week.

3          THE COURT:  Okay.

4          We just talked to Ms. Forrest, and Ms. Forrest -- it's

5     Ms. Forrest's case next week.  She said it's going.

6          How about if I give you -- I don't know -- 36 hours,

7     whatever it is, between now and Wednesday morning at

8     9:00 o'clock?

9          MS. SHERRON:  I can just check quickly with

10    Mr. Vasquez.

11         THE COURT:  Okay.  That's only one day postponement.

12    What I'll do is I'll go over as many of the motions in limine now

13    as I can, and then if there's anything else after you review it,

14    I'll take that up Wednesday morning before we bring the jury in.

15         MS. CLARK:  I do want to ask -- and maybe the Marshals

16    have this information -- where --

17         I don't think Mr. Vasquez will be sleeping in the

18    cell block, so I don't know if he'll be at MCC.  If he is, I

19    don't know that we'll be able to visit him due to their

20    quarantine procedures.

21         THE COURT:  Are people in trial still being held in a

22    single cell during the course of the trial?

23         U.S. MARSHAL:  Your Honor, I don't know that.  All I

24    know is that at CCA, he was going to --

25         He's not in the right site uniform.  So when they're in

1  the CCA uniform, they go back to CCA; if they're not, if they're

2  in street clothes, then they go to San Luis.

3          THE COURT:  Oh.  I don't want him to go to San Louise.

4          U.S. MARSHAL:  Your Honor, I have to notify the deputy

5  in charge of that so they can house him here, because he needs to

6  go to quarantine.  San Luis is the only one that is having

7  quarantine.

8          THE COURT:  MCC used to have cells for those who are in

9  custody, in trial.  Here's what I'm going to do.

10          That's my understanding.

11          And you know, because you've been here many times, that

12  I'm loathe to order the Marshals to hold some person.  I rarely

13  do that, but we're in a very special situation now, and if trial

14  were to start tomorrow, he'd certainly have to state here.  He

15  wouldn't go to San Luis.

16          So I'm going to order that he remain at MCC and that he

17  be in a quarantine-type cell, which has been the protocol up to

18  this point.

19          U.S. MARSHAL:  If not, we can take him maybe to GEO.

20          THE COURT:  I prefer it be MCC.  It needs to be

21  somewhere where counsel knows where he is so that they can

22  consult with him, particularly if we don't start this case until

23  Wednesday.

24          MS. SHERRON:  If he's at GEO, that's fine, also, as

25  long as we know where he is.

1    THE COURT:  Do we have anybody at GEO anymore?

2    MS. CLARK:  I would say GEO is preferable, because we

3  can actually visit clients at GEO, whereas at MCC, often we

4  cannot visit clients at MCC.

5    THE COURT:  Are there still federal detainees being

6  held at GEO?

7    MS. CLARK:  Yes, Your Honor.

8    THE COURT:  I'll direct that he go to GEO, then, that

9  he'll be held at GEO, which will facilitate easier access by

10  defense counsel.

11    MS. CLARK:  Thank you, Your Honor.

12    THE COURT:  Wednesday?  Is that what you want?

13    MS. CLARK:  Yes, Your Honor.  Of the presented

14  options --

15    THE COURT:  Right.  Right.  Without waiving any of your

16  previous requests for --

17    THE CLERK:  Okay.  So Wednesday at 9:00, Your Honor, so

18  I can let the jury department know?

19    THE COURT:  Yes.

20    MS. SHERRON:  Mr. Vasquez is amenable to moving forward

21  on Wednesday.

22    THE COURT:  Wednesday at 9.

23    The Court's going to order that he be held at GEO

24  pending the completion of his trial.

25    Okay.  Let me go through the motions in limine so we

can clear that out.

Preclude field statements.  If this is a motion to suppress, it should have been brought as a motion to suppress. It's not a proper in limine motion.  It isn't.  Effectively it's saying, "Well, he had a right to have Miranda warnings."  That should have been a substantive motion to suppress, which was never brought here.

Now, having said that, it doesn't seem to me it's meritorious in any event.  As I understand the background, unless I'm wrong about this, at 7:45, a scope operator notifies field agents that he sees four people.  They reach the area, they find three of the people.  And then around four or five hours later, around 12:00 o'clock, they find the defendant.  A brief chase; they encounter him hiding in a bush.  The location is eight miles east of Otay Mesa and nine miles north of the border.  They make inquiry of him, whether he's got any right to be in the United States and of what country he's a citizen.

The Ninth Circuit has consistently said those are not custodial interrogation.  It's not at that point a significant deprivation of freedom of action.  They're entitled -- Border Patrol agents are entitled to make sure he's not just somebody that can be here on a walkabout down by the border.  So I don't see that Miranda warnings were necessary, and there's no indication that his will to speak was overcome.

And he made statements, apparently, to the

```
1   Border Patrol agent that -- what? -- he's a citizen of Mexico
2   with no right to be here?
3            MS. SAPTHAVEE:  Yes, in addition to a couple other
4   statements, Your Honor.
5            THE COURT:  Well, what are the other statements?  I
6   mean, the scope is limited to the purpose of the inquiry, which
7   is to verify that he doesn't have a right to be here before they
8   take him into custody.
9            MS. SAPTHAVEE:  I believe that he said that he was a
10  citizen of Mexico and born in Mexico; that he knew he was here
11  illegally, and -- now I'm unfortunately blanking -- and that he
12  had no documents giving him permission to be in the country.
13           THE COURT:  Those are all standard fare for encounters
14  between Border Patrol and people found wandering around in the
15  area, particularly people hiding under bushes.  So --
16           MS. SHERRON:  I would agree with you, Your Honor, if we
17  had Mr. Vasquez's actual statements.  The problem in this case is
18  that it's stock language that's included in I-213.
19           Mr. Vasquez doesn't speak English, and so I know for a
20  fact that those were not his words that he spoke verbatim.  It's
21  some version of a translation and paraphrasing from the agent who
22  actually wrote the I-213.
23           THE COURT:  Won't you be able to inquire into that on
24  cross-examination?  I mean, you have the substance of it from
25  what the Government says, and what particular language he used,
```

1    all of that is fair game for you to inquire into.

2              Was the inquiry in Spanish?

3              MS. SAPTHAVEE:  Yes, Your Honor.

4              THE COURT:  And the agent's a Spanish speaker?

5              MS. SAPTHAVEE:  He is trained in Spanish.

6              THE COURT:  Anything else on this motion?

7              MS. SHERRON:  No, Your Honor.

8              THE COURT:  The motion to suppress or preclude field

9    statements is denied.  The Court finds that the encounter

10   occurred at the time when there was no requirement that the agent

11   give Miranda warnings, because the defendant was not in custody

12   for Miranda purposes.

13             Concerning exactly what the defendant said, it's a

14   matter that can be inquired into by Counsel on cross-examination,

15   but the gist of it has been revealed to Counsel.

16             You don't have any intention to introduce statements

17   from the three people who were arrested beforehand, do you?

18             MS. SAPTHAVEE:  No, Your Honor.

19             THE COURT:  Okay.  That motion's granted.

20             MS. SAPTHAVEE:  Your Honor, there is one matter that I

21   would like to bring up on that front.

22             THE COURT:  Sure.

23             MS. SAPTHAVEE:  We do want to provide some evidence

24   regarding the surveillance of that group in order to provide

25   context for the defendants who --

1    THE COURT:  Sure.  That's different.  I find that

2    that's relevant.  There's inference, at least, that the defendant

3    is the missing guy.  The scope agent saw four, and in the same

4    general area, they find three, and then a fourth guy turns up.

5    It's a matter of inference whether he was the fourth guy spotted

6    by the scope, but none of that implicates hearsay or offering

7    statements by a third party as to the defendant.

8    MS. SHERRON:  I would like to point out for the Court

9    that we also learned earlier that there was scope footage of

10   those individuals that, although we had asked be preserved for

11   trial back in November, has been destroyed through routine

12   process.  So that footage is not available, and anything that

13   might have been exculpatory is not available to the defense.

14   THE COURT:  What might have been exculpatory, though?

15   They're nine miles inside the border, and they're

16   spotted by a scope operator.  Apparently, the other three people

17   were not legally in the United States.  I can't think of anything

18   that benefits any of the people involved, including the

19   defendant, from that scenario.

20   MS. SHERRON:  Unfortunately, Your Honor, we don't know

21   that.  We don't have interviews from those people; we don't have

22   any discovery that was produced pertaining to those people; we

23   don't have the scope video.  We don't know --

24   The only thing we know is where those people were

25   arrested, and we know that that is far away from where

1   Mr. Vasquez was eventually apprehended.

2           THE COURT:  How far away?

3           MS. SHERRON:  It was, I believe, over a mile east.

4           THE COURT:  Yeah.  We've got four or five hours.  I

5   mean, look.  I'm old, and I can go more than a mile in an hour.

6           MS. SHERRON:  Well, we were told by CBP agents when we

7   were actually at the site viewing that we would --

8           MS. CLARK:  Your Honor, with regard to that, we

9   received blank I-213s including their pictures and names, but it

10  had nothing about their statements with regard to whether or not

11  there was a fourth person.

12          THE COURT:  Do you have the statements?

13          MR. DESHONG:  I don't believe they were interviewed,

14  because they were sent back under the Title 42 authority.

15          THE COURT:  So did you give over --

16          The I-213s, are they what you had?  You didn't redact

17  anything?

18          MR. DESHONG:  That's correct.

19          MS. CLARK:  So, Your Honor, we don't know if they were

20  shown a photo identification.

21          THE COURT:  Apparently they weren't.  He can't give you

22  what they don't have.  If they had the stuff, if it was extant

23  and they didn't give it to you, that would be one thing, but he

24  says they picked these people up and sent them back.

25          MS. CLARK:  So it's purely speculation that Mr. Vasquez

1    was that fourth person.

2              THE COURT:  It's purely speculation the other way, too;

3    that they would have shown him --

4              Why would they show --

5              When they catch him in the United States, nine miles in

6    under a bush, hiding under a bush, why would they feel it's --

7              MS. CLARK:  We learned it wasn't actually nine miles;

8    that the agent told --

9              THE COURT:  A period of miles.  Whatever it was,

10   Ms. Clark.

11             I mean, honestly, to the extent that the motion seeks

12   to suppress or preclude anything beyond the statements of the

13   three, it's denied.

14             The Court finds that it would be relevant for the

15   Government to put on evidence that four people were seen

16   originally, and they caught three at about 7:45, and the

17   defendant was then encountered at around noon.

18             MR. DESHONG:  And, Your Honor, just for the record, the

19   scope video of defendant's arrest and the events immediately

20   leading up to it was preserved and produced.

21             THE COURT:  Okay.  Spanish-English translations.

22             Do you have anything like that that you're going to

23   show to the jury?

24             MR. DESHONG:  The only item, Your Honor, is one of the

25   A-File documents, the notice of his IJ hearing.  Everything on

1    the document's in English and in Spanish right next to each

2    other.

3            THE COURT:  I'm not so sure that notice of an IJ

4    hearing is going to come into evidence, anyway.  We'll get to

5    that.

6            404(b).  Do you intend to offer any 404(b) evidence?

7    Other act evidence?

8            MR. DESHONG:  Not other than prior deports.  Again --

9            THE COURT:  Okay.  That's an element of the crime, so

10   that's not 404(b).

11           MR. DESHONG:  Well, the allegations in his IJ hearing

12   are a little bit unique, in that they allege he's removable

13   because he's previously been deported and came back without --

14           THE COURT:  Yeah.  I'm not sure those are relevant.

15   The relevant thing is that he's been deported.  That's the

16   element; that he's previously deported and removed from the

17   United States, not the reasons for it.

18           He's got prior convictions.  As I understand it from

19   the Government's trial memo, isn't it mostly immigration stuff?

20           MR. DESHONG:  No.  I think those are just the ones

21   referenced in the trial memo.  He has multiple battery

22   convictions from Nevada.  And while in custody on his last 1326,

23   he beat an inmate with a lock in a sock and received --

24           THE COURT:  Is that the assault --

25           Was that the prison assault?

1        MR. DESHONG:  Yes.

2        THE COURT:  The Court defers on that.  I'm not going to

3   preclude the Government under 609.  I may have the Government --

4   if I do permit them to impeach the defendant in the event he

5   testifies, I may require them to sanitize the nature of the

6   conviction.  In all events, I won't allow the Government to

7   impeach by expressly naming that he's been previously convicted

8   of this offense before.  So they may have to say, "Weren't you

9   convicted of a felony back in 2015?" without describing the

10  nature of it.  I'll wait and listen to the testimony.  Under the

11  Brown case, I have to determine the importance of the testimony,

12  how central the conviction is to the defendant's credibility.

13  Those kinds of determinations can only be made after I hear the

14  defendant's testimony.  So if he testifies, I'll revisit this.

15        Preclude A-File removal documents.  Really?  How else

16  are they going to prove he's been removed?

17        MS. SHERRON:  Sorry, Your Honor.  I just wanted --

18        I don't think I got if you granted or denied the motion

19  to preclude, 404(b).

20        THE COURT:  I'm told that the only thing that may fall

21  under 404(b) are the removal -- the prior removals.  They're not

22  404(b), because they're an element of the crime.  They have to

23  prove that.  Otherwise, Mr. Deshong says no other act evidence.

24  So, yes, that's granted.  That's in the Government's case in

25  chief, of course.  If the defendant testifies and he implicates

1  something that might be -- that there might be 404(b) evidence

2  that's relevant to cross-examination, it doesn't preclude that,

3  but case in chief, no 404(b).

4      You say you want me to preclude the A-File -- A-File

5  removal documents?

6      MS. SHERRON:  Yes, Your Honor.  The documents

7  themselves are hearsay, and they don't fall into any exception.

8  They're not --

9      THE COURT:  Of course they do.  Of course they do.

10     They always have a blue sheet they say, "Look, these

11 are either business records or official records," and they have

12 to authenticate them by laying the foundation before I let them

13 in.  I've tried a zillion of these cases, and they always fall

14 into one of those two exceptions.

15     Why would you say they don't fall under any hearsay

16 exception?

17     MS. SHERRON:  Well, they lack foundation as the

18 custodian has no personal knowledge of the --

19     THE COURT:  That's the whole purpose for business or

20 official records, so we don't have to track down the person that

21 actually wrote the document as long as they're kept in the

22 regular course of business, at or near the time, factual.  That's

23 the reason we have those exceptions; so you don't have to call

24 the person historically connected to the document.

25     And how could we do that, anyway?  The documents only

1   have a useful life of the life of the person that wrote the

2   document, otherwise.

3         MS. SHERRON:  I understand, Your Honor.

4         I would just ask that the use be limited to just one

5   document and --

6         THE COURT:  One removal?

7         MS. SHERRON:  One removal and --

8         THE COURT:  How many do you intend to offer?

9         MR. DESHONG:  Two.

10        THE COURT:  Okay.  Motion's denied.  I'm going to allow

11   him to put two.  I mean, there's a point where I agree it becomes

12   prejudicial, but two is not that point.  So they have to prove it

13   is an element.  I don't know if it has a smudged fingerprint on

14   one or something like that.  I'll limit him to two.

15        MS. SHERRON:  I would also ask that the use be limited

16   just to the fact of removal and not to the alienage of

17   Mr. Vasquez.

18        THE COURT:  You're up against Ninth Circuit precedent.

19   The Hernandez case says, "Oh, no.  We don't deport U.S. citizens.

20   We don't deport people that have a right to be in the United

21   States."  So evidence of removal indicates alienage.  It

22   indicates that somebody's not a natural-born or naturalized

23   citizen.  That's black letter law.  It has been since Hernandez

24   was decided.

25        Motion's denied.  They can use it to prove that the

1  defendant is not legally in the United States and doesn't have a

2  right to be here.

3  Sworn statement.  Do you intend to offer anything on

4  that?

5  MR. DESHONG:  Not other than the field admissions and

6  one which we expect a stipulation from a prior proceeding.

7  THE COURT:  All right.  But the field admission, he's

8  not under oath.  That's not a sworn statement.

9  MR. DESHONG:  No.  I think this is referring to sworn

10  statements during prior removal proceedings.  We're not going to

11  introduce any of that.

12  THE COURT:  So that motion's granted.

13  Anything not produced in discovery will not be admitted

14  at this point.  It's too late in the day.  So I hope none of the

15  150 pages are things that you intend to admit, because I'm not

16  going to admit that at this point.

17  Unproduced statements of the defendant.

18  Did he make a post-arrest statement?

19  MR. DESHONG:  He did not, Your Honor.

20  THE COURT:  Okay.  So the only statements of the

21  defendant that you're going to offer are the field statements

22  that we've already talked about?

23  MR. DESHONG:  The field statements and admissions he

24  made during a prior guilty plea which, as I mentioned, I believe

25  we're going to have a stipulation about.  If not, it would be

```
1    through a certified transcript, sanitized to not reference it's a
2    criminal proceeding.
3              THE COURT:  Other than those things, no other
4    statements of the defendant will be admitted on representation of
5    the Government.
6              Have you seen the certified documents?  Have they shown
7    you their exhibits already, Ms. Sherron?
8              MS. SHERRON:  We just received a CD as we came into
9    court this afternoon.
10             THE COURT:  Okay.  Take a look.  If there's any problem
11   with it, of course you can raise it with me, but my experience is
12   typically they have a blue sheet.  It's a testing certificate
13   that lays out the foundation for either business or official
14   records or both.
15             MR. DESHONG:  And the blue sheet and those documents
16   were produced some time ago.
17             THE COURT:  Okay.  I don't know about this one.  Permit
18   defense counsel or defense investigator be present when A-File
19   custodian searches the database.
20             Oh, no.  No.  Not allowed.  The databases are limited
21   to people who have the right to look at the information, and that
22   doesn't include defense investigators or defense counsel.
23   Denied.
24             You're not going to call Mr. Vasquez-Perez "the alien,"
25   are you, in a derogatory way?
```

```
1            MS. SAPTHAVEE:  No, Your Honor.

2            THE COURT:  I'm not going to forbid mention of "alien,"

3    because that's in the nature of the charge, but no one is going

4    to point to him and call him an alien.

5            MS. SHERRON:  I would just ask, Your Honor, that

6    Government witnesses who are called be at least asked not to

7    refer to Mr. Vasquez as an alien.  I know that that term is

8    colloquially used by Border Patrol agents, and it's unduly

9    prejudicial.

10           THE COURT:  Instruct the witnesses not to call him "the

11   alien."  Refer to him by his surname.

12           MS. SAPTHAVEE:  Or "defendant"?

13           THE COURT:  Yeah.  Or "the defendant," yeah.

14           MS. SAPTHAVEE:  Certainly, Your Honor.

15           THE COURT:  I'm not going to send the indictment in.

16   That motion's granted.

17           The motion for attorney-conducted voir dire is denied.

18           I turn now to the Government's motions in limine.

19           MS. SAPTHAVEE:  Your Honor, I believe there might be

20   one more about precluding expert testimony that might not have

21   been addressed.

22           THE COURT:  Oh, yes.  You're right.  I jumped over it.

23           No. 8.  Do you have any expert testimony?

24           MS. SAPTHAVEE:  We will be bringing in a fingerprint

25   expert, Your Honor.
```

1          THE COURT:  Oh, okay.

2          MS. SHERRON:  Your Honor, we are asking to preclude the

3    expert testimony in this case because the Government has not met

4    their notice requirements under Rule 16(a)(1)(G).

5          We did receive just the CV of Laurie Torres as well

6    as -- basically just, like, a blanket statement of procedures

7    that she typically follows, but there's been no explanation of

8    how she actually arrived at her opinions in this case.

9          THE COURT:  Do you know how many points of comparison

10   she found between the defendant's fingerprints and the official

11   ones?  Did she put that in her message?

12         MS. SHERRON:  Yes.

13         THE COURT:  I mean, that's the substance of it.  They

14   don't have to give you chapter and verse.  Ms. Torres testifies

15   all the time.  You're entitled to voir dire her on her

16   credentials, but it sounds like you know what she's going to

17   testify to and what the specific things she's going to say are;

18   right?  She's going to say, "These fingerprints match, and I

19   found ten points of comparison," "eight point of comparison."

20   Something like that; right?

21         MS. SHERRON:  I believe so, Your Honor.  However, we

22   have no notice regarding the method that she actually used to

23   arrive at that opinion or conclusion.  So that means that it

24   doesn't meet the notice requirement.

25         THE COURT:  I deny the motion.  I find that you have

1  substantial information on which to prepare for

2  cross-examination.

3           I can tell you what she's going to say is that she has

4  a certain number of --

5           Ms. Sherron?

6           MS. SHERRON:  I'm sorry.

7           THE COURT:  I can tell you what she's going to say.

8  She's going to say, "There's a certain number of points of

9  comparison I make.  We're all born with fingerprints that are

10 unique to us, even identical twins.  They don't change in your

11 lifetime."

12          Then she'll have a graph that shows where -- she'll

13 have little dots that show the corresponding questioned

14 fingerprint and known fingerprint and say, "This is what leads me

15 to say that these fingerprints are the same."

16          That's the gist of it.

17          MS. SHERRON:  I mean, I appreciate your explanation,

18 Your Honor.  I think the point of the notice requirement is so

19 that we are able to assess in advance of trial, not two days

20 beforehand, if we need to bring our own expert.

21          THE COURT:  Well, you can.  You've had the ability to

22 do that.

23          Ms. Clark was shaking her head affirmatively when I

24 said, "Did Ms. Torres' explanation of the method that she used

25 include the number of points of comparison?"

1    She shook her head "Yes."

2    MS. CLARK:  To clarify, Your Honor, we received

3    pictures of fingerprints with dots, but it wasn't about the

4    methodology.

5    THE COURT:  But did you count the dots and say -- and

6    compare the photos together?

7    MS. CLARK:  The two photos are together, and there are

8    dots on the photo.

9    THE COURT:  Okay.  I find that sufficient production.

10   MR. DESHONG:  Your Honor, just for the record, her

11   report does indicate she uses the ACE method.

12   THE COURT:  Okay.  Which is easy to find if you look it

13   up in Google.

14   MR. DESHONG:  I've Googled it myself, and it is.

15   THE COURT:  All right.  Okay.  So that's done.

16   Admit A-File documents.  Mr. Deshong, we may have a

17   disagreement on what the relevant A-File documents are.  I don't

18   think we need to give notice of this and that.  You've got to

19   prove removal, why he was removed, whether he got notice, this

20   and that.  His fingerprints are going to be in the A-File.  The

21   documents are going to refer to him by an A number, I assume.

22   Will it be the same number?

23   MR. DESHONG:  That's correct.  We're looking to do five

24   documents total about two deports.

25   THE COURT:  That's two.  So get me the last three.

1          MR. DESHONG:  The one that has three documents is the

2  immigration judge removal has the notice appearing with the

3  allegations and the notice, the IJ order, and the warrant of

4  removal.

5          THE COURT:  You can put in the IJ -- judge's removal

6  order.

7          But you're saying you would have to segregate that

8  order?  Or are they separate pieces of paper?

9          MR. DESHONG:  They're separate.  To the extent the

10  Court's going to exclude the notice, we'd like the jury to hear

11  that there is a process and how it works.

12          THE COURT:  I don't think they need to know that,

13  because the legality of the deportation is not a matter for the

14  jury; just for the Court.  It's a waste of time to get into that,

15  and it will involve redactions and this and that and the other

16  thing.

17          MR. DESHONG:  We will not put in the notice, just the

18  IJ order and the warrant of removal for that.

19          THE COURT:  The IJ order is the one that says, "You're

20  out," and the warrant removal is the one that says, "I let him

21  out.  He got out afoot"?

22          MR. DESHONG:  That's correct.  And then it's

23  essentially the same thing for the next removal, the notice of

24  reinstatement and the warrant showing that he was --

25          THE COURT:  So a total of four documents, then?

1    MR. DESHONG:  That's correct.

2    I guess, then, the fingerprint card from this

3  apprehension.

4    THE COURT:  Got it.  Got it.

5    The Court grants admission of those things but not the

6  notice.

7    You say the matter of the prior admission regarding

8  alienage is going to be the subject of a stipulation?

9    MR. DESHONG:  That was my understanding.

10    MS. CLARK:  Yes, Your Honor.  We do intend to stipulate

11  to the proposed stipulation by the Government on that matter.

12    THE COURT:  All right.

13    And Ms. Sherron was in agreement with me when I was

14  telling Mr. Deshong the reason I'm not going to let the notice in

15  is because the legality of the deportation is an issue for the

16  court.  They want me to preclude collateral attacks on the prior

17  removal.

18    You're not going to try to do that, right?

19    MS. SHERRON:  No, Your Honor.

20    THE COURT:  Okay.  That's granted.

21    References to the defendant's health, finances,

22  education --

23    Look.  The defendant's on trial.  I'm going to allow

24  you some latitude in describing him and what his situation is.  I

25  think what they're trying to avoid here is a crying towel; you

know, "Poor me.  I had to come across.  I was --"

You know, so if you think that it's gone beyond what is permissible --

As I said, the defendant's on trial.  He's entitled to have some information about him made known to the jury, but just not ploys for sympathy.  Okay?  It's granted to that extent.

If you think that it's going overboard, you can object.

You're not going to talk about the potential punishment; right?  That shouldn't come up at all.

Defendant's not claiming duress or necessity here?

You got to answer out loud.

MS. SHERRON:  No, Your Honor.

THE COURT:  Okay.

The 609 evidence, I've ruled on; and the field statements, I've ruled on.

So I think that's it.  Trial will --

Pardon me?

MR. DESHONG:  Your Honor, I was just going to flag for the Court, we put in a motion, and we have it in our jury instructions.  We did file the motion to bar --

THE COURT:  Yeah.  I saw that.  You want me to say it's not just at the time -- precisely at the time he crossed; right?

MR. DESHONG:  That's correct.

THE COURT:  I'm inclined to do that, but I'll take it up when we have our jury instructions conferences.

1    MR. DESHONG:  Thank you, Your Honor.

2    THE COURT:  See you Wednesday morning, 9:00 o'clock.

3    The defendant's to be held either at GEO or MCC.

4    U.S. MARSHAL:  GEO.

5    THE COURT:  GEO.  Good.

6    Thank you for doing that.

7    When can you get the 150 missing pages to them?

8    MR. DESHONG:  I will go through the 300 that were

9    already put out and do an audit tonight.

10    I was just texting the A-File custodian to see if I

11    could confirm if she's still in the office.  I can check when I

12    get back.

13    THE COURT:  We've got to be Ready Freddy, because

14    they're going to be here on Wednesday at 9:00.  So I would say by

15    no later than 10:00 tomorrow, you need to turn over what has not

16    been turned over.

17    MR. DESHONG:  I think that's doable, Your Honor.  We

18    can do that.

19    MS. SAPTHAVEE:  Thank you, Your Honor.

20    THE COURT:  All right.  See you on Wednesday, then.

21    Wednesday at 9:00 o'clock here in this court.

22    (Proceedings adjourned at 5:13 p.m.)

23    -   -   -   -   -   -

24

25

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2              I, Tricia Rosate, official court reporter, in and for

3    the United States District Court for the Southern District of

4    California, do hereby certify that pursuant to Section 753,

5    Title 28, United States Code, that to the best of my ability, the

6    foregoing is a true and correct transcript of the

7    stenographically reported proceedings held in the above-entitled

8    matter and that the transcript page format is in conformance with

9    the regulations of the Judicial Conference of the United States.

10             Dated this 9th day of May 2022.

11             s/  Tricia Rosate
               Tricia Rosate, CSR No. 10891, RDR, CRR, FCRR
12             Federal Official Court Stenographer

13

14

15

16

17

18

19

20

21

22

23

24

25